THE HONORABLE ROBERT S. LASNIK

FILED ____ ENTERED
LODGED ____ RECEIVED

OCT 05 2001 MR

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MAXINE MARCUS, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AMAZON COM, INC., JEFFREY P. BEZOS, WARREN C. JENSON, JOSEPH GALLI, JR., THOMAS A. ALBERG, L. JOHN DOERR, MARK J BRITTO, JOEL R. SPIEGEL, SCOTT D. COOK, JOY D. COVEY, RICHARD L. DALZELL, JOHN D. RISHER, KAVITARK R. SHRIRAM, PATRICIA Q. STONESIFER, JIMMY WRIGHT, KELYN J. BRANNON, MARY E. ENGSTROM, KLEINER PERKINS CAUFIELD & BYERS, MORGAN STANLEY DEAN WITTER, CREDIT SUISSE FIRST BOSTON, MARY MEEKER, JAMIE KIGGEN and LISE BUYER,<br><br>Defendants.<br><br>In re AMAZON.COM, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Master File No. C-01-0358-L<br><br>__CLASS ACTION__<br><br>CONSOLIDATED COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>__DEMAND FOR JURY TRIAL__ |



CV 01-00358 #00000030

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone· 619/231-1058 • Fax: 619/231-7423

1

# TABLE OF CONTENTS

2

3

Page

4   INTRODUCTION AND OVERVIEW . . . . . . . . . . . . . . . . . . . . . 1

5   JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . 36

6   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

7   SCIENTER AND SCHEME ALLEGATIONS . . . . . . . . . . . . . . . . 58

8   BACKGROUND TO THE CLASS PERIOD . . . . . . . . . . . . . . . . . 68

9   FALSE AND MISLEADING STATEMENTS
    DURING THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . . . 72
10

11   AMAZON'S MISLEADING FINANCIAL
    REPORTING DURING THE CLASS PERIOD . . . . . . . . . . . . . . . 175

12   THE INDIVIDUAL AMAZON DEFENDANTS'
    ILLEGAL INSIDER TRADING . . . . . . . . . . . . . . . . . . . . . 187
13

  STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . 199
14

  FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . 200
15

  SECOND CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . 201
16

  CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . 201
17

  PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
18

19   JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

20

21

22

23

24

25

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax 619/231-7423

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

Plaintiffs allege:

## INTRODUCTION AND OVERVIEW

**Summary**

1. This is a securities class action on behalf of all persons who purchased the publicly traded securities of Amazon.com, Inc. ("Amazon" or the "Company") on the open market during 10/29/98 through 7/23/01 (the "Class Period"). The defendants are Amazon's top officers and directors (Jeff Bezos, Warren Jenson, Joseph Galli, Thomas Alberg, L. John Doerr, Kelyn Brannon, Mark Britto, Scott Cook, Joy Covey, Richard Dalzell, John Risher, Kavitark Shriram, Patricia Stonesifer, Joel Spiegel, Mary Engstrom and Jimmy Wright), Amazon's venture capital firm and controlling shareholder (Kleiner Perkins Caufield & Byers ("Kleiner Perkins")), and Amazon's financial advisors/underwriters and certain of their analysts (Morgan Stanley Dean Witter ("Morgan Stanley") and Morgan Stanley analyst Mary Meeker, and Credit Suisse First Boston ("First Boston") and First Boston analysts Jamie Kiggen[1] and Lise Buyer).

2 Throughout the Class Period, the trading prices of Amazon's securities were artificially inflated due to a fraudulent scheme and course of business pursued by defendants involving false and misleading statements about Amazon's business, financial condition and results, customer metrics, operations, inventories and the value of its investments in, as well as the revenues and payments to be received from, its e-commerce/Amazon Commerce Network ("ACN") partnerships, as well as the Company's overall revenue growth, liquidity and profitability prospects This enabled Amazon to (i) sell almost two billion dollars of new convertible notes to raise cash/capital that was indispensable to its funding its "Get Big Fast" expansion and diversification, (ii) issue (sell) almost 12 million shares of Amazon stock at inflated prices to make seven important acquisitions; (iii) obtain over $123 million of needed cash/capital from the exercise of "in the money" stock options by employees; and (iv) convince Amazon's vendors to extend vastly increased amounts

---

[1] Donaldson Lufkin & Jenrette ("DLJ") originally employed Kiggen and was the third financial advisor/underwriter for Amazon until it was acquired by First Boston on 11/3/00. As a result of the acquisition, First Boston assumed DLJ's liabilities and Kiggen succeeded Buyer as the First Boston analyst following Amazon.

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 1 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

1  of credit to Amazon to help fund its purchase of vastly expanded amounts of diverse inventory on
2  favorable terms. This stock price inflation also enabled Amazon's top executives and insiders to sell
3  off 6.5+ million shares of their Amazon stock and pocket $250+ million in illegal insider trading
4  proceeds.

5  **Amazon Substantially Increases Its Debt Burden**

6    3.   Originally, Amazon sold books over the Internet. By 97-98, Amazon realized it would
7  not be able to succeed as an enterprise that only sold books and thus devised and then began to
8  implement a "Get Big Fast" strategy. Through this strategy, Amazon would attempt to vastly expand
9  the size and scope of its business, acquiring or investing in other companies and greatly increasing
10 the number and type of products it sold, while massively expanding Amazon's distribution and
11 customer service infrastructure and constructing huge product distribution centers at a cost of
12 hundreds of millions of dollars. To help fund the initial phase of this expansion and diversification,
13 in 5/98, Amazon, with the help of Morgan Stanley, sold $325 million of debt securities, thus
14 substantially increasing Amazon's debt burden  However, as a result of assuming this large amount
15 of debt, Amazon's insiders and financial advisors/underwriters realized Amazon would not be able
16 to sell any significant amount of additional debt securities to raise the billions of dollars it still needed
17 to fund its "Get Big Fast" strategy. Thus, by mid-98, Amazon's ability to fund its vast expansion
18 program was ***dependent*** on Amazon being able to raise billions of dollars by selling ***equity securities***,
19 *i.e.*, common stock or notes convertible into common stock,  and Amazon's ability to expand and
20 diversify and make acquisitions was accordingly ***dependent*** on Amazon's stock performing well and
21 moving to higher levels to minimize the dilutive effect of those securities offerings

22   4.   Indeed, by mid-98, Bezos and Amazon's other top executives and Amazon's financial
23 advisors/underwriters also knew that Amazon's "Get Big Fast" strategy was extremely precarious, as
24 it required the expenditure of billions of dollars by Amazon to fund the expenditures required by its
25 "Get Big Fast" expansion/diversification strategy, while at the same time, the expansion effort would
26 result in Amazon incurring hundreds of millions of dollars of losses before the hoped-for increases

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 2 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

1    in revenues and operating efficiencies would enable it to achieve profitability. *They also knew that*
2    *in order for Amazon's "Get Big Fast" strategy to succeed, it was indispensable that Amazon be*
3    *able to sell equity securities to raise billions of dollars of additional capital to fund its*
4    *expansion/diversification program and provide Amazon a financial "cushion" to absorb huge*
5    *ongoing losses over the next few years*. Because Amazon's balance sheet could not accept any
6    substantial additional amount of pure debt, Amazon needed to push its stock price higher so that it
7    could sell hundreds of millions of dollars of new *equity securities* to raise the billions of dollars of
8    additional necessary capital and also use its stock to acquire other e-tailers so it could rapidly broaden
9    the product lines it sold: two indispensable elements of its business plan. A high Amazon stock
10   price was also critical so that Amazon would be able to *force* the conversion of the convertible
11   securities it was selling into Amazon common stock and *thus allow it to avoid being required to re-*
12   *pay the huge principal amount of those convertible securities and be able to eliminate the large*
13   *annual interest payments otherwise due on those convertible notes, as defendants knew that*
14   *Amazon's business model could not succeed if Amazon was burdened with such annual interest*
15   *payments on an ongoing basis and was forced to pay off the principal amount of those billions of*
16   *dollars of convertible securities at their maturities*

17        5.       Another key part of Amazon's "Get Big Fast" expansion/diversification strategy was
18   getting its vendors to provide increasing amounts of credit financing to it on favorable terms, as
19   Amazon's "Get Big Fast" strategy required Amazon to offer an extremely wide variety of merchandise
20   available for sale, which required a vast expansion of Amazon's inventory. It was thus essential to
21   Amazon's business operations that vendors provide Amazon increasing amounts of credit on
22   favorable terms. If credit were to be curtailed or made more expensive, Amazon would be limited
23   in the products it could offer, its liquidity would be impaired, its costs would increase and its business
24   model would be impaired. Vendors were much more willing to extend favorable credit terms to
25   Amazon when it had more than $500 million in cash, a cash level Amazon would maintain *only by*
26   *raising huge amounts of new equity capital (cash) from investors*. Pushing Amazon's stock price

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 3 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

1  higher was important for another reason – a high stock price would result in Amazon's employees'

2  stock options remaining in, or being pushed into, "the money," causing Amazon employees to

3  exercise their stock options, which would generate many millions of dollars of needed cash for

4  Amazon.  A high stock price was also important as it would allow top Amazon executives and

5  directors to pocket hundreds of millions of dollars in insider trading proceeds, as they sold off large

6  amounts of their Amazon stock, taking advantage of its inflated stock price.  In short, a high stock

7  price for Amazon common stock was indispensable for it to raise the capital it needed to fund its

8  business model and for its business strategy to succeed and for its top insiders to profit from insider

9  selling

10  **Amazon Seeks to Convince Investors that**
   **Its "Get Big Fast" Strategy Is Succeeding**

11

12  6.      As a rapidly expanding "new economy" Internet company, analysts and investors

   expected Amazon to lose money on a current basis.  So, in evaluating Amazon as an investment,
13
   analysts and investors focused first and foremost on the number of customers Amazon had
14
   accumulated, second, on how its revenues were growing and its new business ventures were
15
   succeeding, and third, on its cash revenues and liquidity  Thus, in order for Amazon to create
16
   sufficient investor interest in the Company so that its stock would trade at inflated prices, defendants
17
   had to convince investors that Amazon's business model was not only viable but was actually
18
   working, that Amazon was successfully diversifying its product line, while vastly expanding its
19
   distribution network and infrastructure and, most importantly, that Amazon was creating an ever-
20
   larger "***monetizable***" customer base of millions of persons who were purchasing increasing amounts
21
   of Amazon's products, thus enabling Amazon to harvest this huge customer base.  In turn, Amazon
22
   would harvest its huge customer base by selling ever-increasing numbers of products to them, as this
23
   would lead to rapidly increasing revenues and help provide Amazon with sufficient liquidity to
24
   sustain both the massive capital expenditures required by its "Get Big Fast" strategy and the large
25
   operating losses that strategy would result in until Amazon reached profitability.
26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 4 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

7.      Amazon aggressively pursued its "Get Big Fast" strategy throughout 98   In 5/98, Amazon tapped the capital markets by raising $325 million in new capital through the sale of straight *debt* securities.  Due to the apparent success of Amazon's "Get Big Fast" strategy, Amazon's stock climbed from $5 per share[2] in early 98 to $24-1/2 in 7/98 and Amazon and its financial advisors/underwriters began to plan another large equity securities offering so Amazon could raise the money necessary to continue to fund its expansion and diversification program.  However, as some analysts and writers began to question Amazon's "Get Big Fast" strategy, its escalating losses and its business model, Amazon's stock price declined, falling 21% in one day – on 8/31/98 – its largest one-day percentage price decline in its history as a public company – and continued to decline to as low as $11 in mid-9/98.

8      This sharp decline in Amazon's stock price endangered Amazon's business model and its financing plans, as well as Amazon's insiders' plan to unload increasing amounts of the Amazon stock they owned at much higher, inflated prices.  Defendants were determined to halt this decline in Amazon's stock and push it back higher, and knew that to do this it was imperative that they convince investors that Amazon's "Get Big Fast" strategy was succeeding – and especially that due to *strong customer growth* it was building *an ever-larger base of customers/customer accounts which Amazon would "mine" or "monetize" by selling them an ever-larger selection of products and services, increasing its revenue per customer ("wallet share") and its overall revenues, which was indispensable to the huge revenue growth necessary for Amazon to ever achieve profitability*.

9.      This key part of Amazon's business strategy was recognized by the analysts for Morgan Stanley and First Boston during the Class Period:

> • Jamie Kiggen 12/28/98: "As Amazon layers new retailing categories onto its existing asset base, it is also leveraging its existing customer base.... Remember, Amazon does not have to re-acquire the customer, it only has to direct the incremental spending stream of that customer to the new contiguous category.  As a result, Amazon captures expanded share-of-wallet."

---

[2]      Amazon's stock prices alleged herein reflect Amazon's 3-for-1 stock split on 1/4/99 and 2-for-1 stock split on 9/1/99.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax  619/231-7423

- Jamie Kiggen 6/6/00: "The 'real driver' of revenue per customer will be 'Amazon's ablity to acquire a customer and retain,that customer and cross-promote across a variety of categories which will differ depending on the consumer to increase that share of wallet ... that's been the whole point of the model almost from day one "

- Mary Meeker 4/27/00: "The success of Amazon's business model long term is highly dependent on increased share of wallet ...."

10   However, due to their access to material non-public information about Amazon's business and operations, by 10/98 (the beginning of the Class Period), Amazon's insiders knew that Amazon's business model was seriously flawed, it was not building anywhere near the numbers of total customers claimed, its new warehouse distribution centers were out of control and Amazon did not have sufficient accounting and inventory controls to control its rapidly growing business, and thus it was highly unlikely that Amazon's "Get Big Fast" strategy could succeed or would ever result in Amazon achieving profitability. However, to cover this up and deceive enough investors into believing that Amazon's increasing losses were consistent with its business strategy, and that Amazon's business model was not only working, but was cash efficient and capital effective, defendants disseminated false and misleading statements to the securities markets about Amazon's operations, business model, customer metrics and its revenue, growth, liquidity and profitability prospects.

**Misleading Customer Metrics Drive Up Amazon's**
**Stock Price During the Class Period**

11.   On 10/28/98 – the start of the Class Period – when Amazon announced a loss for the 3rdQ 98, it stressed *that Amazon now had 4.5 million customer accounts* *The Wall Street Journal* reported:

> Amazon.com Inc. beat analysts' expectations for the third quarter ....
> *Customer numbers were also up strongly, Amazon said it now has 4.5 million*
> *customer accounts, up from 977,000 in the same period a year earlier and 3.3*
> *million in the period ended in June.... "Adding so many new customers in what is*
> *generally considered an off-season is tremendous" said Lise Buyer, an analyst with*
> *Credit Suisse First Boston. "It proves that Amazon is now a mass market*
> *phenomenon, rather than just a service used by techies*."

On 10/29/98, First Boston reported· "*Customer growth of 1.2 million was really impressive. While*
*skeptics argue that Amazon is catering to a small group of techno-dweebs, a customer count of*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 6 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax· 619/231-7423

1 | *nearly 4.5 million refutes that point.... With an active customer base of that size, Amazon is clearly*

2 | *reaching out to a mainstream audience.*" On 11/3/98, Morgan Stanley reported "*Cumulative*

3 | *customer accounts grew to an impressive 4.5 million ... in what should have been a seasonally*

4 | *weak summer.... [E]ach of [Amazon's] customers had handed over his/her credit card number,*

5 | *entered his/her e-mail and home addresses, and made a purchase, all of which adds up to, in our*

6 | *view, a very large, valuable, and growing asset for the company.*" Amazon's 3rdQ 98 customer

7 | growth was tremendously important, the *Dow Jones News Service* reported:

8 |         Amazon ... beat Wall Street expectations Wednesday, prompting analysts to
9 | use words like "*fantastic*" and "*excellent*" to describe the third quarter.... "It was a *fantastic quarter* ..." said .. an analyst .... "*They are the kind of numbers that*
10 | *Amazon has shown an ability to report to continue to impress Wall Street,*" [an analyst said] ....

11 |     12.    Amazon's stock moved higher on these "*excellent,*" "*tremendous*" and "*fantastic*"

12 | customer metrics. By late 11/98, the stock reached $35-$38, its then highest ever level. As Amazon's

13 | stock moved higher in the Fall of 98, Amazon and its financial advisors/underwriters began to plan

14 | and work on a huge convertible note offering to take place in early 99 – after Amazon had reported

15 | what defendants hoped would be very good results in the 4thQ 98 (Amazon's most important

16 | (holiday) quarter), and after they had driven Amazon's stock price even higher. As Amazon's stock

17 | soared to artificially inflated levels, Amazon's top insiders took advantage of this by selling off 2.54

18 | million shares of their Amazon stock at as high as $38 for $60 million in illegal insider trading

19 | proceeds – *by far the largest "burst" of insider selling by Amazon's officers and directors in the*

20 | *history of the Company to date*!

21 |     13.    A 12/14/98 *Business Week* cover story on Amazon stated: "*[I]n nearly the blink of*

22 | *a cursor, Amazon has blossomed into cyberspace's biggest consumer merchant, with 4.5 million*

23 | *customers .... No wonder investors are gaga.*" On 1/11/99, just after Amazon announced better-

24 | than-expected 4thQ 98 results, First Boston reported: "*Increasing returns economics work; big*

25 | *really does grow bigger faster.  Amazon.com continues to show faster rates of growth and*

26 | *significantly higher revenues per customer .... A larger base of customer/evangelists.  It helps to*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 7 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1  *have nearly 6.0 million reference accounts, each of who will likely tell a friend about shopping on-*
2  *line.*"

3      14.     On 1/26/99, Amazon officially reported its 4thQ 98 results, announcing "*that*
4  *cumulative customer accounts increased ... to over 6.2 million at December 31, 1998.*" On 1/27/99,
5  First Boston reported: "*Amazon's growth dynamics continue to be unprecedented .... We are very*
6  *big fans of the long term potential and story for both the company and the stock.*" On 1/27/99,
7  S.G. Cowen reported: "And You Thought You Already Knew What A Great Q4 Amazon Had?
8  Think Again.  *Amazon reported a December quarter that ... provided as much jaw-dropping*
9  *material as any quarter in their short history.  Without question, Q4:98 provided the most*
10 *compelling sets of data points yet .... AMZN [had a] total [of] 6.2 million customers.*" *Bloomberg*
11 carried a story on Amazon's 4thQ 98 results, quoting an analyst: "'*Everyone is willing to overlook*
12 *losses' because Amazon.com has increased its revenue and customer base so quickly* "

13      15.     In reaction to the announcements of 1/26-27/99, Amazon's stock soared from $55 on
14 1/25/99 to $69-7/8 on 1/27/99.  As Amazon's stock soared higher, on 2/3/99, Amazon, Morgan
15 Stanley and First Boston sold $1.25 billion in 4.75% convertible subordinated notes – *the largest*
16 *convertible note offering in history up to that point in time* [3]  Taking advantage of the artificial
17 inflation of Amazon's stock price, during 2/99 top Amazon insiders sold off another 303,000 shares
18 of Amazon stock, pocketing another $17.1 million in illegal insider sales proceeds.

19      16.     On 3/29/99, Amazon announced its new auction site, stating it would enable users to
20 "*Reach Amazon.com's Community of 8 Million Pre-Registered, Experienced Online Buyers ....*
21 *Amazon.com's 8 million customers are pre-registered to begin buying and selling immediately in*
22 *more than 800 categories ....*"  On 3/29/99, First Boston issued a report on Amazon, stating
23 "*Amazon's customer base has increased from 6.2 million at 12/31/98 to more than 8.0 million ....*"
24 On 4/16/99, *Associated Press* and the *Dow Jones Business News*, respectively, reported about
25 Amazon:

26 
_____
[3]     The 4.75% convertible notes were convertible into Amazon stock at $78 per share.

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 8 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

- "The online bookseller's shares soared ... after Donaldson Lufkin & Jenrette analyst Jamie Kiggen raised his investment rating and price target on the stock. Kiggen said Amazon is likely to be *'one of two or three consumer auction sites that wind up dominating the enormous consumer auction category' on the Internet*."

- "Kiggen believes the company's new online auction business will boost revenue and profit margin. The analyst believes Amazon will be among the 'two or three consumer auction sites that wind up dominating the enormous consumer auction category,' which he projects will be $35 billion in 2003.... *Kiggen said Amazon's initial execution in entering the online auction market has been 'superb'*"

17.     On 4/29/99, Amazon reported its 1stQ 99 results. Despite better than forecasted 1stQ 99 revenues, Amazon's "Get Big Fast" strategy had caused expenses to soar much higher than anticipated, resulting in another increase in its forecasted losses to occur over the next one or two years. However, Amazon also launched its online auction business and assured investors that its business model was *"cash efficient,"* viable and working and that the increasing losses were consistent with Amazon's strategy and that its key customer metrics – especially its total *"customer base"* or *"accounts"* – were growing rapidly and thus Amazon was building a successful business by increasingly monetizing a huge customer base which would ultimately generate large profits. During 4/99, defendants stated that Amazon had more than 8.4 million customers, its business model was *"cash favored"* and *"capital efficient,"* that its new auction site was *"off to a very fast start"* and that Amazon did a *"remarkable job"* at *"monetizing"* customers once it got them to make their first order, *i.e.*, generating *"greater and greater revenue from them by increasing purchasing frequency and purchase size."*

**Amazon Insiders Continue Their Illegal Stock Sell-Off**

18.     However, in the 5/3/99 edition of *Barron's* magazine, a column about Amazon claimed that its business model was flawed, it would likely never make a profit and that its stock was probably only worth $5-$10. Amazon's stock plummeted from $86-1/32 on Friday, 4/30/99, to $75-1/16 on Monday, 5/3/99, and to $70-1/4 on Tuesday, 5/4/99. As Amazon's stock was falling, Amazon's top insiders learned that *Barron's* was working on a *cover story* on Amazon that would be critical of the Company, which they knew would likely have a very negative impact on Amazon's stock. In violation of their duty to "abstain or disclose" under these circumstances, beginning in early

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax. 619/231-7423

1   5/99, several top Amazon insiders began to sell off their Amazon shares – *unloading 511,770 shares*

2   *of their Amazon stock at as high as $79.97 per share pocketing $36.1 million in illegal insider*

3   *trading proceeds during 5/99 – without disclosing that they knew this very negative cover story*

4   *from a prestigious financial publication was being prepared for publication*.

5         19.    As Amazon's top insiders had anticipated, the 5/31/99 edition of *Barron's* ran a cover

6   story entitled "Amazon.bomb," which was critical of Amazon's business, predicted that Amazon

7   would likely not succeed and asserted that its stock price was a worth less than $10 per share.

8   Amazon's stock price collapsed from $60-3/16 on Friday, 5/28/99 (the last trading date before the

9   *Barron's* cover story was published), to $52-1/2 on Tuesday, 6/1/99 (the first trading day after the

10  publication of the article), and then fell to as low as $48-9/16 on 6/2/99, *less than one-half its high*

11  *of $101 about a month earlier*!  Amazon's insiders knew that this type of adverse commentary was

12  extremely dangerous, because if it gained widespread credence in the investment community, it

13  would drive Amazon's stock price even lower, which would destroy a key element of Amazon's

14  business model, *i.e.*, a high and increasing stock price, as a falling/low stock price would make it

15  much more difficult, if not impossible, for Amazon to continue to raise the billions of dollars of

16  additional capital it still needed to raise to complete its "Get Big Fast" expansion and diversification,

17  reduce the amount of cash Amazon received annually due to the exercise of "in the money" Amazon

18  stock options by Amazon employees, *cripple Amazon's ability to continue to make acquisitions of*

19  e-commerce companies using Amazon stock as currency, and result in the billions of dollars of

20  convertible notes it had already sold and/or would continue to sell never being converted into equity,

21  thus saddling Amazon with the severe financial burden of making huge annual multi-million dollar

22  interest payments on those securities for several years and then being forced to pay off those notes

23  at par at their maturity, costing it billions of dollars.

24        20.    These developments – Amazon's falling stock price and its increasing losses – put

25  tremendous pressure on defendants to find some way to not only halt the precipitous decline in

26  Amazon stock, but to push it back up to much higher levels so that Amazon could continue to use

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 10 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1  its stock to make acquisitions, Amazon's top insiders could continue to sell off shares of their

2  Amazon stock at inflated prices, employee stock options would stay or move into "the money" and

3  would be exercised and generate millions of dollars of needed cash for Amazon, and so it could, at

4  a propitious time, complete another large convertible note offering to raise hundreds of millions of

5  dollars of new capital which it desperately needed to maintain its liquidity while it attempted to fund

6  and implement its "Get Big Fast" strategy.

7      21.   On 6/7/99, Amazon announced it was passing an "*e-commerce milestone*" – "*10*

8  *million customers in its customer base.*"  During 6/99, Bezos also told investors that the real reason

9  Amazon was increasing the discounts on books it sold was not "*weakness*," but rather "*strength*" –

10  actions made possible because of Amazon's "*efficiency of scale*" and a "*business model that makes*

11  *sense.*"  By 7/99, defendants stated that Amazon's "*community of online shoppers*" had grown to

12  10.7 million.  During 7/29/99-8/10/99, Amazon's insiders *unloaded another 270,000 shares of their*

13  *Amazon stock, pocketing $12.5 million in illegal insider trading proceeds.*

14      22.   By 10/99, *Amazon represented it had over 13 million customers* and that:

15     •   Amazon's growth formula was simple  First, Amazon invests big in a big global
16         market.  Second, Amazon drives revenue and customer growth globally in that
       market. *Third, Amazon begins to reap the benefits which include profitability and*
       *significant cash generation.  Fourth, Amazon repeats steps one through three as*
17         *fast as it can.*

18     •   *Amazon's strong new customer growth fueled a virtuous feedback loop.  Executing*
       *this strategy successfully would lead to a multi-billion dollar revenue company that*
19         *profitably serves tens of millions of customers and with unusual returns on*
       *invested capital.*
20

21     •   Amazon had just scratched the surface of what was possible, as its *business model*
       *worked well.*

22  On 11/10/99, Amazon announced a "*$150 Million e-Commerce Alliance*" with NextCard that

23  "*meet[s] the online and offline shopping needs of the more than 13 million Amazon.com*

24  *customers.  [And would] generate $150 million in fees for Amazon.com as its growing customer*

25  *base adopts the new card.*"

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934   - 11 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

23.    Defendants reversed the 5/99-6/99 precipitous decline in Amazon's stock price and, by late 99, Amazon's stock had recovered, more than doubling from its 6/99 low of $44-7/8 to over $90 in early 10/99, and moving higher to its all-time high of $113 in early 12/99. *As Amazon's stock moved higher during 8/99-11/99, Amazon's top insiders sold off 1,216,000 shares of their stock for $84.7 million in illegal insider trading proceeds – the largest clump of insider selling by Amazon's insiders in the history of the Company*. During 4/99-11/99, Amazon also issued at least 11.6 million shares of its stock to fund seven acquisitions of other companies and took in some $64+ million in cash from the exercise of millions of "in the money" stock options by Amazon employees.

**Defendants Lie About the Nature of Several E-Commerce Agreements to Complete a Critically Necessary Equity Offering in 2/00**

24.    Having manipulated Amazon's stock price back up to the levels necessary to try to sustain its business model and having conditioned the market in a manner necessary for Amazon to be able to pull off another huge offering of equity securities, by the Fall of 99, defendants were secretly working on another large offering of convertible notes, to be completed in early 00 after Amazon announced what defendants hoped would be extremely strong 4thQ 99 (holiday) results. So-called strategic alliances were also being announced. On 12/1/99, Amazon announced a "*Multi-million Dollar Marketing and Strategic Alliance With ... Ashford.com*," representing that "*Ashford.com will offer special promotions and unique benefits to Amazon.com's 13 million customers*."

25    However, on 1/4/00, Amazon pre-announced 4thQ 99 revenues that were below the investment community's expectations and larger 4thQ operating losses than had been anticipated – and *a very large and wholly unexpected $39 million inventory writeoff* – increasing concerns that Amazon's basic business model was impaired and that it would take longer than anticipated for it to reach profitability, meaning the Company would have to endure larger losses for a longer period of time than expected, making Amazon's liquidity a concern. *The release of Amazon's 4thQ 99 results on 1/4/00 resulted in Amazon's stock falling from $91-1/2 to $68 on 1/5/00*. Amazon's stock fell

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax 619/231-7423

1  to as low as $60 on 1/21/00 and as low as $58-7/16 on 1/31/00 – *a huge decline from its all-time*

2  *high of $113 on 12/9/99* – as concerns mounted over its business model, customer base and whether

3  its cash reserves were sufficient to sustain its expansion and operations until Amazon reached

4  profitability.

5       26  This sharp decline in Amazon's stock – a wipe-out of over $18 billion in market

6  capitalization in about one month – *created concern among the defendants*. They knew that, in

7  truth, Amazon's 4thQ 99 results confirmed that the Company's business model was, in fact, badly

8  impaired, that Amazon was suffering from excessive customer churn, did not have nearly as many

9  "loyal" customers as claimed and would likely never achieve profitability. However, Amazon

10  desperately needed to raise hundreds of millions of dollars of new capital to help Amazon maintain

11  its liquidity, while it attempted to go forward with its "Get Big Fast" expansion and diversification

12  program. This collapse in Amazon's stock gravely endangered defendants' plan to raise the additional

13  equity capital Amazon needed. In order to reverse this decline in Amazon stock and push it up

14  higher so Amazon could raise the hundreds of millions of dollars in new capital needed, defendants

15  undertook a huge public relations offensive to boost Amazon's stock price and facilitate another large

16  offering of convertible notes. Between 1/21/00 and 2/12/00, Amazon issued a flurry of releases

17  announcing agreements with other e-commerce companies which *it represented would generate*

18  *hundreds of millions of dollars of cash payments to Amazon, greatly benefitting its liquidity and*

19  *enabling it to achieve profitability faster than earlier expected*.

20       27.  These announcements of new multi-year partnership deals with Greenlight.com,

21  drugstore.com, Audible, Inc. and Living.com, which purportedly called for $135 million in annual

22  payments – *some $500 million in total cash payments to Amazon over the next few years* – were

23  accompanied by indications Amazon would announce more such deals in the near term. In addition,

24  when Amazon reported its 4thQ 99 results on 2/2/00, *it stated it had 17 million customers and that*

25  *customers had purchased an average of $116 of merchandise from Amazon during the last 12*

26  *months, a sharp increase from the average purchased in the prior 12-month period, and*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 13 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1  *forecasted 01 and 02 revenues of $5 billion and $7 billion.   Amazon's financial*

2  *advisors/underwriters went into a frenzy over these developments.*

3     (a) On 2/3/00, DLJ reported: "Amazon.com Reports Strong December Quarter

4  Results, Bullish Guidance On Progress To Profitability":

5    Looking forward, the company indicated continued gross margin expansion
   throughout FY'00 ... as Amazon ... sees the impact from its numerous *high-margin*
6  *strategic partnerships, such as NextCard, Drugstore.com, Ashford.com,*
   *Greenlight.com, Living.com and Audible.com.*

7

8    *The Model Is Working. And Now We Have The Proof. Amazon lived up*
   *to its promise this quarter of providing us with enough data to rebuff critics who*
   *said the Amazon model was inherently flawed structurally and unprofitable.*
9  *Amazon currently generates $116 in revenue per customer (up from $108 in Q3)*
   *....*

10

11     (b) On 2/3/00, Morgan Stanley reported: *"Inflection! Amazon.Calm!"*.

12  We believe that investors were reacting positively to several factors ... 2) *the strong*
   *customer metrics – 17MM loyal customers with increasing sales per head and with*
   *rising opportunities to monetize these customers ....*

13

14      &ast; &ast; &ast;

15  *It ain't easy to get 17MM happy customers in 5 years*!

16  &bull; *Call us melodramatic?   Go ahead.   But we continue to maintain that*
   *Amazon.com may be on its way to becoming one of the greatest companies of our*
17  *day*.

    &ast; &ast; &ast;

18

19  Three key points here: 1) With stakes in now 4 public companies – drugstore.com,
   Sotheby's, NextCard, and Ashford.com, *Amazon now has a public investment*
20  *portfolio conservatively worth $500MM; 2) Amazon is developing into an e-*
   *commerce incubator, with the option to deepen its relationships with many of these*
21  *partners; and 3) these partnerships are now developing into a high-margin revenue*
   *stream for Amazon.   Combined, the multi-year* <u>*cash*</u> *commitments to Amazon from*
   *its partners now total over $450MM.*

22

23    28. As a result of defendants' public relations offensive, Amazon's stock soared back

24  higher from its low of $58-7/16 on 1/31/00 to $84 on 2/8/00 *in just six trading sessions* – an increase

25  of 43% in the stock price and $9 billion in market capitalization.  As Amazon's stock price recovered,

26  defendants moved quickly to complete the critically necessary equity offering they had been planning

and/or working on for months.  On 2/16/00, Amazon, Morgan Stanley and First Boston completed

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax: 619/231-7423

1   an offering of €690 million of 6.875% Amazon convertible notes pursuant to a Prospectus which

2   stressed the benefits of Amazon's recent e-commerce partnership deals, indicating that they would

3   result in the payment of millions of dollars to Amazon. While Amazon's stock price was inflated in

4   2/00, Amazon insiders also unloaded another 100,000 shares of their Amazon stock, pocketing

5   another $6.8 million in insider trading proceeds.

6        29.     In 4/00, Amazon reported its 1stQ 00 results – *and that its cumulative customer*

7   *accounts increased by 3.1 million during the first quarter and it had 20 million customer accounts*

8   *with trailing 12-month sales per customer of $121, up from $107 for the same period a year ago*.

9   In early 5/00, Bezos and other top Amazon insiders learned that Lehman Brothers was preparing a

10   very negative report on Amazon. Knowing that this negative report would have an extremely adverse

11   impact on Amazon's stock price, in violation of their duty to abstain or disclose under such

12   circumstances, Amazon's insiders quickly sold off another 432,000 shares of their Amazon stock for

13   $23.6 million in illegal insider trading proceeds. On 6/22/00, when Lehman Brothers issued its

14   critical report on Amazon, Amazon's stock plunged, falling from $46-7/16 on 6/22/00 to as low as

15   $32-15/32 on 6/23/00 – one of the largest one-day percentage declines of its stock in Amazon's

16   history, *pushing Amazon's stock down to its lowest level in 12 months*. Amazon stated the Lehman

17   Brothers' report was "*unadulterated hogwash*," "*completely wrong*," "*baloney*" and "*absurd*,"

18   representing "*our business model works*" and reaffirming to investors that Amazon had *20 million*

19   *customers and its business model would enable it to make money*.

20        30.     During the last half of 00, Amazon continued to report a growing number of

21   customers (25 million by 10/00) and increasing average customer purchases, stating it was gaining

22   "*tremendous traction*" in *all of its business*, no one could "*rightly question*" Amazon's basic

23   business model and it was just a question of "*when*" Amazon would reach profitability, as it would

24   make "*consistent and clear progress toward profitability every quarter*" until it got there – *reaching*

25   *over $1 billion in annual gross profits and double-digit operating margins*. By 12/00, defendants

26   also forecast 50% revenue growth – and 01 and 02 revenues of $4.1 billion and $6.1 billion for

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1    Amazon.   On 12/18/00, Bezos told *Fortune* magazine:   *"'We are very much driving toward*

2    *profitability,'"* insisting *"Amazon is this close to making money"* and *"'We're going to become*

3    *profitable .... That's right:   We're aiming to have sales of $5 billion, produce over $1 billion in*

4    *gross profits, and achieve solid operating profitability ....'"*

5          31.    On 1/30/01, when reporting its 4thQ 00 results, Amazon announced that it would be

6    closing its McDonough, Georgia distribution center, that its customer service center in Seattle was

7    laying off 15% of its employees (1,300 persons) and that it was *cutting back on its revenue growth*

8    *forecast to 20%-30% per year*   However, defendants also assured investors:

9          •       Amazon's international business was doing fantastically well.

10         •       Amazon was prudently balancing growth and profitability and its model was
                   demonstrating asset efficiency, both on the balance sheet and in its cash flow.
11

12         •       *Amazon remained as bullish as ever*, was forecasting 01 and 02 revenues of $3.4-
                   $3.5 billion and $4.3 billion *and that it would reach pro forma profitably by 4thQ*
13                 *01, even if the economy continued to slow.*

14         •       Long-term margins of approximately 10%.

15         •       Profitability was in sight.

16         32.    In mid-to-late 1/01, Bezos learned that Lehman Brothers was preparing another very

17   negative report on Amazon's business by the same analyst who wrote the first critical report, claiming

18   Amazon would face a creditor squeeze due to its deteriorating working capital position.   Given

19   Amazon's stock decline in 6/00 when Lehman Brothers' first negative report on Amazon was issued,

20   the prospect of another negative Lehman Brothers' report was a very adverse development for

21   Amazon's insiders.   Fearing this negative report would drive Amazon's stock lower, after Amazon

22   tried unsuccessfully to prevent the publication of this report, in 2/01 Bezos sold 800,000 shares of

23   his Amazon stock for $11.6 million.   When Lehman Brothers published its report, indicating that

24   Amazon's working capital had declined dramatically and that it would likely face a *"creditor's*

25   *squeeze"* later in 01, Amazon said *"Obviously you can't take this seriously . .. It's a silly report .   "*

26         33    During 3/01-4/01, Bezos continued to assure investors that Amazon would achieve

     20%-30% revenue growth in 01 and would be pro forma profitable by the end of 01, allowing for

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1  the slowing economy, and that this was *a conservative forecast.* By late 4/01, Amazon represented

2  it was making *"solid progress"* toward profitability – telling investors Amazon had *"nailed our*

3  *profitability goals and significantly exceeded expectations"* in the 1stQ 01. During early 5/01,

4  Amazon's insiders sold 520,000 shares of their Amazon stock for $8.6 million in illegal insider

5  trading proceeds. In 6/01, Amazon assured analysts it remained *"well-positioned"* to show pro forma

6  profits by the 4thQ 01 – *"The bottom line is we are bullish about our '02 and '03 growth*

7  *prospects."* Amazon also repeated its forecasts of 4thQ 01 pro forma profitability and forecast

8  Amazon would also achieve pro forma profitability in 02, stating it was *"well positioned"* to achieve

9  such profitability.

10      34  While Amazon stock declined substantially during 00-01 as analyst criticism of

11  Amazon escalated, Amazon's stock continued to trade at artificially inflated prices due to defendants'

12  continuing concealments and misrepresentations. Defendants' fraudulent scheme and course of

13  conduct was a "rolling fraud" whereby defendants consistently and continuously made false and

14  misleading statements throughout the Class Period, although they differed in context and character

15  depending upon the subjects defendants' statements addressed at various points during the Class

16  Period.

17      35  Then, on 7/23/01, Amazon reported much worse-than-anticipated 2ndQ 01 results,

18  showing lower than anticipated revenues, larger than anticipated operating losses and anemic

19  customer growth. *Amazon also sharply cut its forecast of revenue growth for 01-02 to as low as*

20  *10%.* One analyst stated: *"'In the space of a quarter, they are saying growth for the full year will*

21  *be only a little more than half of what they thought it was going to be three months ago'"* As a

22  result of the revelations of 7/23/01 – which largely debunked the hoax that Amazon had created a

23  viable business with a workable business model that would generate sufficient revenue growth to

24  ultimately obtain profitability – Amazon stock collapsed from $17-1/8 to $11-29/32, *a huge 25%*

25  *decline in one day. This was one of the largest one-day percentage declines in Amazon stock in*

26  *its history as a public company and the size of that decline, combined with a stock volume of 32.5*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 17 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1  *million shares on that day, demonstrates that the securities markets were caught off guard and*

2  *unaware of the extremely negative information finally revealed by Amazon on 7/23/01.*  Amazon's

3  stock has continued to fall as analysts have digested the reality that the Company is likely doomed

4  and will likely never achieve even pro forma, let alone Generally Accepted Accounting Principles

5  ("GAAP"), profitability – *reaching a low of $5-43/64 on 9/27/01*.

6  36      Defendants' insider trading before and during the Class Period is set forth below:

| Defendant | Stock Holdings at 7/23/01 | Class Period Sales | Total Holdings(1) | Proceeds | % of Holdings Sold(2) | % of Holdings Sold(3) |
|---|---|---|---|---|---|---|
| Alberg | 1,171,690 | 1,300,000 | 2,471,690 | $ 56,208,522 | 52.60% | 52.60% |
| Bezos | 115,889,346 | 2,548,650 | 118,437,996 | $ 59,852,774 | 2.15% | 2 15% |
| Brannon | 0 | 12,000 | 12,000 | $ 864,725 | 100 00% | 17.24% |
| Britto | 47,536 | 47,000 | 94,536 | $ 2,126,625 | 49.72% | 49.72% |
| Cook | 69,698 | 143,000 | 212,698 | $ 10,536,677 | 67.23% | 15.33% |
| Covey | 1,583,200 | 323,000 | 1,906,200 | $ 16,613,338 | 16.94% | 10.45% |
| Dalzell | 0 | 650,000 | 650,000 | $ 26,667,062 | 100.00% | 71.04% |
| Engstrom | 360,000 | 156,000 | 516,000 | $ 9,078,082 | 30.23% | 9.77% |
| Risher | 408,000 | 630,000 | 1,038,000 | $ 32,025,772 | 60.69% | 21.69% |
| Shriram | 146,688 | 312,000 | 458,688 | $ 12,394,580 | 68 02% | 47.16% |
| Spiegel | 100,000 | 170,000 | 270,000 | $ 6,653,671 | 62.96% | 9 94% |
| Stonesifer | 85,640 | 137,770 | 223,410 | $ 10,313,847 | 61 67% | 20.46% |
| Wright | 7,500 | 150,000 | 157,500 | $ 7,526,744 | 95.24% | 19.80% |
| **TOTALS:** | | 6,579,420 | | $250,862,418 | | |

(1)  Total holdings include common stock held and options exercised
(2)  Includes common stock and options exercised
(3)  Percent sold totals derived from total holdings that include common stock and vested options

37.      During all or part of the Class Period, defendants concealed or failed to disclose the

following material adverse facts which made their statements false and misleading:

**Customer Metrics**

(a)      Amazon was falsifying its key customer metrics in order to artificially inflate

its reported number of customers/customer accounts to make Amazon's customer base appear much

larger than it actually was, and its business and business model look more successful than they

actually were, and to create the impression that Amazon had a much larger number or base of

customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue

growth;

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1        (b)      Amazon was artificially inflating its stated total number of customers/customer

2 accounts by including persons who had not purchased from Amazon in over 12 months, which

3 Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

4 likely that such a person (*i.e.*, a non-purchaser in the prior 12 months) would not be re-purchasing

5 from Amazon;

6        (c)      Amazon was artificially inflating its stated number of total customers/

7 customer accounts by counting customers based on e-mail addresses, *not* customer names, even

8 though Amazon knew from analysis of its customer data that a material number of persons who had

9 purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

10 *even quadruple counted*.  Defendants knew that some customers submitted different e-mail

11 addresses intentionally to take advantage of special offers, and that this contributed to the customer

12 over-counting;

13        (d)      In order to artificially inflate its total number of customer accounts, Amazon

14 was intentionally not purging its customer base or list of what it knew were dormant, outdated,

15 inactive and duplicative accounts of persons who had ceased doing business with Amazon;

16        (e)      In truth, Amazon was suffering serious customer "churn" and was losing

17 nearly as many customers as it was gaining.  The truth about Amazon's customer metrics is shown

18 below:

| | 9/30/98 | 12/31/98 | 3/31/99 | 6/30/99 | 9/30/99 |
|---|---|---|---|---|---|
| Total Customers reported | 4.5M | 6.2M | 8.4M | 10.7M | 13.1M |
| New Customers reported | 1.2M | 1.7M | 2.2M | 2 3M | 2.4M |
| Actual Customers | 4.1M | 5.7M | 7 7M | 9.4M | 11.3M |
| Lost/Former Customers | 400,000 | 500,000 | 800,000 | 1.3M | 1.8M |
| Percentage of Lost/Former Customers | 9% | 8% | 8% | 12% | 13% |

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

| | 12/31/99 | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 |
|---|---|---|---|---|---|
| Additions to Lost/Former Customers (lost in quarter) | | 100,000 | 300,000 | 500,000 | 500,000 |
| Actual Net New Customers | | 1.6M | 1.9M | 1 8M | 1.9M |

| | 12/31/99 | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 |
|---|---|---|---|---|---|
| Total Customers reported | 16.9M | 20.0M | 22.5M | 25.3M | 29.4M |
| New Customers reported | 3.8M | 3.1M | 2.5M | 2.8M | 4 1M |
| Actual Customers | 14.1M | 15.9M | 17.0M | 18.2M | 19.8M |
| Lost/Former Customers | 2.8M | 4.1M | 5.5M | 7.1M | 9.6M |
| Percentage of Lost/Former Customers | 17% | 20% | 24% | 28% | 33% |
| Additions to Lost/Former Customers (lost in quarter) | 1.0M | 1.3M | 1.4M | 1.6M | 2.3M |
| Actual Net New Customers | 2.8M | 1.8M | 1.1M | 1.2M | 1.8M |

Thus, contrary to the success of its business model and strong revenue growth prospects conveyed by the number of new customers and total customers which defendants emphasized each quarter, Amazon's net customer growth was anemic. The percentage of lost/former customers was growing precipitously during the Class Period;

(f) Amazon's creation of the new trailing 12-month average customer revenue metric first announced late in 1/00 ($116 per customer), just before Amazon's sale of €690 million in 6.875% convertible notes, was not created "to remove the effects of seasonality" as represented, but rather to distort the fact that more and more "customers" were not returning to make purchases, which is the real reason Amazon refused to disclose for each quarter the number of customers who made purchases;

(g) Amazon had inflated the revenue per customer metric at 12/31/99 by improperly including non-mail order sales of a company recently acquired by Amazon and not including the mail order customers in this calculation;

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

1    (h)    By dividing Amazon's prior 12-months revenue only by customers who had

2 actually purchased from Amazon in the prior 12 months, Amazon used a calculation that eliminated

3 millions of dormant, outdated and inactive former customers – a subterfuge to conceal the fact that

4 Amazon's true average revenue per customer was declining, not increasing;

5 **Operating Problems**

6    (i)    The statements that Amazon's business model "worked," had been "proven,"

7 was "cash" and "capital" efficient and would permit Amazon to be "profitable," and that Amazon's

8 pricing practices were "sustainable" were all false.  In fact, Amazon's business model did not and

9 could not work, as its costs were too high, its liquidity and working capital too low, its revenue

10 growth too slow and its customer attachment and retention rates too low to permit Amazon to succeed

11 financially or ever reach actual profitability, given the massive debt that Amazon was accumulating

12 to implement its "Get Big Fast" expansion and diversification strategy;

13    (j)    It was not true that Amazon's ever-increasing discounts for its books – its most

14 important store – was out of "***strength***" or ability to cut prices due to "***the efficiencies of scale***" of

15 Amazon's operations; in fact, these increasing discounts were being implemented to meet competitive

16 pressures and actions of other book sellers and were adversely impacting the operating results of

17 Amazon's book operations and thus Amazon overall;

18    (k)    Amazon's new auction site, launched in 3/99, was an immediate failure, not

19 "***off to a very fast start***" as claimed, as it failed to attract anywhere near the level of activity actually

20 forecast or necessary for this new business to succeed.  To create the appearance of artificial activity

21 on Amazon's auction site so that it would appear to be more successful than it really was, Amazon

22 caused its employees to list goods for sale on the site and submit bids for merchandise on the site so

23 as to create the appearance of greater auction site activity than actually existed,

24    (l)    The statements that Amazon had become an "efficient e-commerce incubator"

25 with the ability to quickly and efficiently launch profitable e-commerce enterprises was not true as,

26 in fact, every one of the e-commerce investments/ACN partners Amazon was working with (*i.e.*,

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1   Geoworks, drugstore.com, Pets.com, HomeGrocer.com, Sotheby's, Liquid Audio, Gear.com, Della
2   and James, NextCard, Ashford.com, Greenlight.com, Audible, Inc. and living.com) were struggling,
3   failing, unprofitable, not generating cash and selling far fewer items through Amazon than
4   anticipated, and thus those businesses were not succeeding and therefore there was no basis for
5   Amazon's representation of efficient creation of successful and profitable e-commerce enterprises;

6           (m)     The statements that Amazon had evolved into a business with mutually
7   enforcing divisions or stores and that *each product or service it added helped it amortize its*
8   *investments, reduce its unit costs and thus drive Amazon toward profitability were false*, as many
9   of the additional products and services Amazon was adding to offer for sale were so unsuccessful
10  that they exacerbated Amazon's financial problems, generated excessive inventories and adversely
11  impacted Amazon's cash flow, liquidity and financial condition;

12          (n)     Amazon's lawn and patio store was not successful because the bulky and
13  irregular size of many of the products sold from this store were such that it resulted in excessive
14  handling and storage costs as well as uneconomical shipping costs;

15          (o)     Amazon's consumer electronics business was not nearly as successful as
16  claimed and would never reach profitability due to a number of factors, including that several
17  prestigious and well-known manufacturers of very important and desirable consumer electronic
18  products, such as Sony, Panasonic, Kenmore, Pioneer, Toshiba and others, refused to sell their
19  products directly to Amazon at wholesale prices because they did not want to disrupt their traditional
20  product distribution networks. As a result, Amazon was faced with a "Hobson's Choice" – it was
21  forced to forego carrying the desirable consumer products of these prestigious manufacturers, which
22  were indispensable to providing a broad enough selection for Amazon's consumer electronics store
23  *to attract sufficient customers or purchasers to succeed, or it was forced to purchase these desirable*
24  *and indispensable products through middlemen and other distributors at marked-up prices*, as
25  opposed to directly from the manufacturer, which added costs in an ultra-competitive business line
26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax: 619/231-7423

1  that virtually assured Amazon would lose money on the sale of such products, in either case dooming

2  Amazon's consumer electronics store to failure;

3  **Expansion and Infrastructure Buildout**

4         (p)     Amazon's vast product expansion and infrastructure buildout would likely

5  result in Amazon suffering excessive inventories and margin write-offs, as Amazon was undertaking

6  this huge expansion and buildout without having put in place the internal controls and reporting

7  systems necessary for Amazon to control its product purchases and selection in a way so as to avoid

8  accumulating material amounts of unsaleable or overvalued inventories;

9         (q)     Due to Amazon's overly rapid expansion of the products it offered for sale,

10  its lack of adequate internal controls, and the enormous inefficiencies in its new warehouse

11  distribution system, Amazon was ordering millions of dollars of unneeded and unnecessary

12  merchandise, which would result in Amazon being forced to take large inventory write-offs,

13  adversely impacting its financial condition and results;

14  **E-Commerce/ACN Partnerships and Investments**

15         (r)     The hundreds of millions of dollars of cash payments defendants stated would

16  be made by Amazon's e-commerce/ACN partners to Amazon were false, as a substantial portion of

17  those payments were to be made in the unregistered and illiquid stock of these e-commerce/ACN

18  partners which, in fact, had little or no value, and thus those e-commerce/ACN partnerships would

19  never provide the kind of revenues, benefits or increased liquidity to Amazon as represented,

20         (s)     Amazon and its e-commerce/ACN partners were concealing the true extent

21  of problems with these businesses by using the cash Amazon had provided those companies as part

22  of investing in them to make whatever cash payments to Amazon that were called for by their

23  agreements with Amazon, thus "priming the pump" – concealing that these e-commerce/ACN

24  partners had struggling and failing businesses;

25

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax. 619/231-7423

**Falsification of Financial Results**

(t)    Amazon was falsifying its financial condition and results as detailed in ¶¶262-297 including

(i)    To falsify Amazon's financial condition and make it appear that Amazon had larger cash balances than it actually had, Amazon engaged in the deceptive practice of holding millions of dollars of accounts payable for *months longer than was commercially reasonable* which, *inter alia*, was resulting in the creation of artificial disputes with vendors to try to justify non-payment of invoices that were legitimately due and payable or Amazon using its purchasing power to force vendor acquiescence in these payables stretchouts by threatening to cease doing business with vendors if they did not acquiesce in the long-delayed payments;

(ii)    Amazon was falsifying its financial condition and making its liquidity and working capital appear better than they actually were by engaging in a phony product return scheme in which, near the end of each quarterly reporting period, employees at Amazon's huge distribution centers were instructed to identify hundreds of thousands of items for return to vendors and segregate those items for return, *but not actually ship them back to the vendor, because, in many instances, Amazon's contractual arrangements with those vendors did not permit Amazon to return non-defective, unsold merchandise*; yet Amazon accounted for these segregated but non-returnable items as if they had actually been returned to vendors, thus artificially understating Amazon's accounts payable and understating its inventories, boosting Amazon's apparent liquidity and working capital;

(iii)    Amazon was inflating its reported inventories and understating its true losses by carrying millions of dollars of inventory at grossly overstated values, including electronics merchandise which Amazon was not entitled to return because it had purchased the product from unauthorized dealers; and

(iv)    Amazon, in 00, was falsifying and distorting its financial condition by including in its reported revenues, *at artificially inflated values*, the purported value of the restricted

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934         - 24 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

1    illiquid stock it received from e-commerce/ACN partners in transactions with them.  However, even

2    if GAAP permitted recording the value of such stock as revenue, because Amazon insiders knew

3    these e-commerce/ACN businesses were unsuccessful and failing, the value of the stock recorded

4    as revenue was grossly overstated and Amazon was recording revenue at grossly inflated levels, as

5    a result, Amazon's financial condition and results were not a fair presentation of Amazon's actual

6    financial condition or results, as this practice artificially inflated Amazon's revenue growth, distorted

7    its actual liquidity and made it appear that Amazon's business was more successful than it actually

8    was;

9              (u)      Amazon was also, in 00, distorting its financial condition by grossly

10   overstating the value of its investments in its e-commerce/ACN partners by hundreds of millions of

11   dollars as, in fact, Amazon knew from its involvement with those enterprises that their business

12   models were flawed, their performance execution poor, their businesses were not generating cash,

13   were struggling or failing and generating only a fraction of the sales via Amazon as had been forecast

14   and were necessary for them to succeed, and that Amazon would never realize the stated value of

15   these investments and they would have to be largely if not completely written off, thus adversely

16   impacting Amazon's financial results and condition,

17             (v)      The ongoing revenue being forecast by defendants as a result of Amazon's e-

18   commerce/ACN partnerships and investments was grossly overstated.  Defendants knew this revenue

19   would never be obtained because the business models and operations of these e-commerce/ACN

20   partners were flawed and their businesses were flawed and failing and generating only a fraction of

21   the sales via Amazon that were hoped for or forecast or necessary for Amazon to achieve the levels

22   of revenue growth being forecast by or for it;

23   **False Profitability Statements**

24             (w)      The statements made that Amazon was approaching "***profitability***" or would

25   become "***profitable***" were false, as Amazon *had not and would never achieve true profitability*

26   under GAAP and whatever "profits" or "profitability" Amazon was hoping to achieve could be

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1 reported only by accounting legerdemain in which such items as amortization expense, as well as

2 employee stock option expense and losses from equity investments, were excluded as expenses in

3 calculating Amazon's pro forma results and thus not actually accounted for,

4         (x)     The forecasts of annual revenue growth of 40%-50% in 99-00 and 20%-30%

5 in early 01, and 01-02 revenues of $3.4-$4.1 billion and $4.2-$6.2 billion for Amazon, were false as

6 defendants actually knew that revenue growth of this amount could not and would not be achieved

7 by Amazon, in part because of the problems, deficiencies and adverse conditions pleaded above, and

8         (y)     The forecasts that Amazon would achieve "pro forma" profitability in the 4thQ

9 01 and for all of 02 were false as defendants actually knew Amazon could not and would not reach

10 pro forma profitability at that time, in part due to Amazon's inability to generate sufficient revenues

11 to report even pro forma profitability by that time.

12       38     The Amazon saga set forth in this complaint represents one of the most sinister

13 deceptions of public investors in the history of the U.S. securities markets. Amazon is controlled by

14 avaricious insiders who were willing, with the help of dishonest investment bankers and securities

15 analysts, to manipulate and artificially inflate Amazon's stock by deceiving investors about Amazon's

16 operations, business model, customer base, finances, revenue growth and profit prospects so that

17 Amazon could raise billions of dollars of needed capital on favorable terms, Amazon's investment

18 bankers could pocket millions of dollars out of the proceeds from the securities they helped Amazon

19 sell to investors, and insiders could unload millions of dollars of Amazon stock at artificially inflated

20 prices. Thus, defendants' fraudulent scheme was a success – for them  In the 4.75% and 6.875%

21 convertible note offerings Amazon raised $1.8 billion, while it pocketed over $123 million from the

22 exercise of "in the money" stock options by Amazon employees during 98-01  Morgan Stanley and

23 First Boston got over $30 million out of the 4.75% convertible note offering and over $17 million

24 out of the 6.875% convertible note offering.  The Individual Amazon Defendants also sold 6.5

25 million shares of their Amazon stock at inflated prices, pocketing over $250 million in illegal insider

26 trading proceeds.

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 26 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

39.     The conduct of Amazon and its insiders has been condemned by financial columnists and the New York Society of Securities Analysts, and its disclosure practices as well as the insider trading activities of its top insiders are being investigated by the SEC.

40.     The SEC is investigating Amazon's accounting and disclosure practices relating to Amazon's recognition and reporting of revenue from its online ACN partners. According to a 10/00 article by financial columnist Mark Veverka of *Barron's*:

> *But after looking at filings, press releases and underwriter research from the past nine months or so, we find it reasonable to conclude that Amazon has misled investors through insufficient disclosure of material information.*

> The prospectus for a February offering of convertible eurobonds prominently promotes the financial benefits Amazon would receive from its commerce-partner relationships with online retailers. *Nowhere, though, does the company reveal or explain that most initial payments would come in the form of stock, not cash. Yet an equity analyst of the offering's lead underwriter, Morgan Stanley's Mary Meeker, published a report several days before the debt offering stating that Amazon had received multiyear "cash" commitments worth more than $450 million.*

> \*   \*   \*

> The prospect of fat commerce-partner revenues was presented to European bond investors in releases and filings as evidence that Amazon's debt was a better investment than it ultimately was  The convertibles were sold immediately after the company reported its fourth-quarter 1999 results, *and they were essential for Amazon to maintain comfortable cash balances through the winter and spring of this year. ..*

> The fact that the Eurobonds were sold at all, let alone at favorable terms, was surprising; the company had been under heavy criticism from Wall Street and had suffered a number of downgrades from brokerage-firm analysts. Fourth-quarter gross margins were extremely weak and net losses were far larger than investors expected just a few months before.

> But in late January and early February, Amazon announced it had entered into partnerships with four other Internet companies: Audible, Drugstore.com, Greenlight.com and Living.com. *Analysts cheered the deals, which were supposed to pump as much as $130 million a year in high-margin marketing fees into Amazon.*

> \*   \*   \*

> *Most important, Meeker reported that the payments would be made in the form of cash.* In a February note published five days before Morgan Stanley lead-managed Amazon's convertible eurobond offering, Meeker wrote: "These partnerships are now developing into a high-margin revenue stream for Amazon.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax 619/231-7423

1      *Combined, the multiyear cash commitments to Amazon from its partners now total over $450 million."*

2

3      *... [T]he Meeker statement, coming from an analyst with the company's lead underwriter, was significant.*

4                * * *

5      Meeker's research note certainly didn't discourage European investors from buying Amazon's convertibles. Nor did it hurt Amazon's stock on the Nasdaq  The

6  shares soared 21% to $84.19 on February 3, the first trading day after Amazon announced its commerce-partner backlog

7

8      Another question is whether Meeker violated SEC quiet-period rules by publishing a research note about her employer's client prior to an offering  Convertible-bond offerings are covered by the same SEC rules as equity offerings,

9  subjecting equity analysts as well as bond analysts to the same restrictions, says Harvey Goldschmid, a Columbia University law professor and former SEC counsel.

10

11      According to a February 14 SEC filing, Amazon's eurobond deal was registered with the SEC. The rules indicate that quiet periods begin when the underwriter and client agree to initiate an offering and ends 45 days after the offering

12  has been completed. Meeker's publishing "would seem to be in sharp conflict of SEC quiet-period rules," says John Coffee, a Columbia University professor of securities

13  law.  *"It doesn't sound like something she should have been doing.  It doesn't sound kosher."*

14                * * *

15

16      *What made [Meeker] believe that the commerce-partner marketing payments would be in the form of cash? "We checked with the company," [Morgan Stanley] said, referring to Amazon.*

17

18  Later, (in 11/00) Veverka wrote:

19      What's more, we learned that Amazon officials specifically told Morgan Stanley's chief Internet analyst, Mary Meeker, that marketing payments *from commerce*

20  *partners would be paid in cash, which she reported in a February 3 research note.*

21      *Trouble is, most of the payments have been made in stock.  In addition, other financial analysts have since told Barron's that they were also informed by Amazon executives early this year that most commerce partner marketing fees*

22  *collected in 2000 were to be paid in cash.*

23      *"We felt comfortable with our understanding that it would be payments in cash,"* says Marie Menendez, a financial analyst with Moody's Investor Service in

24  New York, *referring to her conversations with Amazon executives.*

25                * * *

26      The upshot:  Amazon apparently was willing to let Wall Street analysts and European bond investors think that some commerce-partner marketing fees would be

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934       - 28 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax· 619/231-7423

1   paid in cash. Why?   .. *cash on the books is more impressive than shares of equity*
    *in nascent dot.com companies....*

2

3       *The prospects of high-margin marketing fees were sure to bolster Amazon's*
    *shrinking gross profit margins, a key concern as the company prepared to float a*
    *major debt offering. The convertible eurobond offering raised about $650 million*

4   *(690 million euros) for Amazon ....*

5   41.   In 5/01, Veverka again reviewed the 1/00-2/00 flurry of announcements concerning

6   Amazon's e-commerce partner arrangements:

7   According to the brokerage analysts from the investment banks underwriting the
    PEACS offering, *the ACN deals were watershed events in Amazon's short history*

8   ....

9       The analysts seemed to embellish the facts of the bond offering in research
    notes that were published between February 1 and the offering date. Morgan Stanley

10  analyst Mary Meeker pegged the potential value of the deals at approximately $450
    million. DLJ's Jamie Kiggen (now at CSFB) estimated the potential revenues at "*over*

11  *$500 million,*" which would "*accelerate Amazon's path to profitability.*" *Because*
    *ACN revenues were considered to be pure profit, Kiggen called them a 100% gross*

12  *margin revenue stream.*

13                          *   *   *

14  Anyone who has read the recent *Fortune* cover story on Mary Meeker would likely
    find it difficult to believe that she was out of the loop prior [to] her firm's landing of

15  the deal....

16  —      One key piece of this saga does not add up.  In our original column suggesting
    that Amazon may have misled investors regarding its ACN deals (October 30, 2000),

17  we pointed out that Mary Meeker, in a research note prior to the bond offering,
    specifically stated that the payments would provide a "cash" revenue stream. Earlier,

18  we asked the firm why Meeker believed the ACN payments would be made in cash,
    and Morgan Stanley spokesman O'Rourke responded:  "*We checked with the*

19  *company.*"  *Well, we checked with O'Rourke last week and he stands by his*
    *statement.*

20

21  42.   On 5/14/01, in a *Fortune* magazine with a cover headline:  "Can We Ever Trust Wall

22  Street Again?," *Fortune* published an article entitled "Where Mary Meeker Went Wrong," which

23  stated:

24  Morgan Stanley's Mary Meeker was no ordinary analyst....   Meeker was the
    unquestioned diva of the Internet Age   Tech companies begged her to cover them.

25  *Morgan Stanley paid her an eye-popping $15 million in 1999.... During the dot-*
    *com craze, Mary Meeker was by far the most important voice for the internet – and*

26  *the notion that companies without earnings could transform the world and climb*
    *to the moon.*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 29 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

That was then. Today Meeker, 41, has become something else entirely: *the single most powerful symbol of how Wall Street can lead investors astray.* For the past year, as Internet stocks have crumbled and entire companies have vaporized, Meeker has maintained the same upbeat ratings on her companies that characterized her research repots in the glory days.... *For this she has been duly pummeled in the press, accused of cheerleading for Morgan Stanley's investment banking clients.*

... *Meeker came to see herself not merely as an analyst but as a player – a power broker, a dealmaker, a force to be reckoned with* She was a true Internet insider .... *"I don't think of Mary as an analyst,"* says venture capitalist John Doerr. *"I think of her as a service provider for investors, entrepreneurs, and management teams."* As a result Meeker did things that utterly compromised her as a stock picker.

In responding now to criticism that she let investors down, Meeker refuses to admit – or even see – how compromised she is. She defends herself in part by saying she feels protective toward the phenomenon she helped launch – and especially toward the dozens of companies she helped Morgan Stanley take public: "There is something compelling about ... playing an important role in something that will never happen again.... I feel a – 'stewardship' is a strong word – but I feel a keen sense of responsibility." She adds, *"If you take a company public and you are really aggressive on the downside, it can be devastating."* Of course, if you are not aggressive on the downside, it can be devastating for investors. But that was never a Meeker priority

\* \* \*

It becomes clear almost immediately that her real passion is the investment banking side of her job.

Though it's hardly news anymore that the Chinese Wall once separating investment banking from Wall Street research has eroded, what you realize in talking to Meeker is the extent to which these two supposedly conflicting functions – keeping companies happy and giving investors honest stock advice – are now organically intertwined. *She talks unashamedly, for instance, about how she has used her research to help land banking deals for Morgan Stanley.*

\* \* \*

We need to stop a moment to absorb the implications of this. Plenty of publications, including this one, have pointed out that analysts have become far more involved in the process of landing banking business than they once were   The modern analyst helps the banking team smoke out promising companies, sits in on strategy sessions, and promises – implicitly at least – to "support" the company once it has gone public with favorable research .. *Indeed, these days most analysts' pay is directly linked to the number of banking deals they're involved in.*

What Meeker did .. went far beyond the usual analyst's accommodation Rather than supporting Morgan's Internet banking effort, she began driving it   She became the firm's Internet rainmaker and *its key dealmaker.* "When I was at Deutsche Morgan Grenfell," says [Bill] Gurley, now a venture capitalist (and FORTUNE columnist), "we talked about *Mary being one of the best investment*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

*bankers on the planet." She developed close ties to VCs like John Doerr, who gave her early peeks at promising companies. She visited all the top startups to decide which were Morgan Stanley material. "Mary started to be the primary relationship person," says a high–profile banker at a competing firm ... "She'd almost bring her bankers in as a sort of execution team." Replies Meeker: "Our bankers were great. I was part of a team."*

\* \* \*

On launching coverage, *in the fall of 1997, of Amazon – which quickly became one of her flagship stocks (and later used Morgan for three big bond deals) – Meeker wrote that the company's valuation "gives us heartburn of a gargantuan proportion." But she quickly dismissed the concern:   "We have one general response to the word 'valuation' these days:  'Bull market.'"*

\* \* \*

The most critical point is this:  *Mary Meeker got so caught up in the allure of the Internet – the celebrity, the money, the thrill of dealmaking – that she forgot that she was supposed to be analyzing companies.*

43.   *Bezos has admitted that the releases and statements regarding the payments to be received by Amazon from its ACN partners in 1/00-2/00 were misleading in indicating that those payments were to be made in cash.*  On 3/26/01, Bezos appeared on CNBC:

| | |
|---|---|
| [CNBC]: | Earlier, we were talking about the deals – the partnership agreements, and partnering agreements, and – some people feel that you misled the public by not making it clear that you were getting stock in those deals instead of cash   And your press releases said dollars and you said, "Show me."  *So, I'm going to show you now two of your press releases. Here's one from January 21st, here's one from January 24th, and as you can see both of those press releases say you're receiving dollars.  They don't say stock.  Now, I–I–I can see why some people* may look at that kind of thing, and find it hard to take at face value your assurance that – that you are disclose – that you have the level of disclosure that you seem to think you have....  The press releases do say dollars, do they not? |
| BEZOS: | *They do.* |
| [CNBC]: | *Okay.... [D]on't you see now you can be misinterpreted when you put out press releases that say dollars, and in fact it's stock?* |
| BEZOS: | *I think – I think it's easy to be misinterpreted ....* |

44.   It has also been revealed that Amazon has manipulated its revenue per customer metric to inflate it and make Amazon's business look better and stronger than it really was:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

1       Amazon ... is a case of a hyper-growth company altering its business plan on
the fly and failing to come clean with its investors about lack of performance. *How*
2    *many times does the company need to engage in varying degrees of deception*
*before the Securities and Exchange Commission determines that Amazon has*
3    *crossed the line*?

4                                        *   *   *

5       [W]e suggest that regulators take a close look at the latest example of dubious
financial reporting to surface at the e-tailer: Amazon may have made its 1999 online
6    performance appear better than it was by including Old Economy revenues in its
measurements. *In its December 1999 online revenue per-customer figures, Amazon*
7    *included sales from the catalog businesses acquired late 1999. That adjustment*
*made it look like revenue-per-customer – a key metric for the core online business*
8    *– rose more than it actually did, hedge fund sources say.*

9       Go back a little more than a year   Amazon had been enduring analyst
downgrades, *and it needed to raise cash. Company officials touted a high-margin*
10   *revenue stream produced by its e-commerce partner network, which helped counter*
*concerns about "wallet share," which is another way of describing revenue-per-*
11   *customer.*

12      At the same time, the company introduced its own version of revenue-per-
customer, *which it dubbed a "trailing 12-month" metric. In a press release, the*
13   *company stated that "1999 sales per customer who purchased in 1999 were $116*
*up from $106 for 1998."* On the conference call, then-president Joe Galli said this
14   new metric was evidence that the company was "*gaining a larger share of wallet."*
*The spin worked, investors were satisfied, and Amazon successfully floated a $680*
15   *million convertible bond deal in Europe shortly thereafter*.

16      Now, scroll forward to the company's yearend financial report, and slipped
inside is a new, restated "trailing 12-month revenue-per-customer figure" for
17   December 1999. *The restated number is $113, three bucks shy of its original*
*number.   The reason, Amazon acknowledged, is that catalog revenues were*
18   *included in the inflated metric the first time around, though catalog customers*
*were not.*

19                                        *   *   *

20      *It seems yet another example of Amazon officials playing fast and loose*
21   *with information investors use to value the company.* In a February 2000 article in
*Industry Standard* magazine, attorney Boris Feldman, a partner at Wilson Sonsini
22   Goodrich & Rosati in Palo Alto, *coined the phrase "metrics fraud" to describe the*
*practice where by Internet companies inflate their results.  We think the phrase is*
23   *applicable here.*

24      45.   Amazon's holding back of paying its accounts payable to artificially boost its stated

25   cash and make its liquidity look better than it really was *has also been confirmed*.  A 7/21/01 *Los*

26   *Angeles Times* article stated:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

Amazon dismissed Suria's credit squeeze report as "silly and chock full of errors." The company went on the offensive, stressing in many media interviews that relations with its thousands of vendors had never been better.

*"I just laughed when I heard that," said an executive at one electronics vendor. "Amazon played the slow-pay game with us for about a year." The executive, who agreed to talk if neither he nor his firm was named, finally gave up and scaled back his shipments to Amazon by 90%.*

46.     An internal memo by Bezos entitled "Getting the Crap Out" circulated to employees in late 1/01-early 2/01 admits that the Company, in trying to sell everything to everyone and provide "Earth's Biggest Selection," was selling products where it was impossible to attain profitability. "The 30-pound box of nails isn't long for our world," Bezos wrote. Indeed, the 2/3/01 *Seattle Post-Intelligencer* reported that Company spokeswoman Patty Smith confirmed that the Company could not afford to ship single units of certain low-priced items. The "Getting the Crap Out" memo marks a stunning reversal from the "Get Big Fast" business plan that Amazon officials relentlessly hyped throughout the Class Period.

47     It has also been publicly reported that Amazon had received a draft copy of Suria's 2/6/01 negative report on Amazon, *well before* Bezos sold off 800,000 shares of his Amazon stock, pocketing $11.6 million in insider trading proceeds, and that Amazon tried to prevent the publication of that report, including having Amazon director Doerr call a top Lehman Brothers executive to try to block the publication of the report. The SEC is also investigating this apparent insider trading violation.

48.     As to Amazon's ill-fated investments in e-commerce/ACN partners – virtually all of which are now worthless – Bezos admitted in a 3/26/01 interview that they were *"very bad investments that we made, you know, in Pets.com and living.com and so on, some of those kinds of investments .... We've been very clear that's one of out biggest mistakes*." However, in a brazen admission of how defendants took advantage of investors – referring to the nearly $2 billion Amazon raised from investors in 2/99 and 2/00 – Bezos stated:

*[T]he key thing that we did well is we raised the money at a time when we could raise the money.... [Y]ou know, you can argue exactly how the money should have been raised but ... we did raise the money that we need[ed] to build the company.*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1   49.  The events regarding Amazon during the Class Period are graphically presented in

2 the attached chart:

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934 - 34 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423





Am¿
January 2001

**Class Period Sales**

Shares: 6,579,420

Proceeds: $250,862,418

**Dollars Per Share**

120 —

100 —

80 —

60 —

4/29/99
2 2 million new customers – tot
now 8 4 million, Amazon auct
off to "very fast start." AM
"remarkable job" at mo
customers  Business
"cash-favored" an
efficient "

million

11/99 $150 million alliance with
NextCard based on 13 million
Amazon customers

6/00  Business model works
Absurd - not true - to say won't
make more money  Complete
baloney
7/00 2 5 million new customers
Total customers now over 23
million  All elements of business
improving  Trailing 12 months
sales per customer up to $125
Lowers 01-02 revenue forecast
to $4 and $6+/- billion  No need
to lower expectations  Moving to
profitability and will do so in
every quarter

8/00-10/00  Business
will yield double digit
margins  Driving
toward profitability
· Surpassed key
internal financial
objectives  25+
million customers

11/00  Driving
toward profitability
· Close to making
money.  Going to
become profitable –
$5 billion in revenue
in gross profits and
solid operating
profitability

12/00
Forecasts 50%
revenue growth,
01-02 revenue $4 1
and $6 1 billion  AMZ
driving to profitability,
going to become
profitable, produce
over $1 billion in
gross profits and
achieve solid
operating profitability

nue forecast
venue
Will
·bility

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

1

**JURISDICTION AND VENUE**

2    50.    The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of

3  1934 ("1934 Act"). Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to

4  §27 of the 1934 Act, as Amazon is headquartered in this District and a substantial part of the

5  wrongful conduct complained of took place in this District.

6

**THE PARTIES**

7    51.    Lead Plaintiffs Moussa Peykar, Edward Ingeneri, Lena Govberg, Emil Panait and

8  Richard A. Yahr each purchased shares of Amazon securities during the Class Period and were

9  damaged thereby  These plaintiffs were appointed Lead Plaintiffs by Court order dated 6/29/01.

10    52.    Defendant Amazon is an online retailer that sells millions of distinct items such as

11  books, music, DVDs, videos, toys, consumer electronics, computer software, personal computers,

12  video games and home improvement and garden products.  Amazon is headquartered in Seattle,

13  Washington. Amazon securities traded in an efficient market on the Nasdaq National Market System

14  during the Class Period

15    53.    (a)    Defendant Jeffrey P. Bezos ("Bezos") was Chief Executive Officer and

16  Chairman of Amazon. Because of his position with the Company, he had access to the adverse non-

17  public information about the Company's business, finances, products, markets and present and future

18  business prospects via access to internal corporate documents (including the Company's customer

19  metrics, product sales, operating plan, budget and forecast and product sales reports of actual

20  operations compared thereto), conversations and connections with other corporate officers and

21  employees, attendance at management and Board of Directors meetings and committees thereof and

22  via reports and other information provided to him in connection therewith. Bezos, due to his position

23  and Amazon stock ownership was a controlling person of Amazon. During the Class Period, while

24  in possession of adverse undisclosed information about the Company, Bezos sold 2,548,650 shares

25  of his Amazon stock for $59.8 million in illegal insider trading proceeds. This defendant's insider

26  selling before and during the Class Period is shown below:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



## AMAZON.COM INC
### Jeffrey Bezos - Insider Sales Monthly Dollar Volume
### May 15, 1997 - September 7, 2001

16 Bezos signed the false and misleading Registration Statement by which the offering of Amazon's

17 6.875% convertible notes was effectuated and the Registration Statement by which shares of

18 Amazon's stock to cover conversion of the 4.75% convertible notes were registered.

19         (b)       Defendant Warren C. Jenson ("Jenson") was Senior Vice President/Chief

20 Financial Officer of Amazon on and after 10/1/99. Because of his position with the Company, he

21 had access to the adverse non-public information about the Company's business, finances, products,

22 markets and present and future business prospects via access to internal corporate documents

23 (including the Company's customer metrics, product sales, operating plan, budget and forecast and

24 product sales reports of actual operations compared thereto), conversations and connections with

25 other corporate officers and employees, attendance at management and/or Board of Directors

26 meetings and committees thereof and via reports and other information provided to him in connection

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1   therewith.  Jenson sold no Amazon stock during the Class Period as he owned none to sell and his

2   Amazon stock options were unvested and/or "underwater," and thus he had no economic incentive

3   or ability to exercise those options or to sell stock.  Jenson had 100,000 options vest at the end of 00;

4   however, the exercise price was $63.25 and Amazon's stock was well below $50 and never traded

5   above $63.25 during the balance of the Class Period.  Although these options were repriced to $13 38

6   per share in 2/01, the newly repriced options did not begin to vest until 8/01, and Jenson therefore

7   did not have the opportunity to exercise the options and sell the stock that he would acquire thereby

8   until after the Class Period ended.

9           (c)     Defendant Joseph Galli, Jr. ("Galli") was President, Chief Operating Officer

10  and a director of Amazon from 7/99 to 7/00, when he quit.  Because of his position with the

11  Company, he had access to the adverse non-public information about the Company's business,

12  finances, products, markets and present and future business prospects via access to internal corporate

13  documents (including the Company's customer metrics, product sales, operating plan, budget and

14  forecast and product sales reports of actual operations compared thereto), conversations and

15  connections with other corporate officers and employees, attendance at management and Board of

16  Directors meetings and committees thereof and via reports and other information provided to him in

17  connection therewith.  This defendant signed the false and misleading Registration Statement by

18  which the offering of Amazon's 6.875% convertible notes was effectuated.  During the Class Period,

19  Galli sold no shares of Amazon stock as he owned no shares outright to sell and his Amazon stock

20  options were "underwater" throughout most of the Class Period, and thus he had no economic

21  incentive or ability to exercise those options or to sell stock.  Galli had 100,000 options vest in 6/00

22  with an exercise price of $53.93; however, Amazon's stock price was below that level then and did

23  not trade above $53.93 during the balance of the Class Period.

24          (d)     Defendant Thomas A  Alberg ("Alberg") was a director of Amazon.  Alberg

25  was  an early investor in Amazon, owned a substantial amount of Amazon stock and went on

26  Amazon's Board in 96 and thus was intimately familiar with Amazon's business and operations.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

1    Because of his position with the Company, he had access to the adverse non-public information about

2    the Company's business, finances, products, markets and present and future business prospects via

3    access to internal corporate documents (including the Company's customer metrics, product sales,

4    operating plan, budget and forecast and product sales reports of actual operations compared thereto),

5    conversations and connections with other corporate officers and employees, attendance at

6    management and/or Board of Directors meetings and committees thereof and via reports and other

7    information provided to him in connection therewith. During the Class Period, while in possession

8    of adverse undisclosed information about the Company, Alberg sold 1,300,000 shares of his Amazon

9    stock for $56.2 million in illegal insider trading proceeds. This defendant's insider selling before and

10    during the Class Period is shown below:



**AMAZON.COM INC**
Tom Alberg - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1    Alberg signed the false and misleading Registration Statement by which the offering of Amazon's

2    6.875% convertible notes was effectuated and the Registration Statement by which shares of

3    Amazon's stock to cover conversion of the 4.75% convertible notes were registered.

4            (e)      Defendant L. John Doerr ("Doerr") was a director of Amazon.  Doerr is a

5    venture capitalist and a general partner in the Kleiner Perkins venture capital firm that provided

6    financing to Amazon.  Doerr had been a director of Amazon since 96 and was intimately familiar

7    with its business and operations   Because of his position with the Company, he had access to the

8    adverse non-public information about the Company's business, finances, products, markets and

9    present and future business prospects via access to internal corporate documents (including the

10   Company's customer metrics, product sales, operating plan, budget and forecast and product sales

11   reports of actual operations compared thereto), conversations and connections with other corporate

12   officers and employees, attendance at management and/or Board of Directors meetings and

13   committees thereof and via reports and other information provided to him in connection therewith.

14   Doerr signed the false and misleading Registration Statement by which the offering of Amazon's

15   6.875% convertible notes was effectuated and the Registration Statement by which shares of

16   Amazon's stock to cover conversion of the 4.75% convertible notes were registered.

17           (f)      Defendant Mark J Britto ("Britto") was Senior Vice President-Cross Site

18   Merchandising of Amazon. Because of his position with the Company, he had access to the adverse

19   non-public information about the Company's business, finances, products, markets and present and

20   future business prospects via access to internal corporate documents (including the Company's

21   customer metrics, product sales, operating plan, budget and forecast and product sales reports of

22   actual operations compared thereto), conversations and connections with other corporate officers and

23   employees, attendance at management and/or Board of Directors meetings and committees thereof

24   and via reports and other information provided to him in connection therewith.  During the Class

25   Period, while in possession of adverse undisclosed information about the Company, Britto sold

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1   47,000 shares of his Amazon stock for $2.1 million in illegal insider trading proceeds.   This

2   defendant's insider selling before and during the Class Period is shown below:



**AMAZON.COM INC**
Mark Britto - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

19          (g)      Defendant Joel R. Spiegel ("Spiegel") was Vice President-Engineering of

20   Amazon.   Because of his position with the Company, he had access to the adverse non-public

21   information about the Company's business, finances, products, markets and present and future

22   business prospects via access to internal corporate documents (including the Company's customer

23   metrics, product sales, operating plan, budget and forecast and product sales reports of actual

24   operations compared thereto), conversations and connections with other corporate officers and

25   employees, attendance at management and/or Board of Directors meetings and committees thereof

26   and via reports and other information provided to him in connection therewith.   During the Class

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

1  Period, while in possession of adverse undisclosed information about the Company, Spiegel sold

2  170,000 shares of his Amazon stock for $6.6 million in illegal insider trading proceeds   Spiegel's

3  insider selling before and during the Class Period is shown below:



**AMAZON.COM INC**

Joel Spiegel - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

19          (h)     Defendant Scott D. Cook ("Cook") was a director of Amazon   Because of his

20  position with the Company, he had access to the adverse non-public information about the Company's

21  business, finances, products, markets and present and future business prospects via access to internal

22  corporate documents (including the Company's customer metrics, product sales, operating plan,

23  budget and forecast and product sales reports of actual operations compared thereto), conversations

24  and connections with other corporate officers and employees, attendance at management and/or

25  Board of Directors meetings and committees thereof and via reports and other information provided

26  to him in connection therewith.  During the Class Period, while in possession of adverse undisclosed

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1  information about the Company, Cook sold 143,000 shares of his Amazon stock for $10.5 million

2  in illegal insider trading proceeds.  Cook's insider selling before and during the Class Period is shown

3  below:



**AMAZON.COM INC**

Scott Cook - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001 .

19  Cook signed the false and misleading Registration Statement by which the offering of Amazon's

20  6.875% convertible notes was effectuated and the Registration Statement by which shares of

21  Amazon's stock to cover conversion of the 4.75% convertible notes were registered.

22        (i)        Defendant Joy D. Covey ("Covey") was Vice President and CFO of Amazon

23  until 5/99 when she became Chief Strategy Officer.  Covey quit Amazon in or about 4/00  Because

24  of her position with the Company, she had access to the adverse non-public information about the

25  Company's business, finances, products, markets and present and future business prospects via access

26  to internal corporate documents (including the Company's customer metrics, product sales, operating

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1    plan, budget and forecast and product sales reports of actual operations compared thereto),

2    conversations and connections with other corporate officers and employees, attendance at

3    management and/or Board of Directors meetings and committees thereof and via reports and other

4    information provided to her in connection therewith.  During the Class Period, while in possession

5    of adverse undisclosed information about the Company, Covey sold 323,000 shares of her Amazon

6    stock for $16.6 million in illegal insider trading proceeds.  Covey's insider selling before and during

7    the Class Period is shown below.



### AMAZON.COM INC

Joy Covey - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

23   Covey signed the false and misleading Registration Statement by which the offering of Amazon's

24   6.875% convertible notes was effectuated and the Registration Statement by which shares of

25   Amazon's stock to cover conversion of the 4.75% convertible notes were registered.

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1        (j)      Defendant Richard L. Dalzell ("Dalzell") was Senior Vice President/Chief

2 Information Officer of Amazon   Because of his position with the Company, he had access to the

3 adverse non-public information about the Company's business, finances, products, markets and

4 present and future business prospects via access to internal corporate documents (including the

5 Company's customer metrics, product sales, operating plan, budget and forecast and product sales

6 reports of actual operations compared thereto), conversations and connections with other corporate

7 officers and employees, attendance at management and/or Board of Directors meetings and

8 committees thereof and via reports and other information provided to him in connection therewith

9 During the Class Period, while in possession of adverse undisclosed information about the Company,

10 Dalzell sold 650,000 shares of his Amazon stock for $26.6 million.  Dalzell's insider selling before

11 and during the Class Period is shown below:



**AMAZON.COM INC**

Richard Dalzell - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1    (k)    Defendant John D. Risher ("Risher") was Senior Vice President/General

2 Manager U.S. Stores of Amazon. Because of his position with the Company, he had access to the

3 adverse non-public information about the Company's business, finances, products, markets and

4 present and future business prospects via access to internal corporate documents (including the

5 Company's customer metrics, product sales, operating plan, budget and forecast and product sales

6 reports of actual operations compared thereto), conversations and connections with other corporate

7 officers and employees, attendance at management and/or Board of Directors meetings and

8 committees thereof and via reports and other information provided to him in connection therewith.

9 During the Class Period, while in possession of adverse undisclosed information about the Company,

10 Risher sold 630,000 shares of his Amazon stock for over $32 million in illegal insider trading

11 proceeds. Risher's insider selling before and during the Class Period is shown below:



## AMAZON.COM INC
### John Risher - Insider Sales Monthly Dollar Volume
### May 15, 1997 - September 7, 2001

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax: 619/231-7423

1        (l)    Defendant Kavitark R. Shriram ("Shriram") was Vice President of Amazon.

2    Because of his position with the Company, he had access to the adverse non-public information about

3    the Company's business, finances, products, markets and present and future business prospects via

4    access to internal corporate documents (including the Company's customer metrics, product sales,

5    operating plan, budget and forecast and product sales reports of actual operations compared thereto),

6    conversations and connections with other corporate officers and employees, attendance at

7    management and/or Board of Directors meetings and committees thereof and via reports and other

8    information provided to him in connection therewith   During the Class Period, while in possession

9    of adverse undisclosed information about the Company, Shriram sold 312,000 shares of his Amazon

10   stock for $12.3 million in illegal insider trading proceeds.  Shriram's insider selling before and during

11   the Class Period is shown below:



**AMAZON.COM INC**

Kavitark Shriram - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax  619/231-7423

1        (m)    Defendant Patricia Q. Stonesifer ("Stonesifer") was a director of Amazon.

2  Because of her position with the Company, she had access to the adverse non-public information

3  about the Company's business, finances, products, markets and present and future business prospects

4  via access to internal corporate documents (including the Company's metrics, product sales, operating

5  plan, budget and forecast and product sales reports of actual operations compared thereto),

6  conversations and connections with other corporate officers and employees, attendance at

7  management and/or Board of Directors meetings and committees thereof and via reports and other

8  information provided to her in connection therewith.  During the Class Period, while in possession

9  of adverse undisclosed information about the Company, Stonesifer sold over 137,770 shares of her

10  Amazon stock for $10.3 million in illegal insider trading proceeds. Stonesifer's insider selling before

11  and during the Class Period is shown below:



**AMAZON.COM INC**

Patricia Stonesifer - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1    Stonesifer signed the false and misleading Registration Statement by which the offering of Amazon's

2    6.875% convertible notes was effectuated and the Registration Statement by which shares of

3    Amazon's stock to cover conversion of the 4.75% convertible notes were registered.

4              (n)    Defendant Jimmy Wright ("Wright") was Vice President/Chief Logistics

5    Officer of Amazon until in or about 9/99, when he quit the Company.  Because of his position with

6    the Company, he had access to the adverse non-public information about the Company's business,

7    finances, products, markets and present and future business prospects via access to internal corporate

8    documents (including the Company's customer metrics, product sales, operating plan, budget and

9    forecast and product sales reports of actual operations compared thereto), conversations and

10   connections with other corporate officers and employees, attendance at management and/or Board

11   of Directors meetings and committees thereof and via reports and other information provided to him

12   in connection therewith.   During the Class Period, while in possession of adverse undisclosed

13   information about the Company, Wright sold 150,000 shares of his Amazon stock for $7.5 million

14   in illegal insider trading proceeds.   Wright's insider selling before and during the Class Period is

15   shown below:

16

17

18



**AMAZON.COM INC**
Jimmy Wright - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1    (o)    Defendant Kelyn J. Brannon ("Brannon") was Vice President-Finance/Chief

2  Accounting Officer of Amazon after 7/1/99. Because of her position with the Company, she had

3  access to the adverse non-public information about the Company's business, finances, products,

4  markets and present and future business prospects via access to internal corporate documents

5  (including the Company's customer metrics, product sales, operating plan, budget and forecast and

6  product sales reports of actual operations compared thereto), conversations and connections with

7  other corporate officers and employees, attendance at management and Board of Directors meetings

8  and committees thereof and via reports and other information provided to her in connection

9  therewith. During the Class Period, while in possession of adverse undisclosed information about

10 the Company, Brannon sold 12,000 shares of her Amazon stock for $864,725 in illegal insider

11 trading proceeds. Brannon's insider selling before and during the Class Period is shown below:



**AMAZON.COM INC**

Kelyn Brannon - Insider Sales Monthly Dollar Volume

May 15, 1997 - September 7, 2001

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax  619/231-7423

1          (p)     Defendant Mary E. Engstrom ("Engstrom") was Vice President-Publisher

2   Affairs of Amazon.  Because of her position with the Company, she had access to the adverse non-

3   public information about the Company's business, finances, products, markets and present and future

4   business prospects via access to internal corporate documents (including the Company's customer

5   metrics, product sales, operating plan, budget and forecast and product sales reports of actual

6   operations compared thereto), conversations and connections with other corporate officers and

7   employees, attendance at management and/or Board of Directors meetings and committees thereof

8   and via reports and other information provided to her in connection therewith.  During the Class

9   Period, while in possession of adverse undisclosed information about the Company, Engstrom sold

10  156,000 shares of her Amazon stock for $9 0 million in illegal insider trading proceeds.  Engstrom's

11  insider selling before and during the Class Period is shown below:



### AMAZON.COM INC
Mary Engstrom - Insider Sales Monthly Dollar Volume
May 15, 1997 - September 7, 2001

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1  Engstrom signed the false and misleading Registration Statement by which the offering of Amazon's

2  6.875% convertible notes was effectuated and the Registration Statement by which shares of

3  Amazon's stock to cover conversion of the 4.75% convertible notes were registered.

4  (q)  The individuals named as defendants in ¶53(a)-(p) are referred to herein as

5  the "Individual Amazon Defendants."  Amazon and the Individual Amazon Defendants are

6  collectively referred to herein as the "Amazon Defendants."

7  54.  As officers, directors and/or controlling persons of a publicly held company whose

8  stock is registered with the SEC under the 1934 Act and traded on the Nasdaq National Market

9  System, the Individual Amazon Defendants had a duty to promptly disseminate accurate and truthful

10  information with respect to the Company's operations, customer metrics, business, products, markets,

11  management, earnings, present and future business prospects, to cause Amazon's financial statements

12  to fairly present its financial condition and results from operations in conformity with GAAP, to

13  correct any previously issued statements that had become untrue and to disclose any adverse trends

14  that would materially affect the present and future financial operating results of the Company, so that

15  the market price of the Company's stock would be based upon truthful and accurate information.

16  During the Class Period, the Individual Amazon Defendants engaged in illegal insider trading, selling

17  6.5 million shares of their Amazon stock at prices inflated by their fraudulent scheme and while in

18  possession of material adverse non-public information, pocketing over $250 million in illegal insider

19  trading proceeds.  The collective insider selling by the Individual Amazon Defendants before and

20  during the Class Period is show below:

21

22

23

24

25

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax· 619/231-7423

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



# AMAZON.COM INC

## All Defendants - Insider Sales Monthly Dollar Volume
### May 15, 1997 - September 7, 2001

17    55.    (a)    Defendant Kleiner Perkins Caufield & Byers ("Kleiner Perkins") is a

18   partnership – a venture capital firm that makes investments in emerging companies at low per-share

19   prices, takes control of them, puts one or more of its partners on the board and then takes the

20   company public – reaping huge profits. Kleiner Perkins was Amazon's venture capital investor and

21   owned and controlled some 34 million shares of Amazon's stock – the second largest Amazon

22   shareholder – and had its general partner and agent, L. John Doerr, on Amazon's Board, and was thus

23   a controlling shareholder of Amazon and liable under §20(a) of the 1934 Act.

24          (b)    L. John Doerr ("Doerr"), in his position as a controlling shareholder and

25   director of Amazon, personally profited from the fraudulent scheme by utilizing Amazon as a vehicle

26   to make cash investments in and/or acquire other dot.com/Internet companies which Kleiner Perkins

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 53 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

1   controlled and was attempting to bring public, or for which Kleiner Perkins was seeking an infusion

2   of cash to support companies that had already gone public and to make their businesses appear to be

3   successful and thriving, thereby artificially inflating the price of these companies' stocks trading on

4   the market – a process that would enable Kleiner Perkins and its partners (including Doerr) to profit

5   to the tune of hundreds of millions of dollars.  For instance, Greenlight com, drugstore.com and

6   Audible were all companies controlled and dominated by Kleiner Perkins.  As a result of Kleiner

7   Perkins' control and domination of these companies, Kleiner Perkins knew that these companies

8   were, in fact, suffering from serious business problems and that their business models did not work

9   nearly as well as Kleiner Perkins had hoped.  However, Kleiner Perkins was determined to dress

10  these companies up and take them public at grossly excessive values and/or artificially inflate their

11  stock trading on the market, as this would enable Kleiner Perkins to bail out of its otherwise

12  endangered investment position in these companies. Set forth below is a chart showing the Kleiner

13  Perkins companies that were either invested in or acquired by Amazon during 98-01 and the nature

14  of the transaction·

15
|  | | Nature | |
| Kleiner Perkins | Amazon | of | |
| Company | Investment | Investment | Date |
| drugstore com | $30 million | Investment | 8/98-2/00 |
| Accept.com | $101.7 million | Acquisition | 6/99 |
| HomeGrocer com | $42.5 million | Investment | 5/99 |
| NextCard | $22.5 million | e-Commerce Alliance | 11/99 |
| Greenlight.com | 5% investment | Investment | 1/00 |
| Audible | $20 million | Investment | 1/00 |

21          (c)     Three of the four companies with which Amazon announced the phony

22  revenue deals to help inflate its stock price just before the 6.875% convertible note offering in 2/00

23  were Kleiner Perkins-controlled companies  These purported transactions not only had the effect of

24  artificially inflating Amazon's stock price, but also artificially inflated the apparent value of

25  Greenlight.com, drugstore.com and Audible, greatly benefitting Kleiner Perkins and Doerr.  In fact,

26  in part based upon phony transactions with Amazon, Kleiner Perkins was able to take NextCard,

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 54 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1    Audible, drugstore com and HomeGrocer com public in 99-00 at grossly excessive valuations, or was

2    able to support the price of those companies' stocks which had already been taken public – thus

3    financially benefitting Kleiner Perkins and Doerr.

4          (d)    In essence, Kleiner Perkins created its own "Daisy Chain," whereby it used

5    its control over the finances and activities of companies it had taken public, such as Amazon, to

6    artificially inflate the stock prices of other companies it controlled, intended to take public or had

7    already taken public so as to artificially inflate the stock prices of those companies.  In so doing,

8    Kleiner Perkins succeeded in inflating the stock it held in each of these companies (including

9    Amazon, drugstore.com, Accept.com, HomeGrocer.com, NextCard, Greenlight com and Audible)

10   to the detriment of public investors.

11         (e)    In addition, to help reward Morgan Stanley and Meeker and First Boston and

12   Buyer/Kiggen for their efforts in inflating Amazon's stock price, Kleiner Perkins arranged for

13   Morgan Stanley and First Boston to be designated the lead underwriter in the initial public offerings

14   of the companies listed below, as a result of which the analysts benefitted via their high cash

15   compensation and bonuses and the underwriters benefitted to the tune of many millions of dollars

16   of underwriting fees.  Listed below are the Kleiner Perkins-controlled companies that went public

17   during 99-00 and their underwriters:

18
| Company | Underwriter | Offering Date |
| --- | --- | --- |
| NextCard | First Boston | 5/14/99 |
| Audible | First Boston | 7/16/99 |
| drugstore.com | Morgan Stanley/ First Boston | 7/28/99 |
| HomeGrocer.com | Morgan Stanley/ First Boston | 3/10/00 |

23         56.    Defendants Morgan Stanley and First Boston (in its own right and also as the legal

24   successor of DLJ) are investment banking firms.  Morgan Stanley and First Boston had a long and

25   intimate relationship with Amazon, acting as the underwriters of its securities sold to investors and

26   as its financial advisors.  Morgan Stanley was the placement agent of Amazon's $325 million debt

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 55 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1   offering in early 98, which raised monies to fund the initial stage of Amazon's "Get Big Fast"

2   expansion and diversification strategy.  These firms, individually and through their subsidiaries,

3   served as financial advisors to Amazon and the underwriters of Amazon's $1.25 billion 4.75%

4   convertible note offering in 2/99 and as the underwriters of Amazon's €690 million 6.875%

5   convertible note offering in 2/00.  Morgan Stanley and First Boston received a significant portion of

6   the money raised in the 4.75% and 6.875% convertible note offerings, over $30 million and $17

7   million, respectively, and so directly benefitted from their participation in the fraudulent scheme

8   Morgan Stanley and First Boston were marketmakers in Amazon stock and purchased and sold

9   Amazon stock on a daily basis throughout the Class Period.  Morgan Stanley and First Boston issued

10  false research reports on Amazon during the Class Period as part of the scheme to help inflate

11  Amazon's stock and facilitate Amazon's sales of equity securities and the Individual Amazon

12  Defendants' insider trading.

13       57.     Defendant Mary Meeker ("Meeker") was a securities analyst with Morgan Stanley,

14  who was employed and controlled by it.  She authored the false and misleading Morgan Stanley

15  reports on Amazon issued during the Class Period, knowing of or deliberately disregarding their

16  falsity  The reports written by Meeker for Morgan Stanley were intended to boost Amazon's stock

17  in anticipation of the convertible note offerings and to help to continue to support Amazon's stock

18  and cover up defendants' fraudulent scheme thereafter.  Defendant Meeker received large cash

19  compensation and bonuses that were directly tied to – and thus increased by – the underwriting fees

20  received by Morgan Stanley for securities offerings of clients which Meeker covered and helped

21  boost the stock price of by issuing favorable reports.

22       58.     Defendants Jamie Kiggen ("Kiggen") and Lise Buyer ("Buyer") were securities

23  analysts with First Boston, who were employed and controlled by First Boston  They authored the

24  false and misleading First Boston reports on Amazon issued during the Class Period, knowing of or

25  deliberately disregarding their falsity. The reports written by Kiggen and Buyer for First Boston were

26  intended to boost Amazon's stock in anticipation of the convertible note offerings and to help to

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934       - 56 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1  continue to support Amazon's stock and cover up defendants' fraudulent scheme thereafter.

2  Defendants Kiggen and Buyer received large cash compensation and bonuses that were directly tied

3  to – and thus increased by – the underwriting fees received by First Boston for securities offerings

4  of clients which Kiggen and Buyer covered and helped boost the stock price of by issuing favorable

5  analyst reports.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

1

## SCIENTER AND SCHEME ALLEGATIONS

59.     Each defendant is liable for (i) making false statements, or (ii) for failing to disclose adverse facts while selling Amazon stock, and/or (iii) participating in a fraudulent scheme which permitted the Individual Amazon Defendants to sell or dispose of over 6.5 million shares of Amazon stock at artificially inflated prices for over $250 million in illegal insider trading proceeds, enabled Amazon to issue over 11.7 million shares of its stock at inflated prices to fund the acquisition of seven other companies, allowed Amazon to raise over $123 million in cash from the exercise of Amazon employees' "in the money" stock options during 98-01, and allowed Amazon to raise some $1.8 billion from the sale of 4.75% and 6 875% convertible notes in 2/99 and 2/00, respectively, while Morgan Stanley and First Boston pocketed $50+ million of these offering proceeds and their analysts pocketed huge payments for their role in the success of these offerings.

60.     Bezos, Covey, Jenson, Galli, Brannon, Britto, Dalzell, Risher, Spiegel, Engstrom, Shriram and Wright were the top executives of Amazon.  They had daily contact with each other while running Amazon as "hands-on" managers, dealing with important issues facing Amazon's business, *i.e.*, the growth of its customer base, sales of its products, its ACN investments and partnerships, its "Get Big Fast" expansion and diversification strategy and its future revenues and profits.  The Individual Amazon Defendants controlled and/or possessed the power and authority to control the contents of Amazon's Registration Statements for the 4.75% and 6.875% offerings, its Form 8-K SEC filings and its quarterly and annual reports and press releases, and were provided with copies of the filings, reports and releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Amazon's unusually small Board of Directors, which consists of only five or so members, met almost monthly, resulting in Amazon's directors having a direct and active role in the management of the Company – functioning more as an executive committee overseeing operations on a constant basis than a traditional Board of Directors engaged more in oversight.  Alberg, Cook, Doerr and Stonesifer were thus much more involved in Amazon's day-to-day operations than is normally the case with

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934     - 58 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1    "outside directors."  Alberg, Cook, Doerr and Stonesifer were also in frequent contact with Bezos,

2    Covey, Galli and Jenson to receive information from them about Amazon's business and they

3    received copies of Amazon's internal operating and budget reports circulated to Amazon's top

4    executives. ·The 4.75% and 6.875% convertible note offerings *could not have taken place without*

5    *the authorization of Amazon's Board.*  The Individual Amazon Defendants are each liable for the

6    false statements pleaded herein at ¶¶88, 100, 118, 123, 131, 137, 140, 147, 152, 155, 159, 161, 164,

7    167, 172, 178, 188-192, 204-205, 218 and 229, as those statements were each "group-published"

8    information, the result of the collective action of the Individual Amazon Defendants.

9        61.    Because of the Individual Amazon Defendants' positions with the Company, they each

10    had access to the adverse non-public information about its business, customer metrics, partnerships

11    and investments, finances, products, markets and present and future business prospects via access

12    to internal corporate documents (including the Company's operating plans, customer metrics, budgets

13    and forecasts and reports of actual operations compared thereto), conversations and connections with

14    other corporate officers and employees, attendance at management and/or Board of Directors meeting

15    and committees thereof and via reports and other information provided to them in connection

16    therewith.

17        62.    Because obtaining large numbers of new customers, keeping those customers and

18    obtaining larger numbers of repeat orders from those customers in larger dollar amounts was critical

19    to Amazon achieving the levels of sharply increased revenues necessary for the successful pursuit

20    of its "Get Big Fast" strategy, and generating substantial revenues from ACN partnerships by the sale

21    of the partners' products over Amazon's site was another indispensable element to the Company

22    meeting its internally budgeted and publicly disseminated revenue forecasts, the Individual Amazon

23    Defendants *constantly monitored each of these key factors affecting Amazon's business.*

24        63.    The Individual Amazon Defendants closely monitored the performance of Amazon's

25    business via reports which Amazon's Finance Department generated on a weekly and monthly basis.

26    There were reports that summarized all relevant customer metrics, shipping and order statistics, dollar

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone· 619/231-1058 • Fax 619/231-7423

1   volume and each product category on a weekly basis, as well as customer acquisition cost and

2   fulfillment cost reports.    The Finance Department also distributed monthly financial reports

3   comparing Amazon's *actual* financial results and customer metrics to *projected* results, including

4   product orders, customer numbers and customer orders, which included information about dormant

5   customers – persons who had not purchased in the last 12 months.  Thus, each Individual Amazon

6   Defendant was apprised of the status of orders for and sales of *every Amazon product* category so

7   that they knew where Amazon stood in terms of the sale of and demand for its products, as well as

8   Amazon's actual results compared to budget, as well as the status of its so-called customer base.

9   Each Individual Amazon Defendant also received continual information about Amazon's "Get Big

10   Fast" program and the success of Amazon's new distribution centers.

11       64.    Because of their top positions with Amazon and involvement in the management of

12   Amazon's business operations, each Individual Amazon Defendant actually knew of the adverse

13   material facts particularized herein from internal corporate reporting and documents and

14   conversations with other corporate officers and employees and their attendance at management

15   and/or Board meetings and, in the case of Alberg, Cook, Doerr and Stonesifer, information they got

16   from Bezos, Covey, Galli and Jenson  Thus, each Amazon Defendant actually knew or deliberately

17   disregarded that the public statements made about Amazon were false or misleading due to the

18   adverse facts and conditions pleaded and that Amazon was falsifying its results and financial

19   conditions.

20       65    The Individual Amazon Defendants also had the motive and the opportunity to make

21   the false statements and perpetrate the scheme described herein.

22       66.    Originally, Amazon was a seller of books over the Internet.  By 97-98, Bezos and his

23   fellow top insiders realized that Amazon would never be able to succeed as an enterprise that only

24   sold books.  Thus, in 97–98, Amazon adopted and began to implement its so-called "Get Big Fast"

25   strategy by which it attempted to expand the size and scope of its business, greatly increasing and

26   diversifying the number of products it sold, while massively expanding Amazon's distribution and

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934   - 60 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1   customer service infrastructure, including constructing huge product distribution centers at a cost of

2   hundreds of millions of dollars.

3       67.    However, Bezos and Amazon's other top executives and Amazon's financial advisors/

4   underwriters knew that Amazon's "Get Big Fast" strategy was extremely dangerous as it would

5   require the expenditure of billions of dollars by Amazon to fund the capital expenditures required

6   by its "Get Big Fast" expansion/diversification and result in Amazon incurring hundreds of millions

7   of dollars of losses before the Company's increased revenues and operating efficiencies hopefully

8   enabled it to achieve profitability  They knew that in order for Amazon's "Get Big Fast" strategy to

9   have any chance to succeed, it was indispensable that Amazon *raise billions of dollars of new capital*

10  *from investors to fund its massive expansion program* and provide Amazon a financial "cushion"

11  to absorb its huge ongoing losses.  This need to raise billions of dollars of capital, in turn, made it

12  very important that Amazon push its stock price higher and higher for several reasons.  First, Amazon

13  needed to keep its stock price high so that it could sell hundreds of millions of dollars of new

14  securities and raise hundreds of millions of dollars of needed capital and also use its stock to acquire

15  other e-tailers on favorable terms and thus quickly broaden the product lines it sold – key, indeed

16  indispensable, elements of its business plan.  Second, a high stock price was critical so that Amazon

17  would be able to force the conversion of the convertible debt securities it had sold, or was intending

18  to sell, to the public into Amazon common stock and thus avoid being required to ever re-pay the

19  high principal amount of this debt and be able to eliminate the huge annual interest payments

20  otherwise due on that debt, as they knew that Amazon's business model was such that it could never

21  succeed if Amazon was burdened with those annual debt payments on an ongoing basis or was forced

22  to pay off those billions of dollars of debt in cash at its maturity.  Pushing Amazon's stock price

23  higher was also very important for another reason – *a high stock price would result in Amazon*

24  employees' stock options staying in or moving into "the money," causing a large number of Amazon

25  employees to exercise their Amazon stock options – purchases of Amazon stock that generated

26  hundreds of millions of dollars in needed cash for Amazon during the Class Period.  A high stock

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1  price was important to Amazon's top insiders as it would allow top executives and directors to pocket

2  millions of dollars in insider trading proceeds, as they sold off some of the Amazon stock they

3  owned, taking advantage of that high stock price. Finally, Amazon also had a specific need to raise

4  additional capital for reasons fundamental to its business operations. Amazon needed to have its

5  vendors continue to offer financing on favorable terms. A key part of Amazon's "Get Big Fast"

6  strategy was to have an extremely wide variety of merchandise available for purchase – in Bezos'

7  words, "Earth's biggest selection." As a result, at 12/31/98, Amazon had inventory of $29 million

8  (left after the holiday season) and payables of $113 million and, at 12/31/99, Amazon had inventory

9  of $220 million and payables of $463 million   With this large amount of payables, it was essential

10  to Amazon's business operations that vendors offer Amazon credit on favorable terms. If credit were

11  to be curtailed or made more expensive, Amazon would be limited in the products it could offer and

12  its costs would increase. As Amazon noted in its 99 Form 10-K:

13          We do not have long-term contracts or arrangements with most of our vendors
         to guarantee the availability of merchandise, particular payment terms or the
14         extension of credit limits. Our current vendors may stop selling merchandise to us
         on acceptable terms. We may not be able to acquire merchandise from other suppliers
15         in a timely and efficient manner and on acceptable terms.

16  Vendors were much more willing to extend favorable credit terms to Amazon when it had more than

17  $500 million in cash, a cash level Amazon would maintain only by raising huge amounts of new

18  capital from investors.

19          68.     During 98-99, Amazon made the following acquisitions by issuing its common stock

20

| Acquisitions | Date | Shares | Value |
|---|---|---|---|
| 3 Internet companies | 4/98 | 6,400,000 | $ 55 million |
| Junglee Corp. | 8/98 | 9,400,000 | $180 million |
| Sage Enterprises | | | |
| (PlanetAll) | 8/98 | 4,800,000 | $ 92 million |
| e-Niche Inc. | | | |
| (Exchange com) | 4/99 | 1,875,000 | $200 million |
| Accept.com Financial | | | |
| Services Corp. | 6/99 | 1,755,000 | $101.7 million |
| Alexa Internet | 6/99 | 4,370,000 | $250 million |
| LiveBid.com, Inc. | 6/99 | 534,000 | $ 40 million |
| Exchange.com | 5/99 | 2,894,000 | $145 million |
| Acme Electric Motor | | | |

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1 Co. (Tool Crib) &
Back to Basics Toys  11/99  1,514,000 $112 million

2

3 69. Amazon raised the following amounts of cash via the exercise of employee stock

options during 98-00:

4

5

| Year | Cash Raised |
|------|-------------|
| 2000 | $ 44.7 million |
| 1999 | $ 64.5 million |
| 1998 | $ 14.4 million |
| TOTAL: | $123.6 million |

6

7

8 70. In order to attract investors to its stock and create sufficient investor interest in

9 Amazon so that its stock price would trade at higher prices, defendants had to convince investors that

10 Amazon's business model was viable and was working, that Amazon was successfully diversifying

11 its product line, that Amazon was continually attracting large numbers of loyal customers – creating

12 an ever increasing "monetizable" customer base of millions of persons, which the Company was

13 harvesting by selling an ever increasing number of products, generating larger "wallet share" – and

14 that Amazon had sufficient liquidity and working capital to sustain both the massive capital

15 expenditures required by its "Get Big Fast" strategy and the large operating losses that strategy would

16 result in while Amazon's revenues grew to a point which would enable Amazon to reach profitability.

17 71. As a rapidly expanding "new economy" Internet company, analysts and investors

18 expected Amazon to lose money on a current basis. So, in evaluating Amazon as an investment,

19 analysts and investors focused first and foremost on the number of customers Amazon had

20 accumulated, second, on how its revenues were growing and its new business ventures were

21 succeeding, and third, on its cash revenues and liquidity.

22 72. During 98, Amazon aggressively pursued its "Get Big Fast" strategy. In 5/98, Amazon

23 tapped the capital markets by raising $325 million in new capital through the sale of straight *debt*

24 *securities.* Due to the apparent success of Amazon's "Get Big Fast" strategy, the stock climbed from

25 $5 per share in early 98 to $24-1/2 in 7/98 and Amazon and its financial advisors/underwriters began

26 to plan another large equity securities offering so Amazon could raise the money necessary to

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1   continue to fund its expansion and diversification program.  However, as some analysts and writers

2   began to question Amazon's "Get Big Fast" strategy, its escalating losses and its business model,

3   Amazon's stock price declined, falling 21% in one day on 8/31/98 – its largest one-day percentage

4   price decline in its history as a public company – and continued to decline to as low as $11 in mid-

5   9/98.

6         73.     This sharp decline in Amazon's stock price endangered Amazon's business model and

7   its financing plans, as well as its insiders' plan to unload increasing amounts of the Amazon stock

8   they owned at much higher, inflated prices.  Defendants were determined to halt this decline in

9   Amazon's stock and push it back higher and knew that to do this, it was imperative that they convince

10  investors that Amazon's "Get Big Fast" strategy was succeeding – and especially that due to *strong*

11  *customer growth* it was building *an ever-larger base of customers/customer accounts which*

12  *Amazon would "mine" or "monetize" by selling them an even larger selection of products and*

13  *services, increasing its revenue per customer ("wallet share") and its overall revenues, which was*

14  *indispensable to the huge revenue growth necessary for Amazon to ever achieve profitability*.

15        74.     However, due to their access to material non-public information about Amazon's

16  business and operations, by 10/98, Amazon's insiders knew that the business model was seriously

17  flawed, it was not building anywhere near the numbers of total customers claimed, and was not

18  achieving the rate of repeat customer spending necessary for the business to succeed and thus it was

19  highly unlikely that Amazon's "Get Big Fast" strategy could succeed or would ever result in Amazon

20  achieving profitability.  However, to cover this up and deceive enough investors into believing that

21  Amazon's increasing losses were consistent with its business strategy, and that Amazon's business

22  model was not only working but was cash efficient and capital effective, defendants disseminated

23  false and misleading statements to the securities markets about Amazon's operations, business model,

24  customer metrics and its revenue and profit prospects.

25        75.     As part of this scheme, Morgan Stanley and First Boston extracted from Amazon what

26  they knew was an illegal agreement that Amazon would indemnify them against any cost or liability

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1    from any suit for their participation in the scheme to sell the 4.75% and 6.875% convertible notes,

2    knowing that the huge amounts to be raised for Amazon from the 4.75% and 6 875% convertible note

3    offerings and Amazon's large D&O insurance policy would provide a substantial buffer and protect

4    them from any adverse consequences of their illegal conduct, thus permitting them to participate in

5    the fraudulent scheme with impunity.

6        76.    Morgan Stanley and First Boston and their analysts had the opportunity to commit the

7    fraud by virtue of their participation in the convertible note offering processes and their issuance of

8    analyst reports on Amazon, while acting as marketmakers in its stock, and were motivated to

9    participate in the scheme by the prospect of earning millions in *risk-free* underwriting fees for the

10   huge convertible note offerings, giving them a direct economic incentive to inflate Amazon's stock

11   price.

12       77.    Morgan Stanley and First Boston also issued false research reports on Amazon to help

13   artificially inflate its stock in anticipation of, in connection with and after the offering of the 4.75%

14   and 6.875% convertible notes.  They also knew Amazon's main venture capital investor, Doerr,

15   controlled many other private companies that his firm Kleiner Perkins would likely later take public

16   and, if they helped Amazon with its scheme, they could get lucrative business from Doerr and Kleiner

17   Perkins-controlled companies in the future which, in fact, they did as pleaded in ¶¶55-56.

18       78.    Morgan Stanley and First Boston assisted the Amazon Defendants in planning the

19   4.75% and 6.875% convertible note offerings, purportedly conducting "due diligence" investigations

20   into Amazon's operations and future prospects.  Morgan Stanley and First Boston and their analysts

21   had intimate access to Amazon's confidential corporate information and also constantly

22   communicated with Bezos, Jenson and Galli about intimate details of Amazon's business in their

23   roles as financial advisors to the Company.  As a result, Morgan Stanley and First Boston and their

24   analysts learned of, or deliberately disregarded, the adverse facts concerning and conditions affecting

25   Amazon's business as detailed herein.

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

79.     To implement the scheme, Morgan Stanley and First Boston met with Amazon, its accountants and counsel during the weeks prior to the 2/99 and 2/00 convertible note offerings, participating in "drafting sessions" to discuss the timing and terms of the offerings and agreed upon the actions necessary to complete the offerings, including the strategy to best accomplish the offerings, the language of and disclosure in the Registration Statements and Prospectuses and what responses would be made to the SEC. Both before and after the convertible note offerings, Morgan Stanley and First Boston published false research reports on Amazon, creating the impression that Amazon's business was successful, growing and moving toward profitability.

80.     As pleaded at ¶¶150, 175, 173 and 180-182, First Boston (Buyer/Kiggen) and Morgan Stanley (Meeker) issued extraordinarily glowing – and very false – research reports about Amazon, extolling Amazon's new ACN partnerships, which would supposedly generate hundreds of millions of dollars of high-margin revenue over the next few years, while publishing Amazon's false customer metrics. At the time these reports were issued, First Boston (Buyer/Kiggen) and Morgan Stanley (Meeker) knew that Amazon was in the process of preparing an offering of the 6.875% convertible notes which would be sold/distributed by Morgan Stanley and First Boston. These were false statements and/or manipulative devices done to artificially inflate Amazon's stock price at a critical point in time – a key part of the scheme to sell the 6.875% convertible notes on much more favorable terms than would have been possible had Amazon's stock sold at its true value, which was far below its artificially inflated levels. Publishing and distributing these false reports at that time was a manipulative device and contrivance to help artificially inflate Amazon's stock price and a violation of the SEC's "quiet period" rule.

81.     Defendants' fraudulent scheme was a success – for them   In the convertible note offerings, Amazon raised over $1.8 billion, while Amazon got over $14.4 million in 98, $64.5 million in 99 and $44.7 million in 00 from the exercise of "in the money" stock options by Amazon employees – a total of $123.6 million. Morgan Stanley and First Boston got approximately $50 million from the two convertible note offerings. The Individual Amazon Defendants also sold 6 5

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934     - 66 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone· 619/231-1058 • Fax· 619/231-7423

1 | million shares of their Amazon stock at inflated prices, pocketing over $250 million in illegal insider

2 | trading proceeds. The securities analysts got large cash payments as compensation and bonuses for

3 | their roles in helping with Amazon's note offerings. Kleiner Perkins (and Doerr) profited by millions

4 | due to the Amazon investment in and/or public offerings of the companies Kleiner Perkins controls

5 | which were facilitated by Amazon's investments in the companies at overvalued levels.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

RECYCLED PAPER MADE FROM 50% POST CONSUMER CONTENT

## BACKGROUND TO THE CLASS PERIOD

82.     Amazon opened for business in 95 and went public in 97.  In 97-98, Amazon adopted and began to implement a "Get Big Fast" strategy by which it expanded the size and scope of its business, greatly increasing and diversifying the products it sold, while massively expanding its distribution and customer service infrastructure, at a cost of hundreds of millions of dollars. Defendants knew that the "Get Big Fast" strategy was extremely dangerous as it would require the expenditure of billions of dollars by Amazon to fund the capital expenditures required by its "Get Big Fast" expansion/diversification and result in Amazon incurring hundreds of millions of dollars of losses before Amazon's increased revenues and operating efficiencies hopefully enabled it to achieve profitability.  Amazon raised $325 million in early 98 by selling debt securities.  However, this was only a fraction of the money Amazon needed to raise to fund its "Get Big Fast" diversification and expansion and due to Amazon's financial condition, it could not sell any substantial additional amount of debt.  Thus, defendants knew that in order for Amazon's "Get Big Fast" strategy to have a chance to succeed, it was indispensable that the Company *raise billions of dollars of new capital to fund its massive expansion program and cushion its huge ongoing losses*.  This need to raise capital, in turn, made it very important that Amazon push its stock price higher as this:

(a)     Would enable Amazon to sell hundreds of millions of dollars of new equity securities and raise hundreds of millions of dollars of needed capital and also use its stock to acquire other e-tailers on favorable terms and thus quickly broaden the product lines it sold;

(b)     Would enable Amazon to force the conversion of the convertible debt securities it had sold and was intending to sell to the public into Amazon common stock and thus avoid being required to ever repay the high principal amount of this debt and be able to eliminate the huge annual interest payments otherwise due on that debt, as they knew that Amazon's business model was such that it could never succeed if Amazon was burdened with those annual debt payments on an ongoing basis or forced to pay off those billions of dollars of debt in cash at its maturity;

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1            (c)     Would result in a large number of Amazon employees exercising their stock

2 options – *exercises that generated hundreds of millions of dollars in needed cash for Amazon;*

3            (d)     Would allow top Amazon executives and directors to pocket millions in insider

4 trading proceeds, as they sold off some of the Amazon stock they owned; and

5            (e)     Would allow Amazon to raise additional capital to show large cash resources

6 and a stronger working capital position so its vendors would continue to offer inventory financing

7 on favorable terms.

8       83.     By the Fall of 98, the defendants were planning a large securities offering for Amazon.

9 In order for the Company to attract investors to its stock and create sufficient investor interest in

10 Amazon so that its stock price would trade at high prices, Amazon had to convince investors that

11 Amazon's business model was viable and worked, that Amazon was successfully diversifying its

12 product line, that the Company was continually attracting large numbers of loyal customers – creating

13 an ever increasing "monetizable" customer base which Amazon was harvesting by selling to them

14 an ever increasing number of products – and that Amazon had sufficient liquidity and working capital

15 to sustain both the massive capital expenditures required by its "Get Big Fast" strategy and the large

16 operating losses that strategy would result in while Amazon's revenues grew, enabling it to reach

17 profitability.

18       84.     As a rapidly expanding "new economy" Internet company, analysts and investors

19 expected Amazon to lose money on a current basis. So, in evaluating Amazon as an investment,

20 analysts and investors first and foremost focused on the number of customers Amazon had

21 accumulated, second, on how its revenues were growing and its new business ventures were

22 succeeding, and third, on its cash revenues and liquidity. Thus, in order for Amazon to create

23 sufficient investor interest in the Company so that its stock would trade at inflated prices, it had to

24 convince investors that the business model was not only viable but was actually working and that

25 Amazon had sufficient liquidity to sustain the massive capital expenditures required by its "Get Big

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

1 Fast" strategy and the large operating losses that strategy would result in until Amazon reached

2 profitability.

3       85.    During 98, Amazon aggressively pursued its "Get Big Fast" strategy. In 5/98, Amazon

4 tapped the capital markets by raising $325 million in new capital through the sale of straight *debt*

5 securities. Due to the apparent success of Amazon's "Get Big Fast" strategy, Amazon's stock climbed

6 from $5 per share in early 98 to $24-1/2 in 7/98 and Amazon and its financial advisors/underwriters

7 began to plan another large equity securities offering so Amazon could raise the money necessary

8 to continue to fund its expansion and diversification program. However, as some analysts and writers

9 began to question Amazon's "Get Big Fast" strategy, its escalating losses and its business model,

10 Amazon's stock price declined, falling 21% in one day on 8/31/98 – its largest one-day percentage

11 price decline in its history as a public company – and continued to decline to as low as $11 in mid-

12 9/98.

13       86.    By 9/98, defendants were planning and working on a large offering of Amazon's

14 convertible notes and needed to drive its stock price higher so that an equity offering could be

15 completed on the most favorable, least dilutive terms possible. Thus, this sharp decline in Amazon's

16 stock price endangered Amazon's business model and its financing plans, as well as its insiders' plan

17 to unload increasing amounts of the Amazon stock they owned at much higher, inflated prices.

18 Defendants were determined to halt this decline in Amazon's stock and push it back higher and knew

19 that to do this, it was imperative that they convince investors that Amazon's "Get Big Fast" strategy

20 was succeeding – and especially that due to *strong customer growth* it was building *an ever-larger*

21 *base of customers/customer accounts which it would "mine" or "monetize" by selling them an*

22 *even larger selection of products and services, increasing its revenue per customer ("wallet*

23 *share") and its overall revenues, which was indispensable to the huge revenue growth necessary*

24 *for Amazon to ever achieve profitability*.

25       87.    To deceive enough investors into believing that Amazon's increasing losses were

26 consistent with its business strategy, that the business model was not only working, but cash efficient

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1   and capital effective, defendants disseminated false and misleading statements to the securities

2   markets about Amazon's operations, business model, customer metrics and its revenue and profit

3   prospects. Thus, defendants knew it was important that Amazon's 3rdQ 98 results, to be announced

4   on 10/28/98, be very strong and that it show very strong customer growth.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 71 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

88.     On 10/28/98, Amazon announced its 3rdQ 98 results. Its release stated:

Amazon.com announced that *cumulative customer accounts increased by over 1.2 million during the third quarter to nearly 4.5 million at September 20, 1998*, an increase of over 377 percent from 940,000 customer accounts at September 30, 1997. Repeat customer orders represented more than 64 percent of orders placed during the quarter ended September 30, 1998.

89.     On 10/28/98, subsequent to the release of its 3rdQ 98 results, Amazon held a conference call to discuss Amazon's business. During the call – and in follow-up conversations with analysts – Bezos and Covey stated:

- Amazon now had 4.5 million customer accounts. Amazon had added 1.2 million customer accounts during the 3rdQ 98.

- Adding so many customers during a seasonally weak, non-holiday quarter demonstrated the strength of Amazon's model and that Amazon's model would easily scale beyond books.

- Amazon's active customer base was a very large, valuable and growing asset for the Company.

90.     On 10/29/98, *The Wall Street Journal* reported:

*Amazon ... beat analysts' expectations .... Customer numbers were also up strongly. Amazon said it now has 4.5 million customer accounts, up from 977,000 in the same period year earlier and 3.3 million in the period ended in June* Amazon officials said repeat customers accounted for 64% of orders placed during the quarter, an important trend since it is less costly to keep an old customer, than attract a new one.

\* \* \*

*"Adding so many new customers in what is generally considered an off-season is tremendous" said Lise Buyer, an analyst with Credit Suisse First Boston.   "It proves that Amazon is now a mass market phenomenon, rather than just a service used by techies."*

91.     On 10/29/98, *Knight-Ridder* reported·

Amazon.com signed up 1.2 million customers during the third quarter, *bringing its cumulative total to 4.5 million customer accounts as of Sept. 30.*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

92.     On 10/29/98, First Boston issued a report on Amazon by Buyer, which was based on conversations with Bezos and Covey, who after reviewing the report agreed with Buyer her report should be issued.  It stated:

Another Big Quarter for Amazon.com.

*   *   *

Q398 Proves 2 Points:  *1) Amazon has market appeal, and 2) the model easily scales beyond books*

*   *   *

[W]e will highlight a few key[ ] [statistics].  Customer growth of 1.2 million was really impressive.  *While skeptics argue that Amazon is catering to a small group of techno-dweebs, a customer count of nearly 4.5 million refutes that point.*

*   *   *

The company added 1 2 million new customers during the summer quarter, bringing the total count ... to just under 4.5 million.  *With an active customer base of that size, Amazon is clearly reaching out to a mainstream audience.*

93.     On 11/3/98, Morgan Stanley issued a report on Amazon by Meeker, which was based on and repeated information provided her in conversations with Bezos and Covey, who after reviewing the report, agreed with Meeker her report should be issued.  The report stated:

Cumulative customer accounts grew to an impressive 4.5 million ... up a record 1.2 million Q/Q and up 379% Y/Y – and yo, this was in what should have been a seasonally weak summer.  Repeat purchases constituted 64% of sales, compared with 63% in C2Q98.  Note as always that each of AMZN's customers had handed over his/her credit card number, entered his/her e-mail and home addresses, and made a purchase, *all of which adds up to, in our view, a very large, valuable, and growing asset for the company.*

*   *   *

Again, the emerging presence of AMZN as an online powerhouse reminds us of the early days of America Online – grow, grow, grow, spend, spend, spend, expand, grow, spend more, grow more *and then suddenly reap the financial benefits of having a large, happy customer base* ....

94.     Amazon's tremendous 3rdQ 98 results – *especially its growth in total customers* – was extremely important to analysts and investors who followed Amazon.  The *Dow Jones News Service* reported:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax. 619/231-7423

1         Amazon ... report[ed] results that beat Wall Street expectations Wednesday, prompting analysts to use words like *"fantastic"* and *"excellent"* to describe the third

2    quarter.

3                          \*   \*   \*

4         "It was a *fantastic quarter* by just about every measure I've been able to look

5    at," said ... an analyst ....

6                          \*   \*   \*

         *"They are the kind of numbers that Amazon has shown an ability to report*

7    *to continue to impress Wall Street,"* [an analyst said].

8                          \*   \*   \*

9         "Clearly the company is showing that customers have embraced Amazon not only as a destination book retailer, but now they've done so on the music front as

10   well,"[an analyst] said. "So the question becomes in how many other categories can they leverage their *quite formidable customer base to continue growth."*

11  The importance of Amazon's claimed number of total customers to the analysts and investment

12  community is demonstrated by how fixated on this key customer metric analysts were:

13

14         (a)     On 10/29/98, Bear Stearns issued a report on Amazon by Ehrens, which was

15  based on conversations with Bezos and Covey, who reviewed the report and assured Ehrens it was

16  accurate.  It stated:

17         *Strong ... Subscriber Momentum.  Revenue reached $153.7 million ....  Revenues were driven by the addition of 1.2 million customers in quarter, reaching 4.5*

18         *million cumulative ... as well as by a 64% repeat order rate.*

19                          \*   \*   \*

20         *Customers Keep Flocking To Amazon.com*

21            *The two best metrics for measuring Amazon.com's health, beyond just plain revenues, are the number of customers it has done business with, and the percentage of its business represented by repeat orders  The key asset, as we've*

22         *repeated again and again, is the customer.  This quarter, Amazon.com impressed us with its performance in both of these metrics.  First, the subscriber base grew*

23         *by 1.2 million in the quarter to nearly 4.5 million.*

24         (b)     On 10/29/98, BT Alex. Brown issued a report on Amazon by Andrikopoulos,

25  based on conversations with Bezos and Covey, who reviewed the report and assured Andrikopoulos

26  it was accurate.  It stated:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

1        —    CORE METRICS CONTINUE TO IMPRESS – DRIVERS OF FUTURE
REVENUE: Repeat purchases accounted for 64% of the total versus 63% in 2Q and

2    60% in 1Q. *Cumulative customer accounts grew to 4.5mm (up 37% Q/Q).*

3            (c)     On 10/29/98, ABN/AMRO issued a report on Amazon by Appleby, which

4    was based on conversations with Bezos and Covey, who reviewed the report and assured him it was

5    accurate. It stated:

6            ***Amazon ended the September quarter with 4.5 million customers, up 39%
sequentially from 3.1 million in Q2.***

7

8            (d)     On 10/29/98, CIBC Oppenheimer issued a report on Amazon by Blodget,

9    which was based on conversations with Bezos and Covey, who reviewed the report and assured

10   Blodget it was accurate. It stated:

11           Customer account growth of 1.2 million crushed our estimate of 780,000, and
increased total accounts to 4.5 million – up 37% sequentially.

12           (e)     On 10/29/98, S.G. Cowen issued a report on Amazon by Reamer, which was

13   based on conversations with Bezos and Covey, who reviewed the report and assured Reamer it was

14   accurate. It stated:

15           Customers. AMZN added more than 1.2 million new customers in the quarter,
bringing the total to 4.5 million customers. ***Some perspective is in order here, given***

16   ***the enormity of this number: last September Amazon had only 940k customers,***
***having taken them 2 years to get to that figure; this quarter they added more***

17   ***customers than they were able to for 8 quarters running. This is increasing returns***
***at its finest: word of mouth buzz coupled with smart marketing programs equals***

18   ***outsized customer additions. If this isn't the knee of the curve, we're not sure what***
***is.***

19

20   95.     The statements made in late 10/98 were false or misleading when issued. The true but

21   concealed facts were:

**Customer Metrics**

22

23           (a)     Amazon was falsifying its key customer metrics in order to artificially inflate

24   its reported number of customers/customer accounts to make Amazon's customer base appear much

larger than it actually was, and its business and business model look more successful than they

25   actually were, and to create the impression that Amazon had a much larger number or base of

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax 619/231-7423

1  customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue

2  growth;

3          (b)      Amazon was artificially inflating its stated total number of customers/customer

4  accounts by including persons who had not purchased from Amazon in over 12 months, which

5  Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

6  likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from

7  Amazon;

8          (c)      Amazon was artificially inflating its stated number of total customers/

9  customer accounts by counting customers based on e-mail addresses, *not* customer names, even

10  though Amazon knew from analysis of its customer data that a material number of persons who had

11  purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

12  *even quadruple counted.* This occurred in part because some customers intentionally signed up as

13  *new users to take advantage of promotions for new customers;*

14          (d)      In order to artificially inflate its total number of customer accounts, Amazon

15  was intentionally not purging its customer base or list of what it knew were dormant, outdated,

16  inactive and duplicative accounts of persons who had ceased doing business with Amazon;

17          (e)      In truth, during the 3rdQ 98, Amazon was suffering serious customer "churn"

18  and was losing nearly as many customers as it was gaining. The truth about Amazon's customer

19  metrics during the 3rdQ 98 is shown below:

20
|                         | 09/30/98 |
|-------------------------|----------|
| Total Customers reported | 4.5M    |
| New Customers reported   | 1.2M    |
| Actual Customers         | 4.1M    |
| Lost/Former Customers    | 400,000 |

23  Thus, contrary to the success of its business model and strong revenue growth prospects conveyed

24  by the number of new customers and total customers which defendants emphasized each quarter,

25  Amazon's net customer growth was anemic;

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

**Expansion and Infrastructure Buildout**

(f)     Amazon's vast product expansion and infrastructure buildout would likely result in Amazon suffering excessive inventories and margin write-offs, as Amazon was undertaking this huge expansion and buildout without having put in place the controls and reporting systems necessary for Amazon to control its product purchases and selection in a way so as to avoid accumulating material amounts of unsaleable or overvalued inventories;

(g)     Due to Amazon's overly rapid expansion of the products it offered for sale, its lack of adequate internal controls, and the enormous inefficiencies in its new warehouse distribution system, Amazon was ordering millions of dollars of unneeded and unnecessary merchandise, which would result in Amazon being forced to take large inventory write-offs, adversely impacting its financial condition and results, and

**Financial Condition and Statements**

(h)     Amazon's financial condition and financial statements for the 3rdQ 98 were falsified as detailed at ¶¶262-267 and 289-297, due to Amazon's reporting product returns to vendors which it had not returned or which it was not entitled to return.

96.     Amazon's stock soared following the reports of its "*excellent*," "*tremendous*" and "*fantastic*" 3rdQ 98 customer metrics, reaching $22 by 11/3/98, $30-19/64 by 11/20/98 and $50 by 12/16/98. As Amazon's stock increased in price to artificially inflated levels due to these very positive statements about Amazon's business, Amazon insiders Alberg, Bezos, Shriram, Dalzell, Spiegel, Covey, Risher and Engstrom took advantage of this artificial inflation of Amazon's stock by selling off 660,000, 1,080,000, 180,000, 150,000, 90,000, 150,000, 210,000 and 20,400 shares of their stock at as high as $38.32 per share, pocketing $15.2 million, $23.1 million, $4.3 million, $4.4 million, $2.4 million, $3.9 million, $5.6 million and $760,000, respectively, in illegal insider trading proceeds. In total, between 11/2/98 and 11/25/98, these Individual Amazon Defendants unloaded 2,540,400 shares of their Amazon stock for $60 million in illegal insider trading proceeds, *by far the largest burst of insider trading by Amazon's top insiders in the history of the Company to date*!

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax. 619/231-7423

97.    On 12/14/98, *Business Week* published a cover story on Amazon stating:

By pioneering – and damn near perfecting – the art of selling online, Amazon is re-defining retailing.

\* \* \*

Indeed, in nearly the blink of a cursor, ***Amazon has blossomed into cyberspace's biggest consumer merchant, with 4.5 million customers*** .... No wonder investors are gaga

\* \* \*

Besides spurring more purchases, there's another huge bonus for Amazon: It can gather instant feedback on customer preferences to divine what else they might want to buy.  Such valuable information has proven forbiddingly effective in capturing new markets online.  While it may appear as though the company is careening willy-nilly into new terrain, Amazon is in fact targeting areas its customers have already requested. "We want Amazon.com to be the right store for you as an individual," says Bezos. ***"If we have 4.5 million customers, we should have 4.5 million stores."***

\* \* \*

"[U]nlike retailers, who must continually invest in new stores to hike revenues, ***Amazon can boost sales by simply getting more people to come to its single online store.  Says Chief Financial Officer Joy Covey:  "I don't think we could have grown a physical store base four times in one year."***

Amazon cooperated with *Business Week* in the preparation and publication of this article as a vehicle to disseminate false information

98.    On 1/11/99, First Boston issued a report on Amazon by Buyer, after discussions with Bezos and Covey, which was based on and repeated information provided by them.  Bezos and Covey reviewed this report before it was issued and agreed with Buyer it should be issued.  The report stated:

Increasing returns economics work; ***big really does grow bigger faster***. Amazon.com continues to show faster rates of growth and significantly higher revenues per customer ***than its closest competitor barnesandnoble.com***

Amazon's recently released Q4 revenue estimate of $250 million was a tremendous number ....

The holiday period customer growth of 1.0 million was also impressive Assuming a customer addition rate of 75,000 to 80,000 per week (the pre-Christmas season rate), we believe the company will report total new customers for the quarter in the 1.4 to 1.5 million range.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

* * *

*A larger base of customer/evangelists. It helps to have nearly 6.0 million reference accounts, each of who [sic] will likely tell a friend about shopping on-line.*

99.    On 1/19/99, *The Seattle Post-Intelligencer* published an article on Amazon headlined and stating:

AMAZING AMAZON.COM WRITING A PAGE OF HISTORY

A year and a half ago, a stock analyst said Amazon.com would soon be "Amazon.toast." *Its business has growth tenfold since then, and its stock has tripled in the past three months....* Operationally, Amazon com is like an hourglass, funneling orders for 4.7 million different kinds of goods *to 5 million different customers*.

Amazon cooperated with the *Seattle Post-Intelligencer* in the preparation and publication of this article as a vehicle to disseminate false information.

100.    On 1/26/99, as the defendants were actively working on and preparing the huge 4.75% convertible note offering to take place in a few days, Amazon announced its 4thQ 98 results

**RECORD HOLIDAY SEASON PUSHES CUSTOMER TOTAL PAST 6.2 MILLION ....**

.. Amazon.com, Inc. today announced financial results for the fourth quarter of 1998 and for the 1998 fiscal year.  Net sales for the fourth quarter were $252.9 million, an increase of 283 percent over net sales of $66.0 million for the fourth quarter of 1997.  Based on fourth quarter sales, Amazon.com has achieved a $1 billion annualized sales level three and one-half years after opening for business.

* * *

*Amazon.com announced that cumulative customer accounts increased by more than 1.7 million during the fourth quarter to over 6.2 million at December 31, 1998, an increase of over 300 percent from 1.5 million customer accounts at December 31, 1997.*  Repeat customer orders represented more than 64 percent of orders placed on Amazon.com during the quarter ended December 31, 1998.

101.    On 1/26/99, subsequent to the release of its 4thQ 98 results, Amazon held a conference call to discuss Amazon's business.  During the call – and in follow-up conversations with analysts – Bezos and Covey stated:

•    Amazon had added 1.7 million customers in the 4thQ 98.

•    Amazon now had 6.2 million active customer accounts.

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 79 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

102.   On 1/26/99, *Bloomberg* carried a story on Amazon's 4thQ 98 results:

Amazon.com Inc. said its fourth-quarter loss widened less than expected as more holiday shoppers used the No. 1 online retailer to buy gifts .... [S]aid John Robb, an analyst at Gomez Advisors Inc., a Concord, Massachusetts-based research company[:]  ***"Everyone is willing to overlook losses" because Amazon.com has increased its revenue and customer base so quickly.***

103.   On 1/26/99, *Newsbytes News Network* reported:

AMAZON.COM HANDILY BEATS WALL STREET EXPECTATIONS

... Amazon.com said it has reached the $1 billion in annualized sales mark, after being in business for just three and one-half years.

\*   \*   \*

During the quarter, Amazon.com's cumulative customer accounts increased by more than 1.7 million ***to over 6.2 million as of Dec. 31, 1998,*** a more than 300 percent increase from the 1.5 million customer accounts Amazon.com had in the year-ago quarter, as of Dec. 31, 1997.

104.   On 1/26/99, *Associated Press* reported:

The number of customer accounts at Amazon.com's World Wide Web site increased by more than 1.7 million during the fourth quarter to nearly 6.2 million. That compares with 1.5 million customer accounts at the end of 1997.

105.   On 1/27/99, First Boston issued a report on Amazon by Buyer, which was based on and repeated information provided her in the 1/26/99 conference call and in follow-up conversations with Bezos or Covey, who after reviewing the report agreed with Buyer the report should be issued. The report stated:

***Amazon's   growth   dynamics   continue   to   be   unprecedented   in   our experience.***

\*   \*   \*

***Our overall opinion remains unchanged. We are very big fans of the long term potential and story for both the company and the stock.***

\*   \*   \*

***We are firm believers in the multi-year promise of Amazon.com and suspect this management, known for understatement, was not acting out of character when speaking about the potential to be a "multi-billion dollar revenue generator with tens of millions of customers." To mix our metaphors, this car is on a road with nothing but green lights ahead.***

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 80 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

106.    On 1/27/99, Bear Stearns issued a report on Amazon by Ehrens, which was based on and repeated information provided him in the 1/26/99 conference call and in follow-up conversations with Bezos or Covey  The report stated:

AMAZON.COM REPORTS TERRIFIC FOURTH QUARTER

*Blowout Quarter on Top and Bottom Line.* Amazon.com reported strong fourth quarter earnings yesterday with a narrower than expected loss of [($0 07)] per share versus our estimate of [($0.09)] and consensus of [($0.09)] per share.  Earlier in January, the company had pre-announced fourth quarter revenues of $252 8 million (vs. $185 million estimated), an increase of 65% sequentially and 313% from a year ago.... *Revenue growth was driven by the addition of 1.7 million customers in quarter, reaching 6.2 million cumulative, as well as by a 64% repeat order rate, which is impressive given the large number of new subscribers.*

107.    On 1/27/99, S.G. Cowen issued a report on Amazon by Reamer, which was based on and repeated information provided him in the 1/26/99 conference call and in follow-up conversations with Bezos or Covey.  The report stated:

AMAZON'S HUGE Q4:98 ...

\*   \*   \*

*And You Thought You Already Knew What A Great Q4 Amazon Had? Think Again.* Amazon reported a December quarter that ... provided as much jaw-dropping material as any quarter in their short history.  Without question, Q4:98 provided the most compelling sets of data points  yet that Amazon's commerce portal thesis is becoming a near-term reality   .

\*   \*   \*

Customers:  *AMZN added more than 1.7 million new customers in the quarter, bringing the total to 6.2 million customers.* Some perspective is in order here, given the enormity of this number: last December Amazon had only 1.5mm customers, having taken them a bit over 2 years to get to that figure; this quarter they added more customers than they were able to for 8 quarters running in 1997. Amazon, like AOL and Yahoo! before it, is providing yet another great set of data that proves that increasing returns is real and is powerful.

108.    On 1/27/99, CIBC Oppenheimer issued a report on Amazon by Blodget, which was based on and repeated information provided him in the 1/26/99 conference call and in follow-up conversations with Bezos or Covey.  The report stated:

Quarter highlights. Amazon.com had another great quarter. The key metrics for tracking the company's progress ... are.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax: 619/231-7423

1.     Revenues
2.     **Gross customer accounts**

\*   \*   \*

     **Cumulative customer accounts increased 38% sequentially to more than 6.2 million**.

109.    On 1/27/99, BT Alex. Brown issued a report on Amazon by Andrıkopoulos, which was based on and repeated information provided him in the 1/26/99 conference call and in follow-up conversations with Bezos or Covey. The report stated:

AMAZON.COM INC. "STRONG BUY"

The Benefits Of Scale – Another Impressive Quarter

\*   \*   \*

–     KEY METRICS: ... 1.7mm new customers added in 4Q, vs. estimate of 1.4mm new customers. Total customers totaled 6.2mm customers (38% Q/Q).

\*   \*   \*

METRICS DEMONSTRATE STRENGTH OF THE AMAZON COM BUSINESS

     The core metrics continued to demonstrate the strength of Amazon's overall business . . [T]otal customer count grew 38% sequentially to 6.2mm customers from 4.7mm customers at the end of 3Q. Amazon added more than 1.7mm new customers in 4Q, comparing quite favorably to our assumption of 1.4mm new customers. **In our opinion, the large and rapidly-growing customer base that Amazon has amassed over the past several years continues to represent a powerful strategic weapon for the company, in terms of scale, building a large database of purchasing behavior and information, and creating a highly-recurring revenue model** ....

110.    On 1/27/99, ABN/AMRO issued a report on Amazon by Appleby, which was based on and repeated information provided him in the 1/26/99 conference call and in follow-up conversations with Bezos or Covey. The report stated:

**RESULTS ARE IN ... VERY GOOD**

\*   \*   \*

Customer base continues to grow

     **AMZN added 1.7 new customers ending the year with 6.2 million customers, up 300% Y-O-Y.** Revenue per customer was $47 compared with our estimate of $39 and $54 a year ago and $41 last quarter. Repeat customer orders represented 64% of orders placed on the website during the quarter – in line with 3Q

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1    111.    In reaction to the announcements of 1/26-27/99, Amazon's stock soared from $55 on

2  1/25/99 to $69-7/8 on 1/27/99 and created tremendous demand for the convertible notes Morgan

3  Stanley and First Boston had been shopping to institutional investors as part of a private offering of

4  Amazon's convertible notes.

5    112.    On 1/29/99, *The Wall Street Journal* reported:

6  AMAZON.COM LAUNCHES CONVERTIBLE BOND ISSUE

7    Champing at the bit ... bond buyers joined equity investors ... eagerly scooping
   up a $1.25 billion convertible-bond offering from Amazon.com Inc., *the largest U.S.*
8  *convertible-bond offering ever*.

9    As the day began, Amazon.com was slated to sell $500 million of the
   convertible bonds.  But *strong investor demand* led the ... underwriter, Morgan
10 Stanley Dean Witter & Co., to boost the private offering to the $1.25 billion level

11                              *   *   *

12   Amazon.com's latest bond offering is a record-setter in terms of proceeds
   raised for a U.S. convertible-bond deal ....
13
     113.    On 1/29/99, CIBC Oppenheimer issued a report on Amazon by Blodget, after
14
   discussions with Bezos and Covey, which was based on and repeated information provided by them.
15
   Bezos and Covey reviewed this report before it was issued and assured him it was accurate.  The
16
   report stated:
17
     Amazon.com sold a convertible bond offering yesterday, raising a paltry $1.25
18 billion (*on very good terms*).  The offering was increased from $500 million at the
   last minute, *apparently because of enormous demand.  Investors concerned that*
19 *Amazon.com's spending habits might cause it to burn through too much of its*
   *existing $400 million war chest ... now need not be so concerned.* .
20
     Amazon.com has always been focused on the long term, and this offering is
21 all about the long term.  Amazon.com believes ... that the leading e-commerce
   company will one day be able to serve tens of millions of customers and generate tens
22 of billions of dollars in annual revenue.  Amazon.com believes that in order to have
   the best shot at being that company, it must invest heavily now.  *With $1.25 billion*
23 *of new cash in the bank, it can now invest as heavily as it wants.*

24                              *   *   *

25   Additional Information:

26     Total Customers            6.2 million

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1     114.   On 2/1/99, *The Wall Street Journal* reported:

2            On Thursday of last week, the Internet retailer of books, music and videos
       sold $1.25 billion of subordinated notes convertible into the company's common
3      shares, a private issuance that ranks among the largest convertible deals on record.

4            ... [T]he offering was more than doubled from its planned size after
       underwriters discovered that many investors are just as enthusiastic about securities
5      convertible into an Internet company's stock as they are about those stocks.

6     115    On 2/3/99, Amazon issued $1.25 billion of 4 75% convertible notes to be sold by

7     Morgan Stanley and First Boston   The shares of Amazon stock to cover the conversion of these

8     notes was registered with the SEC via a Registration Statement filed with the SEC and signed by

9     Bezos, Alberg, Stonesifer, Jenson, Covey and Doerr.

10    116.   As Amazon's stock price remained inflated due to positive statements about Amazon's

11    business, Amazon insiders Alberg, Cook, Covey, Spiegel, Shriram and Engstrom took advantage of

12    this artificial inflation of Amazon's stock by selling off 20,000, 23,000, 23,000, 80,000, 22,000 and

13    135,600 shares of their stock at as high as $61.34 per share, pocketing $1.0 million, $1.2 million,

14    $1.2 million, $4.1 million, $1.1 million and $8.3 million, respectively, in illegal insider trading

15    proceeds.  In total, between 2/8/99 and 2/25/99, these Individual Amazon Defendants unloaded

16    303,600 shares of their Amazon stock for $17.1 million in illegal insider trading proceeds.

17    117.   The statements made in late 12/98-2/99 were false or misleading when issued.  The

18    true but concealed facts were:

19    **Customer Metrics**

20            (a)    Amazon was falsifying its key customer metrics in order to artificially inflate

21    its reported number of customers/customer accounts to make Amazon's customer base appear much

22    larger than it actually was, and its business and business model look more successful than they

23    actually were, and to create the impression that Amazon had a much larger number or base of

24    customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue

25    growth;

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934     - 84 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1        (b)     Amazon was artificially inflating its stated total number of customers/customer

2 accounts by including persons who had not purchased from Amazon in over 12 months, which

3 Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

4 likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from

5 Amazon;

6        (c)     Amazon was artificially inflating its stated number of total customers/

7 customer accounts by counting customers based on e-mail addresses, *not* customer names, even

8 though Amazon knew from analysis of its customer data that a material number of persons who had

9 purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

10 *even quadruple counted*.  This occurred in part because some customers intentionally signed up as

11 new users to take advantage of promotions for new customers;

12        (d)     In order to artificially inflate its total number of customer accounts, Amazon

13 was intentionally not purging its customer base or list of what it knew were dormant, outdated,

14 inactive and duplicative accounts of persons who had ceased doing business with Amazon;

15        (e)     In truth, during the 4thQ 98, Amazon was suffering serious customer "churn"

16 and was losing nearly as many customers as it was gaining.  The truth about Amazon's customer

17 metrics during the 4thQ 98 is shown below:

18
|                          | 12/31/98 |
|--------------------------|----------|
| Total Customers reported | 6.2M     |
| New Customers reported   | 1.7M     |
| Actual Customers         | 5.7M     |
| Lost/Former Customers    | 500,000  |
| Actual Net New Customers | 1.6M     |

21 Thus, contrary to the success of its business model and strong revenue growth prospects conveyed

22 by the number of new customers and total customers which defendants emphasized each quarter,

23 Amazon's net customer growth was anemic,

24 **Expansion and Infrastructure Buildout**

25        (f)     Amazon's vast product expansion and infrastructure buildout would likely

26 result in Amazon suffering excessive inventories and margin write-offs, as Amazon was undertaking

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1    this huge expansion and buildout without having put in place the controls and reporting systems

2    necessary for Amazon to control its product purchases and selection in a way so as to avoid

3    accumulating material amounts of unsaleable or overvalued inventories;

4           (g)    Due to Amazon's overly rapid expansion of the products it offered for sale,

5    its lack of adequate internal controls, and the enormous inefficiencies in its new warehouse

6    distribution system, Amazon was ordering millions of dollars of unneeded and unnecessary

7    merchandise, some from unauthorized vendors, which would result in Amazon being forced to take

8    large inventory write-offs or having to liquidate product at prices well below Amazon's cost,

9    adversely impacting its financial condition and results; and

10   **Financial Condition and Statements**

11          (h)    Amazon's financial condition and financial statements for the 4thQ 98 were

12   falsified as detailed at ¶¶262-267 and 289-297, due to Amazon's reporting product returns it had yet

13   to return or which it was not entitled to return.

14          118.   On 3/29/99, Amazon issued a press release regarding its new auction site, stating·

15   ***AMAZON.COM LAUNCHES ONLINE AUCTION SITE;***

16   Third-Party Sellers Can Now Reach Amazon.com's Community of *8 Million*
     *Pre-Registered, Experienced Online Buyers*

17
18          ... Amazon.com, the leading online retailer, today opened Amazon.com
     Auctions to help people find, discover, buy – and now sell – virtually anything online.

19          ***Amazon.com's 8 million customers are pre-registered to begin buying and***
     ***selling immediately in more than 800 categories*** ....

20
21          119.   On 3/29/99, First Boston issued a report on Amazon by Buyer, after discussions with

22   Bezos and Covey, which was based on and repeated information provided by them. Bezos or Covey

23   reviewed this report and agreed with Buyer it should be issued. The report stated:

24          Amazon.com will open Amazon Auctions as the company continues to build its
     presence as the e-commerce destination site.... ***Amazon's customer base has***
     ***increased from 6.2 million at 12/31/98 to more than 8.0 million currently***.... This
25   is the largest quarterly increase in the customer base yet and clearly illustrates that the
     momentum continues. Over the last six months, Amazon has attracted approximately
26   3.5 million customers; increasing returns economics appear to be working. The larger
     the company gets, the faster it grows.  ***Based on the new customer count of 8.0***

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 86 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1   *million*, and our belief in the tremendously positive cross marketing implications of
2   an auction site adjoining the current retailing site, we reiterate our Buy
    recommendation for long-term oriented, risk tolerant investors.

3       120.    On 3/30/99, BT Alex. Brown issued a report on Amazon by Andrikopoulos, after

4   discussions with Bezos and Covey, which was based on and repeated information provided by them.

5   Bezos or Covey reviewed this report before it was issued and assured him it was accurate. The report

6   stated:

7           —    Amazon.com plans to launch an on-line auction service within the next
            several weeks, and possibly this week.
8
                                        *   *   *
9
10          *We note that the Company's rich, loyal and rapidly growing base of 8 million
            customers*, coupled with a strong product fulfillment platform, should prove to be
            major strategic advantages for the Company as it seeks to build essential critical mass
11          around its auction service.

12      121.    On 4/16/99, the *Dow Jones Business News* reported:

13          Shares of Internet-retailing pioneer Amazon, which recently entered the
            auction business, were up [$11.38], or 14%, at [$95] in afternoon trading. Shares of
14          leading online auctioneer eBay Inc. were off $5 at $172.875. Shares of Onsale were
            off $5.25, or 15%, at $30.3125, while Cyberian Outpost and Ubid Inc. were little
15          changed.

16          Donaldson Lufkin & Jenrette analyst Jamie Kiggen raised his investment
            rating on Amazon.com to "top pick" from "buy" and lifted his six-to-12-month price
17          target to [$140] from [$95]. Kiggen believes the company's new online auction
            business will boost revenue and profit margin. The analyst believes Amazon will be
18          among the "two or three consumer auction sites what wind up dominating the
            enormous consumer auction category," which he projects will be $35 billion in 2003.
19
                                        *   *   *
20
21          In his research note, DLJ's Kiggen said Amazon's initial execution in entering
            the online auction market has been "superb."
22
            "The company has already amassed thousands of listings in many auction
23          categories and has done a terrific job of integrating auctions throughout its core
            commerce site, turning its 8 million transacting customers into both bidders and
            sellers,'" Kiggen wrote.
24
            The analyst added that success in the auction business will generate an
25          incremental revenue stream that carries a gross margin of at least 80%, which should
            enable Amazon to achieve an operating margin in the low-to-mid teens by the year
26          2003.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax. 619/231-7423

122.   On 4/16/99, *Associated Press* reported·

Amazon.com was one bright spot on the technology horizon.  The online bookseller's shares soared [$11.38] to [$95] after Donaldson Lufkin & Jenrette analyst Jamie Kiggen raised his investment rating and price target on the stock. Kiggen said Amazon is likely to be *"one of two or three consumer auction sites that wind up dominating the enormous consumer auction category" on the Internet*.

123.   On 4/28/99, Amazon reported its 1stQ 99 results via a release stating:

Amazon.com today announced financial results for the first quarter of 1999.  Net sales for the first quarter were $293.6 million, an increase of 236 percent over net sales of $87.4 million for the first quarter of 1998.

*   *   *

Amazon.com announced *that cumulative customer accounts increased by more than 2.2 million during the first quarter to more than 8.4 million at March 31, 1999, an increase of more than 250 percent from the 2.3 million customer accounts at March 31, 1998.*

... [S]aid Jeff Bezos, Amazon.com founder and CEO[:]  *"We're particularly pleased with Amazon.com Auctions, which is off to a very fast start ...."*

*   *   *

With the launch of Amazon.com Auctions, *Amazon.com's more than 8.4 million customers have been preregistered to begin buying and selling immediately in more than 800 categories.*

124.   On 4/29/99, First Boston issued a report on Amazon by Buyer, after discussions with Bezos and Covey, which was based on and repeated information provided by them.  Bezos or Covey reviewed this report and agreed Buyer should issue it.  The report stated:

*The rate of new customer additions was truly remarkable in our opinion. Adding 2.2 million new customers in the quarter – after having added 1.8 million in December* can only be viewed as proof of the theories of increasing returns.

*   *   *

The rock solid performance of the company so far affords management the benefit of the doubt when evaluating near-term pain for long-term gain.  The company has repeatedly delivered impressive revenue and *customer growth* ....

125.   On 4/29/99, Morgan Stanley issued a report on Amazon by Meeker, which was based on and repeated information provided her in conversations with Bezos or Covey  Meeker, Bezos and Covey agreed this report should be issued.  The report stated·

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934         - 88 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax· 619/231-7423

1            —     CQ1 was a quarter of strong mo' for AMZN: ... *customer count of 8.4 million*
2   *(up a record 2.2 million quarter-to-quarter); and a record 66% repeat buyer hit rate*.

3        126.    On 4/29/99, Merrill Lynch issued a report on Amazon by Blodget, after discussions

4   with Bezos and Covey, which was based on and repeated information provided by them.  Bezos or

5   Covey reviewed this report before it was issued and assured Blodget it was accurate.  It stated:

6        •     Amazon.com's Q1 results slightly *exceeded our revised expectations in all*
7   *key metrics*.

                            \*   \*   \*

8        •     *The addition of 2.2 million new customers brought gross customer accounts*
9   *to 8.4 million, exceeding even our revised estimate of 8.0 million.  The company*
10  *added more customers in the quarter than it had in total at this point last year*.

                            \*   \*   \*

11       •     *Auctions appear to have gotten off to a good start, with an estimated*
12   *500,000 customers participating in the first month*.

13      127.    On 4/29/99, Bear Stearns issued a report on Amazon by Ehrens, after discussions with

14   Bezos and Covey, which was based on and repeated information provided by them.  Bezos or Covey

15   reviewed this report before it was issued and assured Ehrens it was accurate.  The report stated:

16      \*\*\*    Customer Additions and Repeat Usage Up.  Amazon added a record 2.2
           million customers in the first quarter, beating our recently revised estimate of 1.8
17   million and *bringing the total number of customers to 8.4 million*.

18      128.    On 4/29/99, Warburg Dillon Read issued a report on Amazon by Zeilstra, after

19   discussions with Bezos and Covey, which was based on and repeated information provided by them

20   Bezos or Covey reviewed this report before it was issued and assured Zeilstra it was accurate.  It

21   stated:

22          New customer accounts were up 2.2mm, or 35% sequentially, *to 8.4mm,*
        *driving the strong revenue growth in the quarter*.... We see this as a positive sign,
23   especially given the number of new customers in the quarter.

                            \*   \*   \*

25          NEW INITIATIVES AND ACQUISITIONS COMING ON LINE.  At the
        end of the quarter Amazon launched its auction site, Amazon.com Auctions ...  *So*
26   *far the company has seen a very positive response, with more first-month*
        *participants than it had for the music service when it was launched*.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

129   On 4/29/99, BT Alex. Brown issued a report on Amazon by Andrikopoulos, after discussions with Bezos and Covey, which was based on and repeated information provided by them. Bezos or Covey reviewed this report before it was issued and assured Andrikopoulos it was accurate. It stated:

### KEY METRICS EXCEED EXPECTATIONS ACROSS THE BOARD

Amazon's core metrics exceeded expectations across the board .... *The total customer count grew by more than 35% Q/Q to 8.4 million customers, up from 6.2 million customers at the end of 4Q 1998.*

\* \* \*

| METRIC | 3QA '98 | 4QA '98 | 1QA '99 | 2QE '99 | 1999E |
|--------|---------|---------|---------|---------|-------|
| | | \* \* \* | | | |
| Total Customers | 4.5mm | 6.2mm | 8.4mm | 10.7mm | 16.2mm |
| Q/Q Growth | 37% | 39% | 35% | 28% | NA |

130.   On 4/29/99, SG Cowen issued a report on Amazon by Reamer, after discussions with Bezos and Covey, which was based on and repeated information provided by them. Bezos or Covey reviewed this report before it was issued and assured Reamer it was accurate. It stated:

*Customers:  AMZN added more than 2.2 million new customers in the quarter, bringing the total to 8.4 million customers.  Some perspective is in order here, given the enormity of this number:  last March Amazon had only 2.2mm customers, having taken them a bit over 2 years to get to that figure; this quarter they added more customers than they were able to for their entire lifetime up until March of 1998.  Amazon ... is providing yet another great set of data that proves that increasing returns is real and is powerful.  Investors should not underestimate the financial power that increasing returns plays in Amazon's story.*

\* \* \*

*Because Amazon tends to do a remarkable job at "monetizing" their customers once they get them to make their first order (that is, generates greater and greater revenue from them by increasing purchasing frequency and purchase size) ....* With 2.2 million new customers ready to purchase (and purchase more in greater categories and price mechanisms) in 2H:99 and beyond, we're hard pressed to envision a scenario in which Amazon doesn't continue to see some nice strength on the customer front and on the top line.

131.   During 4/99, Amazon issued its 98 Annual Report to Shareholders, which included a letter signed by Bezos, which stated:

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 90 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1    *Cumulative customer accounts grew from 1.5 million at the end of 1997 to 6.2*
2    *million at the end of 1998 – an increase of over 300%.*

* * *

3
4    *We're fortunate to benefit from a business model that is cash-favored and*
     *capital efficient.*

5    132    The statements made during 3/29/99-4/99 were false or misleading when issued.  The
6    true but concealed facts were:

7    **Customer Metrics**

8    (a)    Amazon was falsifying its key customer metrics in order to artificially inflate
9    its reported number of customers/customer accounts to make Amazon's customer base appear much
10   larger than it actually was, and its business and business model look more successful than they
11   actually were, and to create the impression that Amazon had a much larger number or base of
12   customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue
13   growth;

14   (b)    Amazon was artificially inflating its stated total number of customers/customer
15   accounts by including persons who had not purchased from Amazon in over 12 months, which
16   Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very
17   likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from
18   Amazon;

19   (c)    Amazon was artificially inflating its stated number of total customers/
20   customer accounts by counting customers based on e-mail addresses, *not* customer names, even
21   though Amazon knew from analysis of its customer data that a material number of persons who had
22   purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*
23   *even quadruple counted*.  This occurred in part because some customers intentionally signed up as
24   new users to take advantage of promotions for new customers;

25
26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

1    (d)    In order to artificially inflate its total number of customer accounts, Amazon
2  was intentionally not purging its customer base or list of what it knew were dormant, outdated,
3  inactive and duplicative accounts of persons who had ceased doing business with Amazon;

4    (e)    In truth, during the 1stQ 99, Amazon was suffering serious customer "churn"
5  and was losing nearly as many customers as it was gaining.  The truth about Amazon's customer
6  metrics during the 1stQ 99 is shown below:

|  | 3/31/99 |
|---|---|
| Total Customers reported | 8.4M |
| New Customers reported | 2.2M |
| Actual Customers | 7.7M |
| Lost/Former Customers | 800,000 |
| Percentage of Lost/Former Customers | 8.3% |
| Additions to Lost/Former Customers (lost in quarter) | 300,000 |
| Actual Net New Customers | 1.9M |

12  Thus, contrary to the success of its business model and strong revenue growth prospects conveyed
13  by the number of new customers and total customers which defendants emphasized each quarter,
14  Amazon's net customer growth was anemic.  The percentage of lost/former customers was growing
15  precipitously during the Class Period;

16  **Operating Problems**

17    (f)    The statements that Amazon's business model was "cash" and "capital"
18  efficient were false  In fact, Amazon's business model did not and could not work, as its costs were
19  too high, its liquidity and working capital too low, its revenue growth too slow and its customer
20  attachment and retention rates too low to permit Amazon to succeed financially or ever reach actual
21  profitability, given the massive debt that Amazon was accumulating to implement its "Get Big Fast"
22  expansion and diversification strategy;

23    (g)    Amazon's new auction site launched in 3/99 was an immediate failure, not "*off*
24  *to a very fast start*" as claimed, as it failed to attract anywhere near the level of activity actually
25  forecast or necessary for this new business to succeed.  To create the appearance of artificial activity
26  on Amazon's auction site so that it would appear to be more successful than it really was, Amazon

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1  caused its employees to list goods for sale on the site and submit bids for merchandise on the site so

2  as to create the appearance of greater auction site activity than actually existed;

3  **Expansion and Infrastructure Buildout**

4          (h)    Amazon's vast product expansion and infrastructure buildout would likely

5  result in Amazon suffering excessive inventories and write-offs, as Amazon was undertaking this

6  huge expansion and buildout without having put in place the controls and reporting systems

7  necessary for Amazon to control its product purchases and selection in a way so as to avoid

8  accumulating material amounts of unsaleable or overvalued inventories;

9          (i)    Due to Amazon's overly rapid expansion of the products it offered for sale,

10  its lack of adequate internal controls, and the enormous inefficiencies in its new warehouse

11  distribution system, Amazon was ordering millions of dollars of unneeded and unnecessary

12  merchandise which would result in Amazon being forced to take large inventory write-offs or to

13  liquidate inventory at prices well below the cost of the inventory to Amazon, adversely impacting its

14  financial condition and results; and

15  **Financial Condition and Statements**

16          (j)    Amazon's financial condition and financial statements for the 1stQ 99 were

17  falsified as detailed at ¶¶262-267 and 289-297, due to Amazon's reporting of returns it had not made

18  or was not entitled to make.

19        133.    Then, in the 5/3/99 edition of *Barron's* magazine, columnist Alan Abelson discussed

20  Amazon, claiming that its business model was flawed, it would likely never make any money and that

21  its stock was only worth $5-$10 per share  As a result, Amazon's stock plummeted from $90 on

22  Friday, 4/30/99, to as low as $75-1/16 on Monday, 5/3/99 and $70-1/4 on Tuesday, 5/4/99.  Worse

23  yet, Amazon's top insiders learned that *Barron's* was working on a cover story on the Company

24  which would be extremely critical of Amazon's "Get Big Fast" strategy and its business model, which

25  they knew would have a very negative impact on Amazon's stock.  In violation of their duty to

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1   "abstain or disclose" under these circumstances, beginning on 5/3/99, several top Amazon insiders
2   began to sell off their Amazon shares.

3       134.    Before Amazon's stock plunged due to these negative statements about Amazon in
4   the *Barron's* cover story, insiders Covey, Alberg, Risher, Shriram and Stonesifer took advantage of
5   this artificial inflation of Amazon's stock by selling off 150,000, 40,000, 200,000, 110,000 and
6   11,770 shares of their stock at as high as $79.97 per share, pocketing $11.4 million, $3.0 million,
7   $14.0 million, $6.9 million and $765,403 in illegal insider trading proceeds. In total, between 5/3/99
8   and 5/28/99, these Individual Amazon Defendants unloaded 511,770 shares of their Amazon stock
9   for $36.1 million in illegal insider trading proceeds.

10      135.    Knowing it was still necessary for it to raise hundreds of millions of dollars of
11  additional capital to continue to pursue its "Get Big Fast" strategy, in 5/99 Amazon filed a "shelf"
12  Registration Statement with the SEC, signed by Alberg, Bezos, Stonesifer, Cook, Doerr and
13  Engstrom, covering the sale of up to $2 billion in securities to the public, so that Amazon would be
14  able to quickly sell securities to the public when conditions were favorable for it to do so.

15      136.    As Amazon's insiders had anticipated, the 5/31/99 edition of *Barron's* ran a cover
16  story entitled "Amazon.bomb," which was critical of Amazon's business model, predicted that the
17  Company would likely not succeed and stated that its stock price was actually worth less than $10
18  per share. Amazon's stock price collapsed from $60-3/16 on Friday, 5/28/99 (the last trading date
19  before the Barron's article was published), to $52-1/2 on Tuesday, 6/1/99 (the first trading day after
20  the publication of the article), and then fell to as low as $48-9/16 on 6/2/99. Amazon's insiders knew
21  that this type of adverse commentary was dangerous to Amazon because if it gained widespread
22  credence in the investment community, it would drive Amazon's stock price even lower, which would
23  destroy a key element of the Company's business model – a high and increasing stock price – as a low
24  and falling stock price would make it much more difficult for Amazon to continue to raise the billions
25  of dollars of additional capital it still needed to complete its "Get Big Fast" expansion and
26  diversification, hinder its ability to continue to acquire other companies in deals which were

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934     - 94 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

1  dependent upon Amazon issuing its stock, and result in the billions of dollars of convertible notes

2  Amazon had already sold (and would continue to sell) never being converted into equity, thus

3  saddling it with the impossible burden of meeting huge annual interest payments on that debt for

4  several years and then being forced to pay off those notes, at par, costing it billions of dollars a few

5  years in the future.

6      137.    On 6/7/99, Amazon issued a release:

7  ***AMAZON.COM TO PASS E-COMMERCE MILESTONE TODAY***

8  ***Amazon.com Set to Serve Its 10 Millionth "Amazonian";***
   ***Customer Base Has Grown 10 Times in 21 Months***

9
10      ... Less than four years after opening on the Internet, Amazon.com today will become the first e-commerce store to serve its 10 millionth customer....

11      ... [I]ts cumulative customer base has grown tenfold in 21 months and is now equivalent to the population of Greece.

12

13      The 10 million number represents an e-commerce watershed reflecting the appeal of online shopping beyond original techno-savvy buyers to mainstream consumers.

14

15      "If anyone had predicted in 1995 that we'd have 10 million Amazonians by now, they'd have been locked up as dangerous," said Amazon.com founder and CEO Jeff Bezos. ***"We certainly didn't expect it, and we're extremely grateful. We're***

16  ***celebrating ...."***

17      138.    On 6/8/99, Bezos was interviewed by Jan Hopkins on CNNfn and stated:

18  ***Yesterday, we had our 10 millionth customer, and that's up from 1 million[th]***
   ***customer just 21 months ago. So those extra 9 million customers were added in 21***

19  ***months ....***

20      139.    On 7/12/99, *The Wall Street Journal* ran an article on Amazon, including an interview

21  with Bezos which stated:

22      WSJ:    Let's talk about pricing.  Over the past two years, you've gradually been widening your discounts.  Is this out of weakness or strength?

23
24      BEZOS:    ***Strength....  The real reason this is possible is because of the*** ***efficiencies of scale***.  If you look at our new distribution centers, and the mechanization in place, ***we can reset our price points and still***

25  ***have a business model that makes sense.***

26      140.    On 7/21/99, Amazon reported its 2ndQ 99 results via a release, stating

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1        *Amazon.com's Community of Online Shoppers Grows to 10.7 Million*

2                                  \*   \*   \*

3             *Amazon.com announced that cumulative customer accounts ... increased*
    *by 2.3 million during the second quarter to 10.7 million at June 30, 1999, an*
4     *increase of more than 220 percent from the 3.3 million customer accounts at June*
    *30, 1998.* Repeat customer orders represented more than 70 percent of orders during
5     the quarter ended June 30, 1999.

6                                    \*    \*   \*

7             Regarding Amazon.com's ongoing expansion, Bezos added, "*We continue to*
    *make great progress building out world-class distribution* ...."

8     Recent Highlights

9     *10 Million Customers*; Extending Global Brand and Reach

10

11             ... Amazon.com announced ... it had become the first e-commerce store to
    serve its 10 millionth customer.... *[I]ts cumulative customer base has grown tenfold*
    *in 21 months and is now equivalent to the population of Greece. These 10 million*
12     *customers represent an e-commerce watershed reflecting the appeal of online*
    *shopping to a broad range of customers.*

13

14     141.    On 7/21/99, subsequent to the release of its 2ndQ 99 results, Amazon held a

conference call to discuss Amazon's business. During the call – and in follow-up conversations with
15
analysts – Bezos stated:
16
       •     Amazon added 2.3 million new customers in the quarter. *Amazon's total cumulative*
17             *customer accounts grew to 10.7 million.* That was 4.5 million new customers since
            the beginning of the year.
18
       •     Bezos said: "Joe Galli joined us last month as Amazon.com's President and Chief
19             Operating Officer.... The entire company is excited about having Joe join us. .. [W]e
            are incredibly excited and lucky to have Joe on our team and I can tell you that *just*
20             *five weeks into his being here, we are luckier than we even knew* "

21        •     Galli said: "After having been here for five weeks, I [now], believe *I initially*
            *underestimated our opportunities for growth, profit and return on capital and quite*
22             *honestly, I underestimated the overall power of our business model. Think about*
            *it. We already have over 10 million customers* ...."
23
    142.    On 7/22/99, Morgan Stanley issued a report on Amazon by Meeker after discussions
24
with Bezos, Wright, Risher and Galli. They reviewed this report and agreed with Meeker is should
25
be issued. The report stated·
26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

CQ2:99 METRIC DETAILS

Cumulative customer accounts grew a record 2.3MM to 10.7MM – above our 10 4MM estimate.  One point here – *new customer adds have increased every quarter for AMZN since its inception.*

* * *

Basic Growth Metrics for AMZN, CQ3.98–CQ2 99

|  | CQ3:98 | CQ4:98 | CQ1:99 | CQ2:99 |
|---|---|---|---|---|
|  | | * * * | | |
| Customer Accounts (000s) | 4,500 | 6,200 | 8,400 | 10,700 |
| Q/Q Growth | 37% | 38% | 35% | 27% |
| Customer Adds (000s) | 1,220 | 1,700 | 2,200 | 2,300 |

143.   On 7/26/99, Morgan Stanley issued a report on Amazon by Meeker, after the Amazon Investor Conference and discussions with Bezos, Jenson, Risher and Galli, which was based on and repeated information provided to her by Amazon's executives.  The report attributed these statements to Bezos:

> *Among Amazon's assets are 10.7MM customers* ....  Amazon's multi-product strategy is also good for AMZN shareholders: 1) *increased customer lifetime value*; 2) reduced customer acquisition costs, and 3) *with scale, a lower per-unit cost infrastructure*.

144.   Each of the statements made between 6/7/99-7/26/99 was false or misleading when issued.  The true but concealed facts were·

**Customer Metrics**

(a)   Amazon was falsifying its key customer metrics in order to artificially inflate its reported number of customers/customer accounts to make Amazon's customer base appear much larger than it actually was, and its business and business model look more successful than they actually were, and to create the impression that Amazon had a much larger number or base of customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue growth;

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934            - 97 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax. 619/231-7423

1        (b)     Amazon was artificially inflating its stated total number of customers/customer

2 accounts by including persons who had not purchased from Amazon in over 12 months, which

3 Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

4 likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from

5 Amazon;

6        (c)     Amazon was artificially inflating its stated number of total customers/

7 customer accounts by counting customers based on e-mail addresses, *not* customer names, even

8 though Amazon knew from analysis of its customer data that a material number of persons who had

9 purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

10 *even quadruple counted*. This occurred in part because some customers intentionally signed up as

11 new users to take advantage of promotions for new customers;

12        (d)     In order to artificially inflate its total number of customer accounts, Amazon

13 was intentionally not purging its customer base or list of what it knew were dormant, outdated,

14 inactive and duplicative accounts of persons who had ceased doing business with Amazon;

15        (e)     In truth, during the 2ndQ 99, Amazon was suffering serious customer "churn"

16 and was losing nearly as many customers as it was gaining.  The truth about Amazon's customer

17 metrics during the 2ndQ 99 is shown below:

| | 6/30/99 |
|---|---|
| Total Customers reported | 10.7M |
| New Customers reported | 2 3M |
| Actual Customers | 9.4M |
| Lost/Former Customers | 1.3M |
| Percentage of Lost/Former Customers | 12% |
| Additions to Lost/Former Customers | |
| (lost in quarter) | 500,000 |
| Actual Net New Customers | 1.8M |

23 Thus, contrary to the success of its business model and strong revenue growth prospects conveyed

24 by the number of new customers and total customers which defendants emphasized each quarter,

25 Amazon's net customer growth was anemic.  The percentage of lost/former customers was growing

26 precipitously during the Class Period;

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 98 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

1  **Operating Problems**

2          (f)     The statements that Amazon's business model was "cash" and "capital"

3  efficient were false.  In fact, Amazon's business model did not and could not work, as its costs were

4  too high, its liquidity and working capital too low, its revenue growth too slow and its customer

5  attachment and retention rates too low to permit Amazon to succeed financially or ever reach actual

6  profitability, given the massive debt that Amazon was accumulating to implement its "Get Big Fast"

7  expansion and diversification strategy;

8          (g)     It was not true that Amazon's increasing discounts for its books – its most

9  important store -- was out of *"strength"* or ability to cut prices due to *"the efficiencies of scale"* of

10  Amazon's operations; in fact, these increasing discounts were being implemented to meet competitive

11  pressures and actions of other book sellers and were adversely impacting the operating results of

12  Amazon's book operations and thus Amazon overall,

13          (h)     Amazon's new auction site, launched in 3/99, was an immediate failure, not

14  *"off to a very fast start"* as claimed, as it failed to attract anywhere near the level of activity actually

15  forecast or necessary for this new business to succeed.  To create the appearance of artificial activity

16  on Amazon's auction site so that it would appear to be more successful than it really was, Amazon

17  caused its employees to list goods for sale on the site and submit bids for merchandise on the site so

18  as to create the appearance of greater auction site activity than actually existed,

19  **Expansion and Infrastructure Buildout**

20          (i)     Amazon's vast product expansion and infrastructure buildout would likely

21  result in Amazon suffering excessive inventories and margin write-offs, as Amazon was undertaking

22  this huge expansion and buildout without having put in place the controls and reporting systems

23  necessary for Amazon to control its product purchases and selection in a way so as to avoid

24  accumulating material amounts of unsaleable or overvalued inventories;

25

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax· 619/231-7423

1          (j)     Galli had visited a new distribution center in Reno in 7/99 and found utter

2  chaos with no plan to organize jobs and equipment still in crates with Christmas just five months

3  away;

4          (k)     Due to Amazon's overly rapid expansion of the products it offered for sale,

5  its lack of adequate internal controls, and the enormous inefficiencies in its new warehouse

6  distribution system, Amazon was ordering millions of dollars of unneeded and unnecessary

7  merchandise, including electronics from unauthorized vendors, which would result in Amazon being

8  forced to take large inventory write-offs or to liquidate inventory at prices well below the cost of the

9  inventory to Amazon, adversely impacting its financial condition and results; and

10  **Financial Condition and Statements**

11          (l)     Amazon's financial condition and financial statements for the 2ndQ 99 were

12  falsified as detailed at ¶¶262-267 and 289-297, due to Amazon's reporting of returns it had not made

13  or was not entitled to make.

14     145.    During 7/29/99-8/10/99, Amazon insiders Wright and Risher took advantage of the

15  artificial inflation of Amazon's stock by selling off 150,000 and 120,000 shares of their stock at as

16  high as $50.62 per share, pocketing $7.5 million and $5.0 million in illegal insider trading proceeds.

17  *In total, between 7/29/99 and 8/10/99, these Individual Amazon Defendants unloaded 270,000*

18  *shares of their Amazon stock for $12.5 million in illegal insider trading proceeds.*

19     146    On 9/23/99, Prudential Securities issued a report "initiating coverage" on Amazon by

20  Rowen.  Because this was Prudential's first report on Amazon, it was issued only after he had

21  extensive discussions with Bezos, Galli and Jenson and was based on and repeated information by

22  them.  Bezos or Galli reviewed this report before it was issued and assured Rowen it was accurate.

23  The report stated:

24          We Are Assuming Coverage Of Amazon ... With A Strong Buy Rating . .. It
            is our assessment that AMZN is in the early stages of building a powerful and

25          dominant general merchandise franchise, *and should eventually become one of the*
            *world's premier retailers*.

26

                              *   *   *

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax: 619/231-7423

*[T]he company has made equity investments in several online specialty retailers.* These investments include significant stakes in Drugstore.com (an online drug store), Pets.com (an online pet supply store), Homegrocer.com (an online grocery store), and Gear.com (an off-price sporting goods retailer). *This minority investment strategy allows AMZN to test new online concepts without the risk of direct entry into the category.*

\* \* \*

**AMZN's Business Model Works**

*Profitability and rapid acquisition payback at the individual customer level at AMZN is consistent with our assessment that the company is building long-term shareholder value.*

147.   On 10/27/99, Amazon reported its 3rdQ 99 results via a release, stating:

Net sales for the third quarter were $356 million, an increase of 132 percent over net sales of $154 million for the third quarter of 1998.

\* \* \*

*[C]umulative customer accounts ... increased by 2.4 million during the third quarter to 13.1 million at September 30, 1999,* an increase of more than 190 percent from 4.5 million customer accounts at September 30, 1998. Repeat customer orders represented more than 72 percent of orders during the quarter ended September 30, 1999, up from 70 percent in the previous quarter.

148.   On 10/27/99, subsequent to the release of its 3rdQ 99 results, Amazon held a conference call for analysts, money and portfolio managers, institutional investors and large Amazon shareholders to discuss Amazon's 3rdQ 99 results, its business and its prospects. During the call – and in follow-up conversations with analysts – Bezos, Galli and/or Jenson stated:

- The Amazon growth formula was simple. First, Amazon invests big in a big global market. Second, Amazon drives revenue and customer growth globally in that market. *Third, Amazon begins to reap the benefits which include profitability and significant cash generation. Fourth, Amazon repeats steps one through three as fast as it can.*

- *Executing this strategy successfully would lead to a multi-billion dollar revenue company that profitably serves tens of millions of customers, with unusual returns on invested capital.*

- Amazon added 2.4 million new customers in the 3rdQ and saw growth across all product lines and geographies. Amazon's total customer count grew to 13.1 million, with 6.9 million new customers since the beginning of the year.

- *Amazon's strong new customer growth fueled a virtuous feedback loop.* The larger Amazon's customer base grows, the better its customers' experience gets. From a

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax: 619/231-7423

larger number of customer views, to faster delivery cycles due to an improved supply chain and broader in-stock selection. *Increases in the size of Amazon's customer community improved the Amazon experience for everyone*.

- Amazon was growing a portfolio of related businesses, *each of which benefits from the other*. Amazon continued to make substantial progress across its stores.

- Amazon was excited about its progress. Amazon had just scratched the surface of what was possible.

- *Amazon's business model worked well*.

149    By late 10/99, Amazon and its financial advisors, Morgan Stanley and First Boston, were planning and discussing a possible securities offering to raise cash for Amazon early in 00, after Amazon reported its 4thQ 99 results. Because they knew that Amazon's 4thQ 99 (holiday) results were being watched by investors as a critical indication of Amazon's "Get Big Fast" strategy, they decided to wait and do the offering in early 00 after Amazon's 4thQ 99 results were announced. Amazon's 4thQ – the holiday season – is by far its largest revenue quarter and one closely watched by investors and analysts – and they anticipated that a successful 4thQ 99 for Amazon would drive its stock price much higher, enabling them to sell much larger amounts of Amazon securities on terms more favorable to Amazon than would otherwise be the case. Because Amazon's ability to raise additional capital by selling securities to public investors was an indispensable element to the success of its rapid expansion plan, *i.e.*, to help fund the costs of that strategy and help Amazon maintain sufficient liquidity and working capital while it absorbed the losses associated with the business plan, analysts Meeker, Buyer and Kiggen were focused on Amazon's financing plans and were aware of the plan of Amazon, Morgan Stanley and First Boston to do a large offering of Amazon securities in early 00.

150.    On 10/28/99, Morgan Stanley issued a report on Amazon by Meeker, after discussions with Bezos, Galli and Jenson which was based on and repeated information provided by them. Bezos, Galli or Jenson reviewed this report before it was issued and agreed with Meeker that it should be issued   The report stated:

- When thinking about Amazon.com, we frequently think about America Online. America Online spent a billion dollars (that it didn't have) to build one of the

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

most impressive businesses of our time – with tens of millions of monetizable customers; a fabulous brand, an impressive (yet expensive) network bail out; a communications platform; a broad product line up; hundreds of millions of dollars of quarterly cash flow; and a market capitalization in excess of $100 billion.

\* \* \*

• We continue to maintain that today Amazon.com's a lot like America Online was then *[with] 13MM monetizable customers and counting* ....

151. Each of the statements made between 9/23/99-10/28/99 were false or misleading when issued. The true but concealed facts were:

**Customer Metrics**

(a) Amazon was falsifying its key customer metrics in order to artificially inflate its reported number of customers/customer accounts to make Amazon's customer base appear much larger than it actually was, and its business and business model look more successful than they actually were, and to create the impression that Amazon had a much larger number or base of customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue growth;

(b) Amazon was artificially inflating its stated total number of customers/customer accounts by including persons who had not purchased from Amazon in over 12 months, which Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from Amazon;

(c) Amazon was artificially inflating its stated number of total customers/ customer accounts by counting customers based on e-mail addresses, *not* customer names, even though Amazon knew from analysis of its customer data that a material number of persons who had purchased from Amazon *had more than one e-mail address and thus were being double, triple, or even quadruple counted*. This occurred in part because some customers intentionally signed up as new users to take advantage of promotions for new customers;

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1           (d)     In order to artificially inflate its total number of customer accounts, Amazon

2 was intentionally not purging its customer base or list of what it knew were dormant, outdated,

3 inactive and duplicative accounts of persons who had ceased doing business with Amazon,

4           (e)     In truth, during the 3rdQ 99, Amazon was suffering serious customer "churn"

5 and was losing nearly as many customers as it was gaining.  The truth about Amazon's customer

6 metrics during the 3rdQ 99 is shown below:

|  | 9/30/99 |
|---|---|
| Total Customers reported | 13.1M |
| New Customers reported | 2.4M |
| Actual Customers | 11.3M |
| Lost/Former Customers | 1.8M |
| Percentage of Lost/Former Customers | 13.7% |
| Additions to Lost/Former Customers (lost in quarter) | 500,000 |
| Actual Net New Customers | 1.9M |

12 Thus, contrary to the success of its business model and strong revenue growth prospects conveyed

13 by the number of new customers and total customers which defendants emphasized each quarter,

14 Amazon's net customer growth was anemic.  The percentage of lost/former customers was growing

15 precipitously during the Class Period,

16 **Operating Problems**

17           (f)     The statements that Amazon's business model "worked," was "cash" and

18 "capital" efficient and would permit Amazon to be "profitable" were all false.  In fact, Amazon's

19 business model did not and could not work, as its costs were too high, its liquidity and working

20 capital too low, its revenue growth too slow and its customer attachment and retention rates too low

21 to permit Amazon to succeed financially or ever reach actual profitability, given the massive debt that

22 Amazon was accumulating to implement its "Get Big Fast" expansion and diversification strategy;

23           (g)     It was not true that Amazon's ever-increasing discounts for its books – its most

24 important store – was out of "*strength*" or ability to cut prices due to "*the efficiencies of scale*" of

25 Amazon's operations; in fact, these increasing discounts were being implemented to meet competitive

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934     - 104 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1  pressures and actions of other book sellers and were adversely impacting the operating results of
2  Amazon's book operations and thus Amazon overall;

3          (h)     Amazon's new auction site launched in 3/99, was an immediate failure, not
4  "*off to a very fast start*" as claimed, as it failed to attract anywhere near the level of activity actually
5  forecast or necessary for this new business to succeed.  To create the appearance of artificial activity
6  on Amazon's auction site so that it would appear to be more successful than it really was, Amazon
7  caused its employees to list goods for sale on the site and submit bids for merchandise on the site so
8  as to create the appearance of greater auction site activity than actually existed;

9          (i)     The statements that Amazon had evolved into a business with mutually
10 enforcing divisions or stores and that *each product or service it added helped it amortize its*
11 *investments, reduce its unit costs and thus drive Amazon toward profitability were false*, as many
12 of the additional products and services Amazon was adding to offer for sale were so unsuccessful
13 that they exacerbated Amazon's financial problems, generated excessive inventories and adversely
14 impacted Amazon's cash flow, liquidity and financial condition;

15 **Expansion and Infrastructure Buildout**

16         (j)     Amazon's vast product expansion and infrastructure buildout would likely
17 result in Amazon suffering excessive inventories and margin write-offs, as Amazon was undertaking
18 this huge expansion and buildout without having put in place the controls and reporting systems
19 necessary for Amazon to control its product purchases and selection in a way so as to avoid
20 accumulating material amounts of unsaleable or overvalued inventories;

21         (k)     Due to Amazon's overly rapid expansion of the products it offered for sale,
22 its lack of adequate internal control, and the enormous inefficiencies in its new warehouse
23 distribution system, Amazon was ordering millions of dollars of unneeded and unnecessary
24 merchandise, including electronics from unauthorized vendors, which would result in Amazon being
25 forced to take large inventory write-offs or to liquidate inventory at prices well below the cost of the
26 inventory to Amazon, adversely impacting its financial condition and results; and

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 105 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax· 619/231-7423

**Financial Condition and Statements**

(l)    Amazon's financial condition and financial statements for the 3rdQ 99 were falsified as detailed at ¶¶262-267 and 289-297, due to Amazon's reporting of returns it had not made or was not entitled to make.

152.    On 11/10/99, Amazon issued a release headlined and stating:

*Amazon.com and NextCard Announce $150 Million e-Commerce Alliance and Equity Investment* ...

... Leading online retailer Amazon.com and NextCard, creator of the First True Internet Visa®, today announced a major strategic relationship to create customized credit card products *to meet the online and offline shopping needs of the more than 13 million Amazon.com customers*.

...    *During the five-year term beginning in early 2000, the Amazon.com/NextCard relationship is expected to generate $150 million in fees for Amazon.com as its growing customer base adopts the new card.*

\*   \*   \*

*Through Amazon.com zShops, any business or individual can sell virtually anything to Amazon.com's more than 13 million customers* ....

153.    Having manipulated Amazon's stock price back up to the levels necessary to try to sustain its business model and having conditioned the market in a manner necessary for Amazon to be able to pull off another huge offering of equity securities, by the Fall of 99, defendants were secretly working on another large offering of convertible notes, to be completed in early 00 after Amazon announced what defendants hoped would be extremely strong 4thQ 99 (holiday) results.

154.    During 11/1/99-11/30/99, as Amazon's stock price soared to $96-7/8 on 11/29/99, Amazon insiders Alberg, Dalzell, Brannon, Risher, Britto, Stonesifer and Cook took advantage of this artificial inflation of Amazon stock by selling off 450,000, 175,000, 12,000, 50,000, 13,000, 126,000 and 120,000 shares of their stock at as high as $92.65 per share, pocketing $35.3 million, $12.4 million, $864,768, $3.7 million, $982,500, $9.5 million and $9.3 million in illegal insider trading proceeds. In total, between 11/1/99 and 11/30/99, these Individual Amazon Defendants unloaded 946,000 shares of their Amazon stock for $72.2 million in illegal insider trading proceeds

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 106 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax. 619/231-7423

1   *– the largest clump of insider sales in one month by Amazon's executives and directors in the*

2   *history of the Company*!

3       155.   On 12/1/99, Ashford.com and Amazon issued a joint release, which was headlined

4   and stated:

5       Amazon.com Announces Multi-million Dollar Marketing and Strategic Alliance With
        and Minority Investment in Ashford.com

6

7       ... Amazon.com, the leading online retailer and Ashford.com, the leading
        Internet retailer of luxury and premium products, *today announced a multi-million*

8       *dollar marketing initiative* and a strategic alliance in a number of luxury product
        categories, including diamonds, watches, sunglasses and writing instruments....
        *Ashford.com will offer special promotions and unique benefits to Amazon.com's*

9       *13 million customers .... Through Amazon.com zShops, any business or individual*
        *can sell virtually anything to Amazon.com's more than 13 million customers ....*

10

11      156.   On 12/1-2/99, Amazon executives appeared at the First Boston Technology

12  Conference. On 12/1/99, First Boston issued a report on Amazon by Buyer, after discussions with

13  Bezos and Jenson, which was based on and repeated information provided by them. Bezos or Jenson

14  reviewed this report before it was issued and agreed with Buyer it should be issued. The report

15  stated:

16      The presentation focused on the company's *move toward profitability over*
        *time*, beginning with books this quarter. The focus on the model was much greater
        than in any of Amazon's previous presentations.

17

18                          *   *   *

19      *The company maintained its negative cash flow is not only maintainable,*
        *but also expandable.*

20      157   On 12/2/99, Bear Stearns issued a report on Amazon by Ehrens, after discussions with

21  Bezos and Jenson, which was based on and repeated information provided by them. Bezos or Jenson

22  reviewed this report before it was issued and assured Ehrens it was accurate. The report stated:

23      ***      Amazon.com acquired 16.6% of Ashford.com, an online retailer of high end
        luxury goods for $10 million and simultaneously *struck a (in their words) "multi-*

24      *million dollar" marketing agreement wherein Ashford will pay Amazon for*
        *funneling them customers from the Amazon site....* [T]his deal accelerates

25      Amazon's ability to offer these goods to its customers...

26      ***      ... *Of course, Amazon could dangle a pretty attractive carrot in front of*
        *Ashford.com at the negotiating table – its 13 million customers.*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 107 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

1    158.    Each of the statements made between 11/10/99-12/2/99 were false or misleading when

2    issued.  The true but concealed facts were:

3  **Customer Metrics**

4    (a)    Amazon was artificially inflating its stated total number of customers/customer

5    accounts by including persons who had not purchased from Amazon in over 12 months, which

6    Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

7    likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from

8    Amazon;

9    (b)    Amazon was artificially inflating its stated number of total customers/

10    customer accounts by counting customers based on e-mail addresses, *not* customer names, even

11    though Amazon knew from analysis of its customer data that a material number of persons who had

12    purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

13    *even quadruple counted*.  This occurred in part because some customers intentionally signed up as

14    new users to take advantage of promotions for new customers;

15    (c)    In order to artificially inflate its total number of customer accounts, Amazon

16    was intentionally not purging its customer base or list of what it knew were dormant, outdated,

17    inactive and duplicative accounts of persons who had ceased doing business with Amazon; and

18  **E-Commerce/ACN Partnerships and Investments**

19    (d)    The hundreds of millions of dollars of fees defendants stated would be made

20    by Amazon's e-commerce/ACN partners to Amazon were false, as the vast bulk of those payments

21    – over 90% – were to be made in the unregistered and illiquid stock of these e-commerce/ACN

22    partners which, in fact, had little or no value, and thus those e-commerce/ACN partnerships of

23    Amazon would never provide the kind of revenues, benefits or increased liquidity to Amazon as

24    represented

25    159    On 1/5/00, Amazon announced that its 4thQ 99 revenues had jumped to about $650

26    million – more than double its 4thQ 98 revenues – in a release which stated

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax: 619/231-7423

1

2

*Through Amazon.com zShops, any business or individual can sell virtually anything to Amazon.com's more than 15 million customers* ..

3

However, Amazon's 4thQ 99 revenues were less than some analysts had been expecting based on

4

their conversations with Amazon executives.  Amazon also indicated it would suffer a larger

5

operating loss than earlier forecast, due to a very large inventory write-down, raising concerns over

6

Amazon's business model, its controls and its liquidity.  As a result of this disappointment, Amazon's

7

stock fell sharply from $91-1/2 on 1/4/00 to as low as $68 on 1/5/00 and $64 on 1/6/00.

8

160.    By 1/21/00, Amazon stock had fallen to as low as $60 – almost a 50% decline from

9

its all-time higher of $113 on 12/9/99   This stock collapse created a crisis for Amazon, its top

10

insiders and its financial advisors/underwriters, as the stock decline and the very negative

11

commentary surrounding Amazon's *4thQ 99 results made it very unlikely that they could complete*

12

a large securities offering for Amazon – *an offering that was indispensable for Amazon to raise the*

13

*capital it needed to continue to fund its "Get Big Fast" strategy and maintain its liquidity, i.e., to*

14

*survive*.  This securities offering, which defendants had been planning and which was indispensable

15

to Amazon's survival, could not be accomplished on acceptable terms unless defendants convinced

16

the markets that the business was succeeding, its business model was sound and Amazon could

17

generate sufficient cash from operations to sustain itself in both the near term and the long term, and

18

pushed Amazon's stock back up to much higher levels.  Thus, defendants went on a huge public

19

relations offensive to halt the decline of Amazon stock and push it higher.  Between 1/21/00 and

20

2/1/00, defendants issued a series of press releases and reports announcing and discussing

21

agreements between Amazon and other companies which defendants represented would generate

22

huge *cash payments* to Amazon over the near term, increasing its liquidity and enabling it to achieve

23

profitability faster than expected.

24

161.    On 1/21/00, Amazon announced

25

that it has agreed to acquire a stake in Greenlight.com [a] car buying company that gives consumers the convenience and control of online purchasing ....

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

1        ... Amazon.com will help introduce Greenlight.com to Amazon.com's *more*
*than 16 million experienced online shoppers, and, in return, Amazon.com will*
2    *receive $82.5 million over five years* . .

3       162.    On 1/24/00, Merrill Lynch issued a report on Amazon, after discussions with Bezos,

4   Jenson and Galli, which was based on and repeated information provided by them. Bezos, Jenson

5   or Galli reviewed this report before it was issued and assured Merrill Lynch it was accurate. The

6   report stated.

7       •     On January 21, Amazon.com announced [a] partnership with Greenlight.com
.... *In exchange for promotion to its 16 million customers, Amazon will receive*
8    *$82.5 million over 5 years* ...

9       •     *The Greenlight deal is Amazon's third major dollars-for-traffic deal in the*
*last two months (the others were with Nextcard and Ashford). In a conversation*
10   *on Friday, management suggested that there would likely be many more of these*
*deals to come.*

11                   *    *    *

12

13       •     *We estimate that Amazon could sign 25 Greenlight-sized deals over the next*
*two to three years. At $75 million apiece, these would generate an incremental*
14   *$375 million of revenue per year. At an 80% operating margin (the only costs*
*associated with the deals are selling, site integration, and serving), we believe this*
*would contribute $300 million of operating profit – or $0.70 per fully diluted share.*
15

16       163.    On 1/24/00, Robertson Stephens issued a report on Amazon by Levitan, after

17   discussions with Bezos, Galli and Jenson, which was based on and repeated information provided

18   by them. Bezos, Galli or Jenson reviewed this report before it was issued and assured Levitan it was

19   accurate. The report stated as to the Greenlight.com deal:

20       •     ... *In return for access to Amazon's 16MM+ customer base, Amazon will*
*receive $82.5MM over the next five years* ....

21       •     Emerging Landlord Status: *Our positive investment thesis for Amazon is*
*based on our belief that the company's sizable, growing customer base could attract*
22   *retailers to sign long-term strategic marketing agreements similar to the*
*distribution deals that are common to AOL and Yahoo!. We believe Amazon's deal*
23   *with Greenlight could prove the first of many such deals where Amazon receives*
*tenant fees ... for prominent placement on its site.*
24

25                   *    *    *

26       *We continue to be impressed by Amazon's portfolio of companies in which*
*it has made strategic investments. Not only are we excited by Amazon's ability to*
*generate recurring high gross margin tenant fees, but also by the company's ability*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax 619/231-7423

1    *to leverage its franchise status to gain equity stakes which could result in
     substantial returns on its investments.*

2    164.    On 1/24/00, Amazon issued a release headlined "Amazon.com Receives $105 Million

3    For A Drugstore.com 'Tab' at Amazon.com," which stated:

4    *Under the agreement, Amazon.com will receive $105 million over three years.*

5                          *   *   *

6    *The result will be greater shopping convenience and selection for
     Amazon.com's more than 16 million customers ...*

7

8    165.    A 1/24/00 news story, published over *Bloomberg News* and titled "Amazon.com,

9    Drugstore.com Form New Pact; Shares Rise," reported.

10   Amazon.com will receive $105 million under a three-year marketing
     agreement with online pharmacy Drugstore.com Inc. ...

11

12                          *   *   *

13   *"The gates are unlocking for a flood of many more commerce partner-
     distribution deals in the future, thereby accelerating Amazon's path to
     profitability," analyst Jamie Kiggen of [First Boston] wrote in a report. He rates
     the stock a "top pick."*

14

15   166.    The importance of these deals to Amazon was highlighted by the following *Dow

16   Jones Business News* item on 1/24/00:

17   *Amazon.com Upgraded By Goldman Sachs Amid Marketing Deals*

18   *.. Goldman Sachs & Co. upgraded its rating on online retailer Amazon.com
     Inc. ... predicting more deals like the company's marketing agreement with
     Drugstore.com Inc.*

19

20   Earlier Monday, Seattle-based Amazon agreed to integrate its shopping
     services with those of Drugstore.com and create a shopping "tab" for Drugstore.com

21   on its Web site. *Under the agreement, Amazon will receive about $105 million
     from the online drugstore over a three-year period.*

22

23                          *   *   *

24   *"We think that Amazon will continue to strike similar deals and view these
     as a catalyst for the stock," said Goldman analyst Anthony Noto.   "We are
     upgrading the stock ... because we think the positive elements of marketing deals
     will offset the negative concerns "*

25

26   *"We believe these high margin revenue streams from marketing agreements
     will overpower near-term operational issues."*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1   Noto's statements were based on information given him by Bezos, Galli and Jenson.  Amazon stock

2   soared from $60 on Friday, 1/21/00 to $73-3/8 on Monday, 1/24/00.

3          167.    On 1/31/00, Amazon announced a strategic alliance with Audible, Inc  in a release

4   stating:

5          Leading online retailer Amazon.com and Audible, Inc.  .. *today announced*
       *a multi-million dollar agreement to prominently feature content and services from*
6       *www.audible.com™ at Amazon.com.*

7                              *   *   *

8          *The alliance will give Amazon.com's more than 16 million customers easy*
       *access to over 20,000 hours of digital audio content from audible.com.*
9
                              *   *   *
10
       *[I]n exchange for promotion of Audible.com's content and services, Amazon.com*
11      *will receive from Audible $30 million over three years.*

12         168.    On 1/31/00, *Dow Jones Business News* reported:

13      Audible – which sells recordings of books and articles read aloud, radio programs
       and speeches – *will pay Amazon $30 million during the next three years for*
14      *promoting Audible's products, Amazon said.*

15         169.    On 1/31/00, the *Associated Press* reported:

16      *Audible will pay Amazon $30 million over three years for promoting Audible's*
       *products.*
17
                              *   *   *
18
          Bezos has a plan to become profitable in the long-term, but ask him what it
19      is and you'll get nothing but a grin and Bezos' trademark belly laugh.... "Our strategy
       hasn't changed at all, and it remains as it always was," he said.  *"This model does*
20      *work.  This is an investment plan in this model and we're full-steam ahead."*

21         *That model has produced impressive results ....  The company boasts a*
       *customer base of 16 million people, which gives Amazon.com an asset that few*
22      *other e-commerce companies can boast – access.*

23         In January, auto vendor Greenlight.com and online pharmacy drugstore.com
       paid Amazon.com for the privilege of having access to its customers    The
24      Greenlight.com deal was worth *dlrs 82.5 million over five years, while*
       *drugstore.com will pay dlrs 105 million over three years.*
25
          *Deals like these led Goldman Sachs and other investment houses to upgrade*
26      *the stock over the past two weeks, noting that a few deals every quarter could push*
       *Amazon.com out of the red far quicker than expected.*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 112 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

170.   On 1/31/00, *The Industry Standard* reported.

*Only a few weeks ago, analyst and investor impatience with Amazon.com hit a peak.* The online retailer's insatiable appetite for expansion was taking its toll. Even as sales soared, losses were mounting at a faster rate  The company's stock lost nearly half its value from its high in early December.

Yet suddenly, profitability for Amazon no longer seems unattainable. That's because after building the Internet's biggest store, Amazon has stepped up efforts to milk its customer base. On Jan. 21, the Seattle company teamed up with car retailer Greenlight.com. Amazon promises to drive customers to the startup *in exchange for $82.5 million over five years*. Then, on Jan. 24, Amazon agreed to rent a "tab" on its site to partner Drugstore.com, adding a pharmacy to the list of shops on its homepage in categories such as books, music, toys and electronics. *Amazon will reap $105 million over three years from that alliance*.

*More importantly for Amazon, the additional revenue carries operating margins of 80 percent to 90 percent, giving a significant boost to its bottom line*.

\* \* \*

Once again, Wall Street analysts are bullish on Amazon. *"If they sign two or three more of these deals, they could break even in 2001,"* says Anthony Noto, a Goldman Sachs analyst who upgraded Amazon following news of the Drugstore.com alliance. *"If they sign 15 of these deals,"* he adds, *"they could [be profitable] by the fourth quarter."*   *Merrill Lynch analyst Henry Blodget was equally upbeat, predicting the company could sign as many as 25 similar agreements over the next two or three years....*

Amazon makes no secret that it will pursue similar deals. *"We expect more arrangements like this when it makes sense for customers," said CEO Jeff Bezos in a statement*.

171.   On 2/1/00, Kiggen issued a report reiterating Amazon as a "Top Pick" and referring to the series of recently announced strategic agreements as *"watershed"* events *"accelerating Amazon's path to profitability,"* stating that *"[t]hese deals represent over $500 million in total payments to Amazon over the life of the contracts, and approximately $120 million to Amazon in FY'2000."* Kiggen's report also stated:

The living.com agreement is the 6th *"audience monetization"* deal Amazon has struck in just under 3 months (and the 4th in 11 days), including deals with NextCard, Ashford.com, Greenlight.com, Drugstore.com, and Audible.com. These deals represent over $500 million in total payments over the life of the contracts, and approximately $120 million to Amazon in FY'2000. *Importantly, these payments represent a 100% gross margin revenue stream for Amazon.*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1      172.   On 2/1/00, Amazon announced a strategic alliance with living.com   The release

2  stated:

3            ***Under the agreement, Amazon.com will receive $145 from living.com over***
        ***five years in exchange for being the exclusive Amazon.com Home Living store,***
4      providing furniture, bedding, home textiles, decorative accessories, tabletop, window
      treatments, and other related home categories ***to Amazon.com's more than 16 million***
5      ***customers.***

6      173.   On 2/1/00, First Boston issued a report on Amazon by Buyer, after discussions with

7  Bezos, Galli and Jenson, which was based on and repeated information provided by them.  Bezos,

8  Galli or Jenson reviewed this report before it was issued and agreed with Buyer it should be issued

9  The report stated:

10        Amazon announced an alliance with home furnishings site Living.com.
      ***Living will pay Amazon $145 million over five years to become the exclusive Home***
11      ***Living store on Amazon.com....***

12          ... ***We expect that Amazon will continue to announce similar agreements,***
      ***promoting from within its sizable stable of companies (like Pets.com, Ashford.com,***
13      ***and HomeGrocer.com)***, as it did with Drugstore com, and from without, as with
      today's announced deal with Living.com.
14

15        ***Amazon has found a way to monetize one of its most valuable assets, traffic.***
      ***By leveraging its customer base of over 16 million, Amazon is able to strengthen***
      ***its overall business.  We believe this deal, and the potential for more like it, are a***
16      ***significant long term positive for gross margins.***

17      174.   On 2/1/00, *The Wall Street Journal* reported:

18        Amazon.com Inc., continuing to leverage its status as the largest online
      retailer, said it reached an investment and marketing agreement with Audible Inc. to
19      sell its spoken-word recordings.

20        Under the agreements, Audible ***will pay $30 million*** over three years to
      Amazon.
21

                      *   *   *
22

23        ***Last week, Amazon announced that Drugstore.com Inc., Bellevue, Wash.,***
      ***agreed to pay $105 million over three years for the right to display a permanent***
      ***shopping tab on the home page of Amazon's Web site, amid a series of links to***
24      ***Amazon-run stores for books, music and other items.***

25      175   On 2/1/00, First Union Securities issued a report on Amazon by Trossman, after

26  discussions with Bezos, Galli and Jenson, which was based on and repeated information provided

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax 619/231-7423

1  by them.  Bezos, Galli or Jenson reviewed this report before it was issued and assured Trossman it

2  was accurate.  The report stated:

3  **KEY POINTS**

4  —       *Amazon has now announced five significant marketing partnerships in the*

    *past two months*.

5

6  —       *This marks a significant new business model for Amazon – a new way to*
    *leverage customers not by selling them more, but by selling access to others*.

7  —       *Revenue from the partnerships is approaching $135 million on an*
    *annualized basis.  This is a much faster ramp than our model, which assumes fee*

8  *revenue of $60 million in 2000 and $90 million in 2001.*

9  —       *We think these actions will stem the trend of widening losses and are*
    *effectively leveraging customers*.

10                                           *   *   *

11  **DISCUSSION**

12          Over the past two months, Amazon has announced five marketing deals that,

13  in our opinion, represent an evolution of the company's business model   *We have*
    *always viewed customers as Amazon's primary asset,* and the leverage of those

14  customers as its primary value-creating mechanism.  Our view of leverage, though,
    was selling more "stuff" to each customer – a same-customer sales measure.  *These*

15  *new deals, however, leverage customers by selling access to other marketers*
    *through marketing and placement arrangements.  This generates fees faster than*

16  *we have modeled, but moves Amazon away from some of its key differentiating*
    *strengths – fulfillment and customer service (both of which will be provided by*

17  *partners).  We view these deals positively, and expect more of them in the future*....

18          Five New Marketing Deals.  Over the past two months, Amazon has
    announced marketing agreements with Ashford.com, Drugstore.com, Greenlight.com,

19  Audible.com, and Living.com (announced this morning).  Each deal .. includes ... *a*
    *fixed payment to Amazon for a specified time period*, and certain marketing rights

20  to the Amazon community.   The largest and most significant deals are with
    drugstore.com and living.com, which will get their own "tab" on the Amazon site.

21

|              | Equity Investment | Period (months) | *Annual Payment* |
|--------------|-------------------|-----------------|------------------|
22
23 | Ashford      | $10 (10%)         | 15              | *$ 50*           |
   | Drugstore    | $30 (2%)          | 36              | *$ 30*           |
24 | Greenlight   | $NA (5%)          | 60              | *$ 15*           |
   | Audible      | $NA (5%)          | 36              | *$ 10*           |
25 | Living       | $NA (18%)         | 60              | *$ 30*           |
   | TOTAL        |                   |                 | *$135*           |

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1         Fee Revenue Appears To Be Growing Faster Than Our Model. *These deals should generate an estimated $135 million in annual fees.... This arrangement should generate fees and profits to Amazon faster than our model, which incorporates $60 million in fees in 2000 and $90 million in 2001*.

176.   On 2/1/00, Bear Stearns issued a report on Amazon by Ehrens, after discussions with Bezos, Galli and Jenson, which was based on and repeated information provided by them. Bezos, Galli or Jenson reviewed this report before it was issued and assured Ehrens it was accurate. The report stated:

***  ... Amazon has announced a string of deals (drugstore.com, Greenlight.com, and Ashford.com) which will generate advertising revenues that the company can place on its income statement to offset increasing pricing pressure and declining gross margins.

***  *On a cosmetic level, this is exactly what the market wants to see from Amazon....*

***  This morning, Amazon signed Living.com as a partner to create a Home Living store on its web site, for which Amazon will receive *$145 million in cash over 5 years....* Living.com joins drugstore.com *($105 mm over 3 years* and an incremental 7% stake in AMZN), Greenlight.com *($82.5 mm over 5 yrs.* and 5% stake to AMZN), and Ashford.com (16.6% stake to AMZN) which have exchanged cash and/or equity *for chance to sell their goods directly to Amazon's more than 15 million customers*.

177   Thus, according to Amazon's press releases of 1/21/00, 1/24/00, 1/31/00 and 2/1/00, Amazon had secured revenue commitments from Greenlight.com, drugstore.com, Audible and living.com *totaling hundreds of millions of dollars in cash payments over the next five years*.

178   On 2/2/00, Amazon announced its 4thQ 99 results in a release, which stated:

Fueled by strong sales in its new consumer electronics store, Amazon.com, Inc today announced that net sales for the fourth quarter of 1999 were $676 million, an increase of 167 percent over net sales of $253 million for the fourth quarter of 1998.

\*  \*  \*

Net sales for all the 1999 were $1.64 billion, a 169 percent increase over net sales of $610 million reported for all of 1998 ....

Amazon.com announced that cumulative customer accounts increased by 3 8 million during the fourth quarter *to more than 16.9 million at December 31, 1999 .... Cumulative customer accounts now stand at over 17 million*. Repeat customer orders represented more than 73 percent of orders in the fourth quarter, up from 72 percent in the previous quarter.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax· 619/231-7423

* * *

Customer Spending Trends

> *In the area of strengthening relationships with customers, Amazon.com announced that 1999 sales per customer who purchased in 1999 were $116, up from $106 for 1998.*

Strategic Alliances

> Amazon.com continued to expand the list of online partners with whom it delivers an expanded set of products and services to its customers. During the fourth quarter and so far in 2000, Amazon com has announced partnerships with NextCard, Ashford.com, Greenlight.com, Audible, and living.com, as well as an expanded drugstore.com partnership. *In aggregate, these partnerships represent more than $500 million in revenue commitments to Amazon.com over the next five years.*

* * *

Auctions, zShops and sothebys.amazon.com

> During the fourth quarter, Amazon.com's three major marketplaces, Auctions, zShops and Sothebys.Amazon.com, surpassed a combined 1 million registered users and 1.5 million active listings. Amazon.com continued to integrate these services with its retail stores to deliver a better overall value and experience for customer [sic].

179. After releasing its 4thQ 99 results, the Company hosted a conference call, during which, Bezos, Galli and Jenson stated:

- Amazon's sales growth was accompanied by the addition of 3.8 million new customer accounts, *bringing Amazon's cumulative customer additions to over 16.9 million at December 31.*

- Investors should consider this most important point: The current online shopping experience with Amazon was the worst it will ever be. *It is good enough today to attract 17 million customers.* Amazon was fortunate to have a fabulous platform on which to build – over 17 million customers.

- One metric that Amazon thought was useful was how much revenue it generated from all the customers that had purchased from it in a given period of time. *To remove the effects of seasonality, it looked at this on a trailing 12-month basis.* For the 12 months ending December 31, 1998, sales per customer who purchased in the past 12 months were $106. This compared with $107 for the same metric for Q1 of 1999, $108 in Q2 of 1999, $108 in Q3 of 1999 *and $116 in Q4 of 1999. Amazon was providing these new numbers to help better understand and analyze its business.*

- By expanding Amazon's partnership program, *through its 17 million customers*, Amazon was able to bring tremendous value to its partners. Amazon's experience so far in such partnerships suggests that Amazon was the most efficient, effective means for its partners to build their online commerce business. *Amazon loved these kinds*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 117 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

*of partnerships because they were financially very attractive, pleasing its shareholders.*

* **With respect to partnerships, in just three months Amazon had announced over half a billion in revenue commitments in this area from NextCard, Ashford.com, Greenlight.com, drugstore.com, Audible and living.com. These would have the compounding effects of increasing the number of products and services customers could find at Amazon, increasing Amazon's overall wallet share and increasing significantly the overall profitability and cash return of Amazon's model.**

* Even with this continued strong rate of new customer additions, orders from repeat customers rose to 73% of total orders during the quarter, up from 72% in the 3rdQ and Amazon's highest repeat statistic yet.

* **Amazon continued to see strong growth in its international businesses, both in general and relative to the rest of the online commerce market.**

* Amazon's platform of customers, brand, distribution capability, technology and e-commerce expertise made Amazon *the most efficient e-commerce incubator in the world.* As Amazon exited 99, it had reached a tipping point as a business where it could launch new e-commerce *businesses faster with lower incremental costs, a higher chance of success and a faster path of scale and profitability than any other company.*

* Each new product or service Amazon added, or investment that it made, further amortized its investment in distribution, customer service, technology and brand, yielding increased leverage on the bottom line.

* Amazon's stores in the UK and Germany *were off to a strong start.*

* Amazon could now be thought of as the large and growing global portfolio of inter-related, mutually reinforcing businesses all built on a shared platform. As Amazon exited 99, it had reached a tipping point as a business – where this platform allowed Amazon to launch new e-commerce businesses faster with higher quality of customer experience, lower incremental costs, a higher chance of success, and a *faster path of scale and profitability than any other company.*

180. On 2/3/00, DLJ issued a report on Amazon by Kiggen, which was based on Kiggen's conversations with Bezos, Galli and Jenson, including the conference call, who agreed with Kiggen after reviewing the report that the report should be issued. The report was entitled "Amazon.com Reports Strong December Quarter Results; Bullish Guidance On Progress To Profitability," and stated:

Amazon Delivers *A Very Strong Quarter*. Amazon officially delivered yet another *high quality quarter*, delivering $676 million in revenue, (+90% q/q, 167.3% y/y) ....

\*   \*   \*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

Looking forward, the company indicated continued gross margin expansion throughout FY'00 ... as Amazon .. sees the impact from its numerous *high-margin strategic partnerships, such as NextCard, Drugstore.com, Ashford.com, Greenlight.com, Living.com and Audible.com*.

*The Model Is Working. And Now We Have The Proof. Amazon lived up to its promise this quarter of providing us with enough data to rebuff critics who said the Amazon model was inherently flawed structurally and unprofitable. Amazon currently generates $116 in revenue per customer (up from $108 in Q3), and had a per customer acquisition cost of $19 in Q4, indicating the company has a positive contribution margin of $4.20 on every customer, if we apply the 20% gross margin guidance ($116 \*20% = $23.20 – $19 = $4.20/customer). Amazon is losing money because they are investing in an enormous opportunity, not because of poor customer economics.*

181.    On 2/3/00, Morgan Stanley issued a report on Amazon, written by Meeker and based on Meeker's conversations with Bezos, Jenson and Galli, who agreed with Meeker that this report should be issued.  The report was entitled *"Inflection! Amazon.Calm!."*  This report – one of the most dishonest reports issued in the history of the U.S. securities markets – stated:

We note that AMZN shares were up 13% in after-hours trading last night.  We believe that investors were reacting positively to several factors: ... 2) *the strong customer metrics – 17MM loyal customers with increasing sales per head and with rising opportunities to monetize these customers ....*

*      *      *

*It ain't easy to get 17MM happy customers in 5 years!*

•      *Call us melodramatic?  Go ahead.  But we continue to maintain that Amazon.com may be on its way to becoming one of the greatest companies of our day ....*

*      *      *

*What we've seen over the last few years is a dramatic expansion in the Amazon vision and retail platform.* Since the end of CQ3, that expansion has accelerated. Since the end of September, Amazon has introduced three new product offerings (PC software, video games, and home improvement), *launched ZShops,* made investments in at least 5 companies (NextCard, Ashford.com, GreenLight.com, Audible, and Living.com), and made two direct acquisitions (ToolCrib of the North and Back to Basics Toys).  *Broad point here is that Amazon has for some time signaled that it could and would take several different paths to become the leading online retailer – it would build, rent out, buy, and invest.  In CQ4, Amazon took all four paths.*

*      *      *

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax. 619/231-7423

Invest – Since CQ3, Amazon has invested in at least 5 new companies – NextCard, Ashford.com, GreenLight.com, Audible, and Living.com – and has increased its investment in another, drugstore.com.    Three key points here: 1) With stakes in now 4 public companies – drugstore.com, Sotheby's, NextCard, and Ashford.com, *Amazon now has a public investment portfolio conservatively worth $500MM; 2) Amazon is developing into an e-commerce incubator, with the option to deepen its relationships with many of these partners; and 3) these partnerships are now developing into a high-margin revenue stream for Amazon.  Combined, the multi-year __cash__ commitments to Amazon from its partners now total over $450MM. Drugstore.com, for example, has committed to paying Amazon $105MM over three years in order to be featured as a "tab" on Amazon Website.*

\* \* \*

## RECENT HIGHLIGHTS

January 31, 2000 – Amazon.com announces an agreement to prominently feature content and services from Audible.com   Amazon.com will make a strategic investment in Audible and acquire 5% of the company.  *In addition, Amazon.com will receive from Audible $30 million over three years in exchange for promotion of Audible's content and services.*

January 24, 2000 – Amazon.com and drugstore.com announce a multi-million dollar agreement to integrate a number of the companies' shopping features and create a drugstore.com shopping "tab" at Amazon com.  *Under the terms of the agreement, Amazon.com will receive $105 million over three years.*

January 21, 2000 – Amazon.com agrees to acquire a 5% stake in Greenlight.com, an online car buying service.  *Under the promotional agreement, Amazon.com will receive $82.5 million over five years ....*

Meeker's report also contained the following table:

Amazon.com – Investments

| Company | Announce-ment Date | Investment Amount ($MM) | Partner's Cash Commitment ($MM) | Company Description |
|---------|--------|--------|--------|-------------|
| Geoworks | 2/16/99 | 5 | NA | Wireless software solutions |
| Drugstore com | 2/24/99 | 45 | 105 | Online drugstore |
| Pets.com | 3/29/99 | 58 | NA | Online pet supplies store |
| HomeGrocer.com | 5/18/99 | 43 | NA | Online grocery store |
| Sotheby's | 6/16/99 | 45 | NA | Auction house |
| Liquid Audio | 6/17/99 | NA | NA | Music downloading |
| Gear.com | 7/14/99 | NA | NA | Online discount close-out sports-gear shop |
| Della and James | 9/23/99 | NA | NA | Online gift registry |
| NextCard | 1/10/99 | 22 | 100 | Internet consumer credit card |
| Ashford.com | 12/1/99 | 10 | NA | Web retailer of luxury and premium products |
| GreenLight com | 1/21/00 | NA | 83 | Internet car buying service |

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 120 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

| | | | | |
|---|---|---|---|---|
| Audible | 1/31/00 | NA | **30** | Internet audio content service |
| Living.com | 2/1/00 | NA | **145** | Internet home living |

Meeker's report also contained the following financial forecast for Amazon:

Amazon – Annual Income Statement
($ Thousands, except EPS)

| | 1998 | 1999 | 2000E | 2001E | 2002E |
|---|---|---|---|---|---|
| | | | Annual Data | | |
| Total Revenue | $609,912 | $1,639,839 * | $2,960,834 * | $5,000,000 * | $7,000,000 |
| Net Income- Operating | (74,186) | (389,839) * | (387,037) * | (40,000) * | 62,000 |
| Earnings Per Share-Operating | ($.25) | ($1.18) * | ($1.10) * | ($.10) * | $.15 |
| Customer Accounts at Period End | | 6,200,000 | 16,900,000 | 26,300,000 | 35,300,000 | 44,300,000 |
| Customers Added in Period | | 4,690,000 | 10,700,000 | 9,400,000 | 9,000,000 | 9,000,000 |

182.   On 2/3/00, First Boston issued a report on Amazon by Buyer, after discussions with Bezos, Galli and Jenson, which was based on and repeated information provided by them   Bezos, Galli or Jenson reviewed this report before it was issued and agreed with Buyer it should be issued. The report stated:

> We have adjusted our model based on the results of the quarter and our belief that Amazon will begin reaping the operational leverage benefits of the scale economy it is building.

> *   *   *

> *Customer count grew to 16.9 million from 13.1 million at the end of Q3 '99* 73% of the customers during the quarter were repeat customers compared to 72% in Q3 '99.  *The average customer purchased $116 in products over the past 12 months, up from $106 at the end of '98.*

> *   *   *

> Changes to the Model

> *We expect 2000 to be the year that Amazon reaps the benefits of scale.... We believe gross margin improvement will come from better operating leverage and revenue from partnership deals such as those signed with Nextcard, Drugstore.com and Living.com.*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

* * *

With the company looking for negative operating margins to reach single digits by year-end 2000, *profitability can actually be seen in the distance*

* * *

*We expect that more partnership deals, like the one announced on Tuesday, where Amazon leverages their loyal customer base to the benefit of its gross margin line will be announced.*

183.    On 2/3/00, Robinson Humphrey issued a report on Amazon by Russ, after discussions with Bezos, Jenson and Galli, which was based on and repeated information provided by them. Bezos, Jenson or Galli reviewed this report before it was issued and assured Russ it was accurate. The report stated:

Besides being happy with the quarters results, we are comfortable, after the call, *that management is clearly focused on improving its bottom line.* .. During the call, management was much more forthcoming with information and elaborated on several internal goals. *We believe the company can deliver on its expectations. The amazon.com model is beginning to click, thanks to scale in customer base* ...

The Quarters Ahead:  a new amazon.com

Amazon.com is beginning to use its ... *enormous customer base* to increase service and partnership revenues.... *These multi-year contracts are resulting in high margin revenue which is incremental to amazon.com's own product sales revenue. These revenues will help monetize amazon.com's installed base, complimenting all of amazon's core offerings as they turn profitable....*   In the fourth quarter, amazon.com signed five new strategic alliances and strengthened its partnership with drugstore.com.  To date, amazon.com has inked multi-million dollar deals with: NextCard, Ashford.com, Greenlight.com, Audible, Inc. and Living.com. *We estimate that by leveraging off its customer base, these six relationships could generate in excess of $500 million dollars in high-margin revenue over the next five years*

* * *

*[W]ith the infrastructure in place, Amazon.com should be able to generate unprecedented earnings growth.*

184.    On 2/3/00, Bear Stearns issued a report on Amazon by Ehrens, after discussions with Bezos, Jenson and Galli, which was based on and repeated information provided by them.  Bezos, Jenson or Galli reviewed this report before it was issued and assured Ehrens it was accurate  The report stated:

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 122 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1    *** Amazon added 3.8 million new customers in 4Q ... bringing its cumulative customer count to 16.9 million. *The company also revealed that at the end of*
2    *December the average customer spent $116 during the trailing 12 months, up from*
     *$108 in the prior 2 quarters, signaling increasing wallet share for Amazon.*
3
                                    *   *   *
4
5    Full Year 2001. For full year 2001, our initial revenue estimate is $4.13 billion, representing an annual increase of 51%.

6    185.    On 2/3/00, J.P. Morgan issued a report on Amazon by Wyman, after discussions with

7    Bezos, Jenson and Galli, which was based on and repeated information provided by them. Bezos,

8    Jenson or Galli reviewed this report before it was issued and assured Wyman it was accurate. The

9    report stated:

10   *If you think Amazon's market cap is large today at $23 billion, wait until you run*
     *this calculation a year from now. We think the stock will trade through $160*
11   *within a year as investors begin to better understand the leverage that Amazon now*
     *has in negotiating deals with new eTailing partners. The newest partners*
12   *Ashford.com, NextCard, Greenlight.com, drugstore.com, Audible and living.com*
     *will collectively pay Amazon over $500 million in fees over the next five years to*
13   *have the privilege of selling products to Amazon's 17 million customer base. We*
     *expect that the list will double in 2000, meaning that instead of forecasting that*
14   *Amazon breaks even in 2002, we now think Amazon will make over $80 million in*
     *operating income in 2002. This is the kind of news that will be an important*
15   *catalyst for the stock.*

16   186.    On 2/3/00, C E. Unterberg Towbin issued a report on Amazon by Ries, after

17   discussions with Bezos, Jenson and Galli, which was based on and repeated information provided

18   by them. Bezos, Jenson or Galli reviewed this report before it was issued and assured Ries it was

19   accurate. The report stated:

20   *Management's outlook ... was surprisingly bullish ....*

21   *Expect the company to perform well in the near-term driven by the bullish*
     *outlook. We believe the company has officially turned the corner, and stands ready*
22   *to deliver progressively improving results in each quarter of FY2000, the opposite*
     *of the trends seen in 1999.*
23
                                    *   *   *
24
     Customer Metrics
25
26   Customer additions were a stronger-than-expected 3.8 million, *bringing the*
     *company's total customer base – perhaps its most valuable asset – to 16.9 million.*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934         - 123 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1   ... *The company indicated that annual spending per customer rose $10 to $116 during 1999.*

2

3                                    *   *   *

4           *Amazon appears to have turned the corner and is now ready to begin showing the strength inherent in its operating model and the power of its leadership position in the eCommerce space. Management guided investors to expect significant gross margin improvement in the year ahead and significantly better leverage on operating expenses. Some of this improvement is due to several of its recent marketing agreements in which it will receive large fees from partners such as Living.com, Drugstore.com, and NextCard, all of which were factored into the guidance provided.*

8   187.   On 2/3/00, *The Wall Street Journal* reported.

9   **Amazon Shares Soar on Upbeat Outlook**

10          Amazon ... *officials predicted steadily narrower deficits this year as recent investments in marketing and distribution start paying off.*

11

12          The upbeat outlook which was disseminated in a conference call .. sent Amazon's shares soaring in after-hours trading. Before the forecast, Amazon rose $2 to $69.4375 in 4 p.m. on the Nasdaq Stock Market.  Soon after Amazon officials offered their outlook, the stock quoted at $78, up a further 12%.

14                                   *   *   *

15          Overall, fourth quarter sales nearly tripled from the year earlier, to a record $676 million. The online merchant added that added that fourth-quarter sales soared 90% from the third-quarter pace, its fastest quarter-to-quarter growth since going public  *The company said it added 3.8 million customers, bringing its total to 16.9 million.*

18                                   *   *   *

19          Amazon's founder and chief executive officer, Jeff Bezos ... referred to *Amazon as "the most efficient e-commerce incubator in the world," and he noted that in recent weeks, Amazon has opened or intensified partnerships with other merchants that sell furniture, drugstore products and streaming audio.*

21          Mr. Bezos also said Amazon plans greater expansion abroad ... *He said Amazon online stores in Britain and Germany are "off to a strong start."*

23                                   *   *   *

24          *Amazon's president, Joseph Galli, said customers spent an average of $116 each during 1999.*

25

26   The very positive information disseminated by defendants in late 1/00 and early 2/00 caused Amazon's stock to soar from $60 on 1/21/00 to as high as $84 on 2/8/00.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

188.   On 2/4/00, Amazon filed an 8-K Report with the SEC, reporting the agreements with Greenlight.com, drugstore.com and living.com.   The releases announcing the agreements with Greenlight.com, drugstore.com and living.com were also included as exhibits to the Form 8-K.

189.   On 2/7/00, Amazon announced it would sell €600 million ($586 million) of convertible notes in Europe in a sale by Morgan Stanley and First Boston   On 2/7/00, defendants filed with the SEC a Prospectus and Registration Statement ("Prospectus") signed by Bezos, Alberg, Stonesifer, Jenson, Engstrom and Doerr.  The Amazon Defendants *and* the underwriters wrote the Registration Statement and Prospectus.

190.   The Prospectus for this offering of convertible notes contained detailed information and "updated" information about Amazon's business strategy, operations and financial results as of 12/31/99 – the end of Amazon's most recently concluded financial reporting period, the 4thQ 99. The Prospectus referred extensively to the series of agreements announced in 1/00 and 2/00 between Amazon and its ACN partners, repeating the misrepresentations contained in Amazon's prior press releases and its recent Form 8-K filings, which were incorporated by reference in the Registration Statement.

191.   In the "Products and Services" section of the Prospectus, Amazon described the recent expansion of its ACN partnerships:

> In the past, we have offered our products and services primarily through two means: Amazon.com's online retail stores and Amazon.com's marketplace services (including Amazon.com Auctions, sothebys.amazon.com and zShops).  We have recently entered into agreements to expand the product and services we offer by allowing selected strategic partners to sell products and services under co-branded sections on the Amazon.com Web site.  We refer to these new arrangements as the Amazon.com Commerce Network.

> *   *   *

> We have recently entered into agreements to allow selected strategic partners to sell products under co-branded sections on our Web site.  We believe that these arrangements will be attractive to Amazon.com customers as a result of the increase in product and service selection available on our site, attractive to the strategic partners as a result of the potential growth of their customer base and brand awareness, and financially attractive to us. *See* "Summary – Recent Developments."

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

192.   The "Recent Developments" section stated.

On January 21, 2000, we announced that we had agreed to acquire 5% of the outstanding shares of Greenlight.com, an online car buying service, and warrants to increase our stake up to 30%. In connection with this investment, we also announced that we had entered into a promotional agreement with Greenlight.com. *This agreement provides for the payment of a minimum of $82.5 million to us over a five-year period.*

On January 24, 2000, we announced that we had agreed to make an additional $30 million investment in drugstore.com, an online retail and information source for health, beauty, wellness, personal care and pharmacy. This investment brings our total stake in drugstore.com to approximately 28% of the outstanding drugstore.com common stock. We also agreed to create a health and beauty store on the Amazon.com site. *Under the commercial agreement for this transaction, Amazon.com will receive $105 million over a three-year period*

On January 31, 2000, we announced that we had agreed to acquire 5% of Audible, Inc., a leader in Internet-delivered spoken audio for PC-based listening or playback on AudibleReady™ portable digital audio devices. *In connection with this investment, we also announced that we had entered into an agreement to feature on the Amazon.com site content and services from Audible, Inc. in exchange for payments of $30 million to us over a three-year period.*

On February 1, 2000, we announced that we had agreed to acquire an 18% stake in living.com, an online retailer of products and services for the home, with warrants for another 9%. In connection with this investment, we also announced that we had entered into an agreement to create a home living store on the Amazon.com site. *Under the commercial agreement for this transaction, Amazon.com will receive $145 million from living.com over a five-year period.*

Thus, the Prospectus stated that Amazon had recently entered into agreements that would provide it with revenues of $362.5 million over five years. None of the agreements referenced in the Prospectus was included as an exhibit to the Prospectus, or, indeed, as an exhibit to any of Amazon's SEC filings.

193.   Each of these statements relating to Amazon's agreements with various Internet companies made in the 6.875% convertible note Prospectus was designed to and did in fact represent that Amazon would be receiving hundreds of millions of dollars in *cash* from the companies over the coming years. These statements were false or misleading when issued. The true but concealed facts were that the agreements provided for stock to be issued to Amazon, which was much less certain and valuable, particularly since the defendants knew these were early-stage Internet

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax. 619/231-7423

1  companies with inadequate business plans and poor service, and which were not generating cash
2  themselves and were struggling, if not failing, enterprises.

3        194.    Defendants, in the Prospectus, did not disclose that the consideration paid by
4  Amazon's ACN partners, purportedly totaling at least $362 5 million, was largely composed of
5  restricted equity rather than cash and was not worth anything near $362.5 million.  The Prospectus
6  was materially misleading and omitted to state facts necessary to make statements contained therein
7  not misleading, in that:

8              (a)    It failed to disclose that Amazon's consideration from the ACN transactions
9  was not $362.5-$500 million in cash, but was to be received in the form of restricted equity in
10 speculative Internet start-ups, and

11             (b)    It failed to correct statements made by its underwriters immediately prior to
12 the filing of the Prospectus which indicated that the ACN network would yield between $362 5-$500
13 million in high-margin revenue to Amazon.

14       195.    Under Item 601 of Regulation S-K, all "material contracts" of an issuer must be
15 annexed as exhibits to a registration statement for the offering of securities.  Agreements purportedly
16 providing Amazon with between $362.5 million in high-margin revenues (according to the
17 Prospectus) and $500 million in revenues (according to Amazon's 2/2/00 press release and the reports
18 published by its underwriters) were "material contracts" within the meaning of Item 601, which
19 should have been annexed to the Prospectus.

20       196.    SEC Form S-3, which Amazon used in its Registration Statement for its 2/00 note
21 sale, required the registrant to follow SEC Regulation S-K Item 303(a).  Item 303(a)(1) and (2) state

22             (1)    *Liquidity*.    Identify any known trends or any known demands,
        commitments, events or uncertainties that will result in or that are reasonably likely
23      to result in the registrant's liquidity increasing or decreasing in any material way  If
        a material deficiency is identified, indicate the course of action that the registrant has
24      taken or proposes to take to remedy the deficiency.  Also identify and separately
        describe internal and external sources of liquidity, and briefly discuss any material
25      unused sources of liquid assets.

26             (2)    *Capital resources*. (i) Describe the registrant's material commitments
        for capital expenditures as of the end of the latest fiscal period, and indicate the

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1      general purpose of such commitments and the anticipated source of funds needed to
2      fulfill such commitments.

3           (ii)     Describe any known material trends, favorable or unfavorable, in the
registrant's capital resources.  Indicate any expected material changes in the mix and
relative cost of such resources.  The discussion shall consider changes between
4      equity, debt and any off-balance sheet financing arrangements.

5   Item 303(a)(3)(ii) requires that a registrant:

6      Describe any known trends or uncertainties that have had or that the registrant
reasonably expects will have a material favorable or unfavorable impact on net sales
7      or revenues or income from continuing operations.

8           197.     SEC Rule 408 requires that registration statements contain, in addition to the

9   information expressly required to be included, all "further material information, if any, as may be

10   necessary to make the required statements, in the light of the circumstances in which they are made,

11   not misleading."  The fact that most of Amazon's purported revenue stream to be generated from its

12   ACN partners would be paid to Amazon not in cash but in restricted equity of Amazon's partners

13   constituted such "further material information" required to be disclosed in the Prospectus for the

14   6.875% convertible notes, within the meaning of Rule 408.  Nevertheless, the agreements Amazon

15   reached with its ACN partners were not annexed as exhibits to any Registration Statement or

16   Prospectus filed with the SEC for the 6.875% convertible note offering.  Nor was the fact that the

17   majority of Amazon's $362.5 million of revenue commitments from its partners would be paid with

18   restricted equity of those partners – rather than cash – disclosed at that time.

19           198.     As represented by defendants, Amazon would be receiving from its partners between

20   $362.5 million and $500 million in high-margin revenues over five years.  This revenue stream from

21   the ACN partners – which, due to its high margins, would supposedly be almost pure profit –

22   represented between 53% and 73% of the convertible debt Amazon was incurring in the 6.875%

23   convertible note offering.  Disclosure of the true nature of the agreements pursuant to which Amazon

24   would be paid by its partners – agreements specifying payments in restricted stock – would have

25   materially altered the total mix of information made available to the securities markets regarding

26   Amazon.  The fact that Amazon did not have *cash* commitments from these affiliates was a material

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1   fact which was required to be stated.  Amazon's cash problems and lack of new sources for cash was

2   a currently known trend which was reasonably expected to have a material effect on Amazon's

3   results.  As such, these items were required to be disclosed in Amazon's Registration Statement/

4   Prospectus by Item 303(a) of Regulation S-K.

5        199.    On 2/10/00, the *National Post* published an article noting a sea change toward more

6   favorable opinions regarding Amazon in the investment community.  The article, entitled "Hot Stock"

7   and featuring the byline "Suddenly Wall Street Believes in Amazon.com, We Think the Worst of this

8   Wild Ride is Over, Says Meeker," reported:

> **Hot Stock**
>
> **Suddenly Wall Street believes in Amazon.com: We think the worst of this wild ride is over, says Meeker**
>
> *   *   *
>
> After months of grousing about Amazon.com Inc.'s escalating cost structure, Wall Street has suddenly started to buy chief executive Jeff Bezos' growth-at-all-costs strategy.
>
> In an outpouring of opinions, Wall Street's Internet cheerleaders ignored the e-tailer's massive fourth quarter losses and instead gushed heartily about its vast potential.  *"In words that are oh so sweet for us to type, Amazon.com may have become the definitive retail platform on the Internet," offered Mary Meeker of Morgan Stanley Dean Witter.*
>
> *   *   *
>
> *Amazon's customer accounts grew 170% to 16.9 million – more than most analysts expected.  And that is lighting a fire under a new strategy that has been filtering into investor consciousness over the past few months.  Now that it has spent such a bundle on securing those 17 million users, the idea is that Amazon will be able to sell access to them at premium prices.*  In essence, it is stocking its own shelves at big, fat margins – a reversal of the usual retailing model.
>
> *Amazon has announced a flurry of cash-generating strategic partnerships with other retailers.*  Companies such as NextCard, Ashford.com, drugstore com, and greenlight.com will pay a combined $450-million in cash (according to Ms. Meeker) over the next few years to sell their products on Amazon's platform.  These deals come at little incremental cost to Amazon.  Anthony Noto of Goldman Sachs estimates they will bring in $122-million in revenue this year, with gross margins of 90%.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1
                      All of this is helping Amazon zero in on when its massive losses may narrow.
2
                *"In 2000, our overall operating loss will decrease significantly as a percentage of sales," Warren Jenson, chief financial officer, said.*

3      200.    On 2/16/00, the defendants completed an offering of €690 million in 6.875%

4 convertible notes with net proceeds to Amazon of $663 million.  The new notes were to be

5 convertible into Amazon stock at €104   Morgan Stanley and First Boston got $17+ million of the

6 proceeds of the note sale.

7      201.    In 2/00, Bezos appeared on a cable television program entitled "The Summit in Silicon

8 Valley" from Stanford University, and was interviewed by Tom Brokaw.  An Amazon shareholder

9 asked him: "I was wondering if you can tell me exactly what it is that I own?" He said: *"[W]hat you*

10 *own is what we like to think of as an incubator for e-commerce companies that can start e-*

11 *commerce companies at lower cost and more quickly than any other company in the world."*

12      202.    Each of the statements made between 1/5/00-2/00 was false or misleading when

13 issued.  The true but concealed facts were:

14 **Customer Metrics**

15      (a)    Amazon was falsifying its key customer metrics in order to artificially inflate

16 its reported number of customers/customer accounts to make Amazon's customer base appear much

17 larger than it actually was, and its business and business model look more successful than they

18 actually were, and to create the impression that Amazon had a much larger number or base of

19 customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue

20 growth;

21      (b)    Amazon was artificially inflating its stated total number of customers/customer

22 accounts by including persons who had not purchased from Amazon in over 12 months, which

23 Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

24 likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from

25 Amazon;

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 130 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1          (c)      Amazon's reported sales per customer of $116 for 4thQ 99 was overstated by

2  Amazon including catalog sales in the numerator of this calculation but excluding catalog customers

3  from the denominator, such that Amazon has subsequently admitted that 4thQ 99 sales per active

4  customer were actually only $113;

5          (d)      Amazon was artificially inflating its stated number of total customers/

6  customer accounts by counting customers based on e-mail addresses, *not* customer names, even

7  though Amazon knew from analysis of its customer data that a material number of persons who had

8  purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

9  *even quadruple counted*.  This occurred in part because some customers intentionally signed up as

10  new users to take advantage of promotions for new customers;

11          (e)      In order to artificially inflate its total number of customer accounts, Amazon

12  was intentionally not purging its customer base or list of what it knew were dormant, outdated,

13  inactive and duplicative accounts of persons who had ceased doing business with Amazon;

14          (f)      In truth, during the 4thQ 99, Amazon was suffering serious customer "churn"

15  and was losing nearly as many customers as it was gaining.  The truth about Amazon's customer

16  metrics during the 4thQ 99 is shown below:

|  | 12/31/99 |
|---|---|
| Total Customers reported | 16.9M |
| New Customers reported | 3.8M |
| Actual Customers | 14.1M |
| Lost/Former Customers | 2.8M |
| Percentage of Lost/Former Customers | 17% |
| Additions to Lost/Former Customers | |
| (lost in quarter) | 1.0M |
| Actual Net New Customers | 2.8M |

22  Thus, contrary to the success of its business model and strong revenue growth prospects conveyed

23  by the number of new customers and total customers which defendants emphasized each quarter,

24  Amazon's net customer growth was anemic.  The percentage of lost/former customers was growing

25  precipitously during the Class Period,

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1      (g)    Amazon's creation of the new trailing 12-month average customer revenue

2 metric first announced late in 1/00, just before Amazon's sale of €690 million in 6.875% convertible

3 notes, was not created "to remove the effects of seasonality" as represented, but rather, to inflate the

4 revenue per customer metric for Amazon by dividing Amazon's prior 12-months revenue only by

5 customers who had actually purchased from Amazon in the prior 12 months, a calculation that

6 eliminated millions of dormant, outdated and inactive former customers – a subterfuge to conceal the

7 fact that Amazon's true average revenue per customer was declining, not increasing;

8      (h)    Amazon had inflated the revenue per customer metric at 12/31/99 by

9 improperly including non-mail order sales of a company recently acquired by Amazon and not

10 including the mail order customers in this calculation;

11 **Operating Problems**

12      (i)    The statements that Amazon's business model "worked," was "cash" and

13 "capital" efficient and would permit Amazon to be "profitable" were all false. In fact, Amazon's

14 business model did not and could not work, as its costs were too high, its liquidity and working

15 capital too low, its revenue growth too slow and its customer attachment and retention rates too low

16 to permit Amazon to succeed financially or ever reach actual profitability, given the massive debt that

17 Amazon was accumulating to implement its "Get Big Fast" expansion and diversification strategy,

18 **Expansion and Infrastructure Buildout**

19      (j)    Amazon's vast product expansion and infrastructure buildout would likely

20 result in Amazon suffering excessive inventories and write-offs, as Amazon was undertaking this

21 huge expansion and buildout without having put in place the controls and reporting systems

22 necessary for Amazon to control its product purchases and selection in a way so as to avoid

23 accumulating material amounts of unsaleable or overvalued inventories;

24      (k)    Amazon's consumer electronics business was not nearly as successful as

25 claimed and would never reach profitability due to a number of factors, including that several

26 prestigious and well-known manufacturers of very important and desirable consumer electronic

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    - 132 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1  products, such as Sony, Panasonic, Kenmore, Pioneer, Toshiba and others, refused to sell their

2  products directly to Amazon at wholesale prices because they did not want to disrupt their traditional

3  product distribution networks. As a result, Amazon was faced with a "Hobson's Choice" – it was

4  forced to forego carrying the desirable consumer products of these prestigious manufacturers, which

5  were indispensable to providing a broad enough selection for Amazon's consumer electronics store

6  to attract sufficient customers or purchasers to succeed, *or* it was forced to purchase these desirable

7  and indispensable products through middlemen and other distributors at marked-up prices, as

8  opposed to directly from the manufacturer, which added costs in an ultra-competitive business line

9  that virtually assured Amazon would lose money on the sale of such products, in either case, dooming

10  Amazon's consumer electronics store to failure;

11  **E-Commerce/ACN Partnerships and Investments**

12      (l)  The hundreds of millions of dollars of cash payments defendants stated would

13  be made by Amazon's e-commerce/ACN partners to Amazon were false, as the vast bulk of those

14  payments – over 90% – were to be made in the unregistered and illiquid stock of these e-

15  commerce/ACN partners which, in fact, had little or no value, and thus those e-commerce/ACN

16  partnerships would never provide the kind of revenues, benefits or increased liquidity to Amazon as

17  represented;

18      (m)  Amazon and its e-commerce/ACN partners were concealing the true extent

19  of problems with these businesses by using the cash Amazon had provided those companies as part

20  of investing in them to make whatever cash payments to Amazon that were called for by their

21  agreements with Amazon, thus "priming the pump" – concealing that these e-commerce/ACN

22  partners had struggling and failing businesses;

23  **Financial Condition and Statements**

24      (n)  Amazon's financial condition and financial statements for the 4thQ 99 were

25  falsified as detailed at ¶¶262-297;

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1      (o)     To falsify Amazon's financial condition and make it appear that Amazon had

2 larger cash balances and better liquidity than it actually had, Amazon engaged in the deceptive

3 practice of holding millions of dollars of accounts payable for *months longer than was*

4 *commercially reasonable* which, *inter alia,* was resulting in the creation of artificial disputes with

5 vendors to try to justify non-payment of invoices that were legitimately due and payable or Amazon

6 using its purchasing power to force vendor acquiescence in these payables stretchouts by threatening

7 to cease doing business with vendors if they did not acquiesce in the long-delayed payments;

8      (p)     Amazon was falsifying its financial condition and making its liquidity and

9 working capital appear better than they actually were by engaging in a phony product return scheme,

10 in which near the end of each quarterly reporting period employees at Amazon's huge distribution

11 centers were instructed to identify hundreds of thousands of items for return to vendors, segregate

12 those items for return, *but not actually ship them back to the vendor, because, in many instances,*

13 *Amazon's contractual arrangements with those vendors did not permit Amazon to return non-*

14 *defective, unsold merchandise*; yet Amazon accounted for these segregated but non-returnable items

15 as if they had actually been returned to vendors, thus artificially inflating Amazon's accounts

16 receivable and understating its inventories, boosting Amazon's apparent liquidity and working

17 capital; and

18      (q)     The ongoing revenue being forecast by defendants as a result of Amazon's e-

19 commerce/ACN partnerships and investments was grossly overstated. Defendants knew this revenue

20 would never be obtained because the business models and operations of these e-commerce/ACN

21 partners were flawed and their businesses were flawed and failing and generating only a fraction of

22 the sales via Amazon that were hoped for or forecast or necessary for Amazon to achieve the levels

23 of revenue growth being forecast by or for it, which defendants knew since they had access to

24 Amazon's data on sales made on Amazon's site for ACN partners.

25     203.    As Amazon's stock was inflated in price due to the very positive but false statements

26 made in 1/00-2/00 about Amazon's business and e-commerce partnerships, Amazon insiders Risher

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934    **- 134 -**

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax  619/231-7423

1  and Dalzell took advantage of this artificial inflation of Amazon's stock by selling off 50,000 and

2  50,000 shares of their stock at as high as $70.50 per share, pocketing $3.5 million and $3.3 million

3  in illegal insider trading proceeds.  In total, between 2/23/00-2/25/00, these Individual Amazon

4  Defendants unloaded 100,000 shares of their Amazon stock for $6.8 million in illegal insider trading

5  proceeds.

6          204.    In 4/00, Amazon issued its 99 Annual Report to Shareholders, including a letter by

7  Bezos stating:

8              During 1999 ....  *We added 10.7 million new customers, increasing*
           *cumulative customer accounts from 6.2 million to 16.9 million*

9                                    *    *    *

10

11             *In 1999, we continued to benefit from a business model that is inherently*
           *capital efficient*.  We don't need to build physical stores or stock those stores with
           inventory, and our centralized distribution model has allowed us to build a business

12         with a fourth quarter run rate of over $2 billion in annualized sales . ..

13                                    *    *    *

14         *You own a piece of the leading e-commerce platform*.

15             *... We begin the year 2000 with 17 million customers .... We believe we have*
           *reached a "tipping point," where this platform allows us to launch new e-*

16         *commerce businesses faster, with a higher quality of customer experience, a lower*
           *incremental cost, a higher chance of success, and a clearer path to scale and*

17         *profitability than perhaps any other company*

18         205.    On 4/26/00, Amazon announced its 1stQ 00 results in a release which stated:

19             Amazon.com, Inc. today announced that net sales for the first quarter of 2000
           were $574 million, an increase of 95 percent over net sales of $294 million for the

20         first quarter of 1999.

21             Pro forma operating loss in the first quarter of 2000 was $99 million,
           compared to a pro forma operating loss of $31 million in the first quarter of 1999.

22         First-quarter pro forma net loss in 2000 was $122 million, or $0.35 per share,
           compared with a pro forma net loss of $36 million, or $0.12 per share, in the first

23         quarter of 1999.

24             *Amazon.com announced that cumulative customer accounts increased by*
           *3.1 million during the first quarter to 20 million as of March 31, 2000*.

25                                    *    *    *

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax· 619/231-7423

1    [S]aid Joe Galli, Amazon.com president and COO. *"We made terrific progress in the first quarter against our key goals for 2000 ...."*

2

3    206.   On 4/26/00, subsequent to the release of its 1stQ 00 results, Amazon held a conference call to discuss Amazon's business. During the call and in follow-up conversations with analysts, Bezos, Jenson and Galli stated:

4

5

6    •    Amazon had 20 million customer accounts today.... *Trailing 12-month sales per customer were $121 up from $107 for the same period a year ago.*

7    •    Amazon was good enough already to attract 20 million customers.

8    •    The amount customers were spending with Amazon continued to improve. Trailing 12-months sales per customer rose to $121 up from $116 for the 12 months ended December 1999.

9

10   •    An investment in Amazon represented an investment in the leading e-commerce platform. *Amazon was a large and growing global portfolio of interrelated and mutually reinforcing businesses built on a shared platform.*

11

12   •    *Lawn and Patio was an excellent category for Amazon because it was counter-seasonal and it had high margins.*

13

14   207.   On 4/27/00, Morgan Stanley issued a report on Amazon by Meeker after discussions with Bezos, Jenson and Galli, which was based on and repeated information provided by them. Bezos, Jenson or Galli reviewed this report before it was issued and agreed with Meeker it should be issued. The report stated:

15

16

17

18   ***MOMENTUM CONTINUES TO MOVE IN THE RIGHT DIRECTION***

                              *   *   *

19   •    ***Strong Metrics*** ...

20

21        3.1MM new customers, vs. our 2.2MM est., *total of 20MM*; sales per customer up Q/Q from $116 ...

22                          *   *   *

23        Key ... metrics: Amazon ... *now has over 20MM customers....*

24

25        Two customer lifetime value indicators improved nicely in CQ1. 1) *Trailing twelve-month sales per active customer (one who purchased during the past 12 months) was $121, up from $116 in CQ4:99 and $107 in CQ1:99. The success of Amazon's business model long term is highly dependent on increased share of wallet; we believe we're starting to see the first signs of this....*

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax 619/231-7423

1           ... It appears that Amazon's balance sheet will support it *until it reaches*
*profitability in C2001.*

2

3                                \*    \*    \*

          *For C2001 and C2002, we are tweaking up our revenue estimates (from*
4   *$5B to $5.1B and from $7B to $7.2B, respectively)* ....

5                                \*    \*    \*

6           *A key component of revenue growth was a substantial expansion of*
*customer accounts – 3.1MM accounts were added in the quarter, much higher than*
7  *our estimate 2.2MM ....*

8                                \*    \*    \*

9           Key point – Trailing twelve-month sales per active customer (one who
purchased during the past 12 months) was $121, up from $116 in CQ4:99 and $107
10 in CQ1:99. *The success of Amazon's business model long term is highly dependent*
*on increased share of wallet; we believe we're starting to see the first signs of this.*

11

12                                \*    \*    \*

RECENT HIGHLIGHTS:
13

14                                \*    \*    \*

15           January 31, 2000 – Amazon.com announces an agreement to prominently
feature content and services from Audible.com. Amazon.com will make a strategic
investment in Audible and acquire 5% of the company. *In addition, Amazon.com*
16 *will receive from Audible $30 million over three years in exchange for promotion*
*of Audible's content and services.*
17

          January 24, 2000 – Amazon.com and drugstore.com announce a multi-million
18 dollar agreement to integrate a number of the companies' shopping features and create
a drugstore.com shopping "tab" at Amazon.com. *Under the terms of the agreement,*
19 *Amazon.com will receive $105 million over three years*

20           January 21, 2000 – Amazon.com agrees to acquire a 5% stake in
Greenlight.com, an online buying service. Under the promotional agreement,
21 *Amazon.com will receive $82.5 million over five years and receive warrants to*
*increase its stake to as much as 30% over the five years.*
22

The Morgan Stanley report contained the following financial forecast for Amazon:
23

24

25

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1

2

| Amazon – Annual Income Statement ($ Thousands, except EPS) | | | | | |
|---|---|---|---|---|---|

3

| | | | Annual Data | | |
|---|---|---|---|---|---|
| | 1998 | 1999 | 2000E | 2001E | 2002E |
| Total Revenue | $609,912 | $1,639,839 | $3,023,889 | $ 5,100,000 | $ 7,200,000 |
| | | * | * | * | |
| Growth Rate | | | | | |
| Total Revenue (Yr/Yr) | 313% | 169% | 84% | 69% | 41% |
| Growth Rate | | | | | |
| | | * | * | * | |
| Customer Accounts | | | | | |
| at Period-End | 6,200,000 | 16,900,000 | 27,800,000 | 37,100,000 | 46,400,000 |

4

5

6

7

8    208    On 4/27/00, First Boston issued a report on Amazon by Buyer, after discussions with

9    Bezos, Jenson and Galli, which was based on and repeated information provided by them.  Bezos,

10   Jenson or Galli reviewed this report before it was issued and agreed with Buyer that it should be

11   issued.  The report stated:

12       ***Now Past the Rapids, Amazon is Flowing Toward a Sea of Black Ink***

13           Amazon showed better than expected revenue growth and gross margin
         improvement....  ***Yippee!***

14

15           ... ***We expect the company to be profitable – really – in CY2002.***

16                               *    *    *

17       *[T]he cumulative customer count increased by 23% in the quarter with the addition
     of 3.1m new shoppers.*

18                               *    *    *

19       ***For CY01, we are raising our revenue estimate from $4073 to $4304 (up 6%) and
     decreasing our estimate operating loss from ($250) to ($167) up 33% again
     referencing faster and more powerful leverage than we had previously anticipated.
     For 2002 we are using a preliminary revenue estimate of $5610 and a preliminary
     operating PROFIT of $35m.***

20

21

22   209.    On 5/5/00, Lehman Brothers issued a report on Amazon by equity analyst Becker after

23   discussions with Bezos, Jenson and Galli, which was based on and repeated information provided

24   by them.  Bezos, Jenson or Galli reviewed this report before it was issued and assured Becker it was

25   accurate.  The report stated:

26       Amazon's ***business model is powerful and its execution skills are superb*** [and] have
     enabled the company to . . ***attract over 20 million customers, thus achieving critical***

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934       - 138 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax· 619/231-7423

1    *mass.... [C]ritical mass results in meaningful long-term competitive advantages
2    with respect to operating leverage, capital efficiency, and technological capabilities.
     These points of leverage, coupled with its strong cash position, are crucial as they
3    provide Amazon with a clear road to profitability ....*

4         .. Amazon will continue to leverage its critical mass and operating experience
     in e-commerce *to become a profitable e-tailing giant. Our estimates call for
5    average annual sales growth of 36% to $13 billion in 2005.... We believe that
     Amazon's scale and established brand will enable the company to generate
6    substantial profit for its shareholders ....*

7                                    *    *    *

8         The company has just begun to monetize its customer base through the
     Amazon Commerce Network (ACN), a series of marketing partnerships with smaller
9    online retailers, *such as drugstore.com, Ashford.com, and living.com, each of
     which is willing to pay for exposure to Amazon's 20 million shoppers....* [T]hese
10   partnerships are positive steps in the execution of Amazon's e-commerce platform
     strategy ..

11                                   *    *    *

12        The gross margin from such revenue would be closer to 80%, instead of the
     typical product margins of 16%-25%, and would provide the company with
13   significant upside in its top and bottom lines....  [W]e estimate that Amazon will
     recognize $100-$120 million in high-margin revenue streams over the next 12
14   months. *Such revenues could provide more than 200 basis points in gross margin
     expansion during the period and boost EPS significantly. In the first quarter,
15   revenues from ACN boosted gross margins 250 basis points.*

16                                   *    *    *

17        The Amazon Commerce Network. The company has just begun to monetize
     its customer base through ACN, a series of marketing partnerships with smaller
18   online retailers, *each of which has made a long-term revenue commitment in
     exchange for exposure to Amazon's 20 million shoppers. These high-margin,
19   long-term revenue commitments have quickly become quite sizable.* In the past
     three months, Amazon has announced five major agreements with online retailers:
20   drugstore.com, Ashford.com, Greenlight.com, audible.com, and living.com. *These
     agreements represent over $500 million in high-margin revenue to be realized over
21   the next five years. We believe that more such partnerships, in product categories
     where Amazon does not have a presence, are likely to be announced in the year
22   ahead.*

23                                   *    *    *

24        *Going forward, we project Amazon's customer base will grow by 12.2
     million (up 72%) to 29.1 million at the end of 2000, followed by growth of 13.4
25   million (up 46%) to 42.5 million at the end of 2001.*

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1    210.    Each of the statements made between 4/00-5/5/00 were false or misleading when

2  issued. The true but concealed facts were:

3  **Customer Metrics**

4    (a)    Amazon was falsifying its key customer metrics in order to artificially inflate

5  its reported number of customers/customer accounts to make Amazon's customer base appear much

6  larger than it actually was, and its business and business model look more successful than they

7  actually were, and to create the impression that Amazon had a much larger number or base of

8  customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue

9  growth;

10    (b)    Amazon was artificially inflating its stated total number of customers/customer

11  accounts by including persons who had not purchased from Amazon in over 12 months, which

12  Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

13  likely that such a person, i.e., a non-purchaser in the prior 12 months, would not again purchase from

14  Amazon;

15    (c)    Amazon was artificially inflating its stated number of total customers/

16  customer accounts by counting customers based on e-mail addresses, *not* customer names, even

17  though Amazon knew from analysis of its customer data that a material number of persons who had

18  purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

19  *even quadruple counted.*  This occurred in part because some customers intentionally signed up as

20  new users to take advantage of promotions for new customers;

21    (d)    In order to artificially inflate its total number of customer accounts, Amazon

22  was intentionally not purging its customer base or list of what it knew were dormant, outdated,

23  inactive and duplicative accounts of persons who had ceased doing business with Amazon;

24    (e)    In truth, during the 1stQ 00, Amazon was suffering serious customer "churn"

25  and was losing nearly as many customers as it was gaining.  The truth about Amazon's customer

26  metrics during the 1stQ 00 is shown below:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax· 619/231-7423

| | 3/31/00 |
|---|---|
| Total Customers reported | 20.0M |
| New Customers reported | 3.1M |
| Actual Customers | 15.9M |
| Lost/Former Customers | 4.1M |
| Percentage of Lost/Former Customers | 20% |
| Additions to Lost/Former Customers (lost in quarter) | 1.3M |
| Actual Net New Customers | 1.8M |

Thus, contrary to the success of its business model and strong revenue growth prospects conveyed by the number of new customers and total customers which defendants emphasized each quarter, Amazon's net customer growth was anemic. The percentage of lost/former customers was growing precipitously during the Class Period;

(f)     Amazon's creation of the new trailing 12-month average customer revenue metric first announced late in 1/00 ($116 per customer), just before Amazon's sale of €690 million in 6.875% convertible notes, was not created "to remove the effects of seasonality" as represented, but rather to distort the fact that more and more "customers" were not returning to make purchases, which is the real reason Amazon refused to disclose for each quarter the number of customers who made purchases;

(g)     Amazon had inflated the revenue per customer metric by improperly including non-mail order sales of a company recently acquired by Amazon and not including the mail order customers in this calculation;

(h)     By dividing Amazon's prior 12-months revenue only by customers who had actually purchased from Amazon in the prior 12 months, Amazon used a calculation that eliminated millions of dormant, outdated and inactive former customers – a subterfuge to conceal the fact that Amazon's true average revenue per customer was declining, not increasing;

**Operating Problems**

(1)     The statements that Amazon's business model "worked," was "cash" and "capital" efficient and would permit Amazon to be "profitable" were all false. In fact, Amazon's business model did not and could not work, as its costs were too high, its liquidity and working

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1   capital too low, its revenue growth too slow and its customer attachment and retention rates too low

2   to permit Amazon to succeed financially or ever reach actual profitability, given the massive debt that

3   Amazon was accumulating to implement its "Get Big Fast" expansion and diversification strategy;

4        (j)      Amazon's new auction site launched in 3/99, was an immediate failure, not

5   *"off to a very fast start"* as claimed, as it failed to attract anywhere near the level of activity actually

6   forecast or necessary for this new business to succeed.  To create the appearance of artificial activity

7   on Amazon's auction site so that it would appear to be more successful than it really was, Amazon

8   caused its employees to list goods for sale on the site and submit bids for merchandise on the site so

9   as to create the appearance of greater auction site activity than actually existed;

10        (k)      The statements that Amazon had become an "efficient e-commerce incubator"

11   with the ability to quickly and efficiently launch profitable e-commerce enterprises was not true as,

12   in fact, every one of the e-commerce investments/ACN partners Amazon was working with (*i.e*,

13   Geoworks, drugstore.com, Pets.com, HomeGrocer.com, Sotheby's, Liquid Audio, Gear.com, Della

14   and James, NextCard, Ashford.com, Greenlight.com, Audible, Inc. and living.com) were struggling,

15   failing, unprofitable, not generating cash and selling far fewer items through Amazon than

16   anticipated, and thus those businesses were not succeeding and therefore there was no basis for

17   Amazon's representation of efficient creation of successful and profitable e-commerce enterprises;

18        (l)      The statements that Amazon had evolved into a business with mutually

19   enforcing divisions or stores and that *each product or service it added helped it amortize its*

20   *investments, reduce its unit costs and thus drive Amazon toward profitability were false*, as many

21   of the additional products and services Amazon was adding to offer for sale were so unsuccessful

22   that they exacerbated Amazon's financial problems, generated excessive inventories and adversely

23   impacted Amazon's cash flow, liquidity and financial condition;

24        (m)      Amazon's lawn and garden store was not successful because the bulky and

25   irregular size of many of the products sold from this store were such that it resulted in excessive

26   handling and storage costs as well as uneconomical shipping costs;

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 142 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

1    (n)  Amazon's consumer electronics business was not nearly as successful as

2 claimed and would never reach profitability due to a number of factors, including that several

3 prestigious and well-known manufacturers of very important and desirable consumer electronic

4 products, such as Sony, Panasonic, Kenmore, Pioneer, Toshiba and others, refused to sell their

5 products directly to Amazon at wholesale prices because they did not want to disrupt their traditional

6 product distribution networks.  As a result, Amazon was faced with a "Hobson's Choice" – it was

7 forced to forego carrying the desirable consumer products of these prestigious manufacturers, which

8 were indispensable to providing a broad enough selection for Amazon's consumer electronics store

9 to attract sufficient customers or purchasers to succeed, *or* it was forced to purchase these desirable

10 and indispensable products through middlemen and other distributors at marked-up prices, as

11 opposed to directly from the manufacturer, which added costs in an ultra-competitive business line

12 that virtually assured Amazon would lose money on the sale of such products, in either case, dooming

13 Amazon's consumer electronics store to failure;

14 **E-Commerce/ACN Partnerships and Investments**

15    (o)  The hundreds of millions of dollars of cash payments defendants stated would

16 be made by Amazon's e-commerce/ACN partners to Amazon were false, as the vast bulk of those

17 payments – over 90% – were to be made in the unregistered and illiquid stock of these e-

18 commerce/ACN partners which, in fact, had little or no value, and thus those e-commerce/ACN

19 partnerships of Amazon would never provide the kind of revenues, benefits or increased liquidity to

20 Amazon as represented;

21    (p)  Amazon and its e-commerce/ACN partners were concealing the true extent

22 of problems with these businesses by using the cash Amazon had provided those companies as part

23 of investing in them to make whatever cash payments to Amazon that were called for by their

24 agreements with Amazon, thus "priming the pump" – concealing that these e-commerce/ACN

25 partners had struggling and failing businesses;

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1  **Financial Statements and Condition**

2         (q)     Amazon's financial condition and financial statements for the 1stQ 00 were

3  falsified as detailed at ¶¶262-297;

4         (r)     To falsify Amazon's financial condition and make it appear that Amazon had

5  larger cash balances and better liquidity than it actually had, Amazon engaged in the deceptive

6  practice of holding millions of dollars of accounts payable for **months longer than was**

7  **commercially reasonable** which, *inter alia*, was resulting in the creation of artificial disputes with

8  vendors to try to justify non-payment of invoices that were legitimately due and payable or Amazon

9  using its purchasing power to force vendor acquiescence in these payables stretchouts by threatening

10 to cease doing business with vendors if they did not acquiesce in the long-delayed payments;

11        (s)     Amazon was falsifying its financial condition and making its liquidity and

12 working capital appear better than they actually were by engaging in a phony product return scheme,

13 in which near the end of each quarterly reporting period employees at Amazon's huge distribution

14 centers were instructed to identify hundreds of thousands of items for return to vendors and segregate

15 those items for return, *but not actually ship them back to the vendor, because, in many instances,*

16 *Amazon's contractual arrangements with those vendors did not permit Amazon to return non-*

17 *defective, unsold merchandise*; yet Amazon accounted for these segregated but non-returnable items

18 as if they had actually been returned to vendors, thus artificially inflating Amazon's accounts

19 receivable and understating its inventories, boosting Amazon's apparent liquidity and working

20 capital;

21        (t)     Amazon was falsifying and distorting its financial condition by including in

22 its reported revenues, *at artificially inflated values,* the purported value of the restricted illiquid stock

23 it received from e-commerce/ACN partners in transactions with them.  However, even if GAAP

24 permitted recording the value of such stock as revenue, because Amazon insiders knew these e-

25 commerce/ACN businesses were unsuccessful and failing, the value of the stock recorded as revenue

26 was grossly overstated and Amazon was recording revenue at grossly inflated levels; as a result,

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1    Amazon's financial condition and results were not a fair presentation of Amazon's actual financial

2    condition or results, as this practice artificially inflated Amazon's revenue growth, distorted its actual

3    liquidity and made it appear that Amazon's business was more successful than it actually was;

4                    (u)       Amazon's calculation of pro forma results was extremely misleading in that

5    it excluded non-cash expenses, but did not exclude non-cash income, including some $17.1 million

6    in non-cash revenue attributable to ACN partners.  This distortion of pro forma results was even

7    more egregious since the actual value of this non-cash revenue (as reflected by the value of the stock

8    Amazon held) was only a fraction of $17.1 million;

9                    (v)       Amazon was also distorting its financial condition by grossly overstating the

10   value of its investments in its e-commerce/ACN partners by hundreds of millions of dollars as, in

11   fact, Amazon knew from its involvement with those enterprises that their business models were

12   flawed, their performance execution poor, their businesses were not generating cash, were struggling

13   or failing and generating only a fraction of the sales via Amazon as had been forecast and were

14   necessary for them to succeed, and that Amazon would never realize the stated value of these

15   investments and they would have to be largely if not completely written off, thus adversely impacting

16   Amazon's financial results and condition;

17                    (w)      The ongoing revenue being forecast by defendants as a result of Amazon's e-

18   commerce/ACN partnerships and investments was grossly overstated.  Defendants knew this revenue

19   would never be obtained because the business models and operations of these e-commerce/ACN

20   partners were flawed and their businesses were flawed and failing and generating only a fraction of

21   the sales via Amazon that were hoped for or forecast or necessary for Amazon to achieve the levels

22   of revenue growth being forecast by or for it;

23   **Future Profitablity**

24                    (x)       The statements made that Amazon was approaching "profitability" or would

25   become "profitable" were false, as Amazon *had not and would never achieve true profitability*, and

26   whatever "profits" or "profitability" Amazon was hoping to achieve could be reported only by

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 145 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax· 619/231-7423

1  accounting legerdemain in which such items as amortization expense, as well as employee stock
2  option expense and losses from equity investments, were excluded as expenses in calculating
3  Amazon's results and thus not actually accounted for, and

4        (y)    The forecasts of annual revenue growth of 40%-60% in 01-02 and 01-02
5  revenues of $4 3-$5.1 billion and $5.6-$7 2 billion for Amazon were false as the defendants actually
6  knew that revenue growth of this amount could not and would not be achieved by Amazon in part
7  because of the problems, deficiencies and adverse conditions pleaded above

8       211.   In early 5/00, Bezos and other top Amazon executives and insiders learned that
9  Lehman Brothers' convertible debt analyst Suria was preparing a negative report on Amazon, its
10 business model and its cash position   Amazon's executives and top insiders learned that this report
11 was being prepared and draft copies of it were provided to them.   They anticipated this negative
12 report could have an adverse impact on Amazon's stock.   To avoid the impact of this adverse report,
13 Bezos sold 368,650 shares of his Amazon.com stock for nearly $20 million and during 5/1/00-
14 5/16/00, Britto sold 14,000 shares for over $800,000 and during 5/12/00-5/16/00, Dalzell sold
15 50,000 shares for $2.7 million

16      212.   On 6/22/00, Lehman Brothers convertible analyst Suria issued a very critical report
17 on Amazon. After the release of this Lehman Brothers report, Amazon's stock collapsed, falling from
18 $46-7/16 on 6/22/00 to $32-13/16 on 6/23/00, on huge volume of 49 million shares – *one of the*
19 *largest one-day percentage declines of its stock price in Amazon's history as a public company* –
20 pushing Amazon's stock down to its lowest level in 12 months. As a result of this stock price decline,
21 the defendants went on a public relations offensive to try to support or boost Amazon's stock price.

22      213.   On 6/26/00, Bezos was interviewed on the "Today Show":

23     COURIC:    Lehman Brothers says your situation is weak and deteriorating ....
24                   Tell me what your view is about what's going on with your company.

    BEZOS:    *Well, the – the report that you're referring to is completely wrong ...*
25                   *pure unadulterated hogwash....   You know, at Amazon we have 20*
26                   *million customers* . .

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

214. On 6/28/00, Bezos appeared on CNBC to discuss Amazon and the recent Lehman Brothers report:

A:      ... *[W]e are certainly very happy with our cash position.*

\*   \*   \*

Q:      Let me talk to you about your cash flow situation .... *There is a suggestion in that report that one way to achieve operating cash flow profitability is to stretch payables.... Is that how you achieve operating cash flow profitability?*

A:      That's an important part of our cash flow dynamic in this business. *But it is not a parlor trick.* It is the real thing that actually matters. We have what's called "negative operating cycle," *which means that we get to borrow about a month's worth of cash from our suppliers at any given time.* This is a very good dynamic in a business because it means in a typical business with a positive operating cycle, the faster you grow, the more cash that you need. *And in our case, the faster we grow the less cash that we need. It is a very unusual dynamic and it is a very good one and it means that we can have higher returns on invested capital over the long term than would otherwise be possible.*

215. On 6/28/00, Bezos was interviewed on Fox News Network:

CAVUTO:     ... [T]his analyst said, *that you don't stand any foreseeable future of making money.*

BEZOS:      *Well, it's just absurd.* So — you know, the business model is very clear. This is the same old argument, we've seen this movie so many times, the same old argument that people have been making all along that we're selling dollar bills for 90 cents. *And it's just not true. We sell dollar bills for $1.20. Our business model works.... What I'm trying to say is that our pricing is sustainable. It's very low, but it's not 90 cent dollar bills. It just isn't. It's low sustainable pricing.*

\*   \*   \*

CAVUTO:     ... I want to go back to this Lehman analyst .. *what he's essentially saying is, your model doesn't allow you to make money.*

BEZOS:      *It's not true.*

216. On 6/30/00, Bezos was interviewed on *Business Week's* "OnLine's Daily Briefing".

Q:      *There's renewed concern that Amazon.com's business model ... is flawed because it has to keep borrowing money and still can't make a profit. What do you say to them?*

A:      *Can I give you a one-word answer? Baloney.*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1                                          * * *

2   Q:    A lot of people would look at your losses and conclude your pricing is not
          sustainable.
3
4   A:    *We sell dollar bills for $1.20, which is completely sustainable. The reason
          we're not profitable is not because we sell dollar bills for 90 cents. It's
          because we're investing in lots of new areas.*
5
6   217.  On 7/10/00, *Newsweek* Online contained an article about Amazon that included an

    interview with Bezos:
7
8   Q:    A Lehman analyst recently called Amazon's financial position "weak and
          deteriorating." You completely agree, right?
9
10  A:    *Absolutely [laughs]. I hope you can detect some sarcasm over the phone...
          It's completely wrong. It's just plain wrong.... Our pricing is completely
          sustainable ....*

11  218.  On 7/26/00, Amazon.com announced its 2ndQ 00 results in a release which stated:

12        Amazon.com, Inc. today announced that net sales for the second quarter of
          2000 were $578 million, an increase of 84% over net sales of $314 million for the
13        second quarter of 1999....

14        Pro forma operation loss for the second quarter of 2000 was $89 million, or
          15% of sales, compared to a pro forma operating loss of $67 million, or 21% of sales,
15        in the second quarter of 1999   Second-quarter pro forma net loss was $0.33 per
          share, compared with a pro forma net loss of $0.26 per share in the second quarter of
16        1999.   Amazon.com's U.S. Books, Music and DVD/Video segment pro forma
          operating profit was $10 million.
17
18        *Cumulative customer accounts increased by 2.5 million during the second
          quarter to more than 22.5 million as of June 30, 2000, and now stand at over 23
          million..*   Trailing 12-month sales per customer who purchased during the 12
19        months ended June 30, 2000, was $125, up from $108 for the same period a year ago.

20                                         * * *

21        [S]aid Jeff Bezos, Amazon.com founder and CEO[:]   *"While we continue to see
          improvements in all of our businesses,* we are especially pleased with the
22        profitability in our U.S. Books, Music and Video group *and the unusual growth in
          our Electronics store."*
23
24  219.  On 7/26/00, subsequent to the release of its 2ndQ 00 results, Amazon held a

    conference call to discuss Amazon's business. During the call and in follow-up conversations with
25
    analysts, Bezos and Jenson stated:
26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 148 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax. 619/231-7423

1    • While Amazon's revenue growth was slower than its internal plan, *Amazon was very pleased that it was able to exceed its own internal bottom line target.* On long-term
2    growth, Amazon remained as bullish as ever.

3    • Amazon was lowering its 01-02 revenue growth forecast.

4    • Amazon had over $900 million in cash or cash equivalents.

5    • Annual active customer spending had increased from $108 to $125 and had been driven by the growing adoption of new product lines. Amazon's strategy of selling
6    more to its current customers was already working  The two best pieces of evidence of this were the extremely high growth rates of Amazon's early stage businesses
7    which were at a $500 million run rate even though the average age is only 8.6 months and the fact that the average spend per active customer was $125 a year, up from
8    $108 a year ago.

9    220.  On 7/27/00, Morgan Stanley issued a report on Amazon by Meeker, after discussions

10   with Bezos, Jenson and Galli, which was based on and repeated information provided by them.

11   Bezos, Jenson or Galli reviewed this report before it was issued and agreed with Meeker it should

12   be issued.  The report stated:

13       *Amazon reported several positive path-to-profitability results ...*

14                                 *   *   *

15       *The key non-financial metrics in CQ2 were strong for Amazon.  The company added 2.5MM customers in CQ2 (vs. our 2.3MM estimate) and reached*
16   *22.5MM customers at the end of June.  (Note that over 3MM of these customers are from overseas – a positive indicator).*

17   
       Amazon ended CQ2 with over $900MM is cash and equivalents . ..
18
                                   *   *   *
19
       For C2001 and C2002, we are lowering our revenue estimates (from $5 1B
20   to $4.1B and from $7.2B to $6.2B, respectively).

21                                 *   *   *

22   The Morgan Stanley report also contained the following forecast for Amazon:

23

24

25

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax: 619/231-7423

| Amazon – Annual Income Statement ($ Thousands, except EPS) | | | | |
|---|---|---|---|---|
| | | Annual Data | | |
| | 1999 | 2000E | 2001E | 2002E |
| Total Revenue | $1,639,839 | $2,751,765 | $4,120,027 | $6,180,040 |
| | | * * * | | |
| Net Income-
Operating | (389,839) | (436,489) | (155,368) | 32,758 |
| | | * * * | | |
| Growth Rate
Total Revenue (Yr/Yr) | 169% | 68% | 50% | 50% |
| | | * * * | | |
| Customer Accounts
at Period-End (MM) | 16 9 | 28 0 | 37.1 | 46 6 |

221.   On 8/15/00, Bezos was interviewed by *Red Herring* magazine:

RH:   Critics say some of your newer categories, like toys and electronics, are not profitable and are not gaining much traction.

BEZOS:   *Our electronics business, for example, is the fastest growing category in the history of the company, so I'm not sure where that notion comes from ... We are gaining tremendous traction in all of those businesses.*

RH·   But are margins so slim that you would simply be unable to make money in them?

BEZOS:   *No.... We're in a very strong cash position .... We expect to be in a very strong cash position .... [W]e're very comfortable with our cash position.*

RH:   A big source of your capital has come from employee stock options.... Is that amount of money raised essential to you business?  Do you truly lean on that money?

BEZOS:   *No, it's not something we think about.*

RH·   It's not even in the equation, especially with your capital needs as you look at the future?

BEZOS:   *Nope....   Look, we've already demonstrated the model in books, videos, and music.  No one can rightly question the basic model*

222.   On 8/24/00, *The Wall Street Journal* reported that Amazon had written off the value of some of its investment, but:  *"Mr. Bezos says Wall Street won't need to lower expectations as a result of the decline."*

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934     - 150 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

223.    In 9/00, Amazon executive Russ Grandinetti was interviewed by *The Wall Street Transcript* during the Bank of America Securities Investment Conference:

TWST:              Can you tell us about Amazon.com's competitive advantages? What differentiates Amazon.com from all the other companies out there?

GRANDINETTI:       *... **It's having introduced ourselves to over 23 million customers**.*

                                *    *    *

TWST.              When do you think Amazon.com will turn the profit corner?

GRANDINETTI:       *It's clearly a question, in our minds, of when, not if... I think we're going to make consistent and clear progress toward profitability every quarter from here until we get there, but we've just chosen not to put an exact timing on profitability.*

224.    On 9/19/00, Amazon executives Bezos and Jenson appeared at the Amazon Investor Relations Conference in Reno, Nevada.  In formal presentations and break-out sessions, they told the assembled analysts, money and portfolio managers, institutional investors, brokers and stock traders that:

- Amazon's consumer electronics business was succeeding.

- Amazon expected 100% of its customers to purchase electronics merchandise during the next 12 months.

- Amazon was very consistent in its 01-02 growth outlook

- Amazon's business model would yield double-digit operating margins.

- Amazon was forecasting 01 and 02 revenues of $4.1 billion and $6 1 billion, respectively

225.    On 9/20/00, Morgan Stanley issued a report on Amazon by Meeker, after discussions with Bezos and Jenson, which was based on and repeated information provided by them at the Amazon Investor Relations Conference.  Bezos or Jenson reviewed this report before it was issued and agreed with Meeker that it should be issued.  The report stated·

UPBEAT ANALYST DAY

                                *    *    *

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax 619/231-7423

*Presentations from Amazon's management team were upbeat/confident, thorough, and more detailed than in years past.  One of the biggest take-aways was the strength and depth of Amazon's management team.... Amazon clearly has one of the most talented and experienced management teams in the business.*

\* \* \*

One of the key new points from the analyst day, however, was Amazon's increasingly strong positioning in non-media products – *the newer segments like consumer electronics*, toys, home products, etc.... *We think Amazon is developing a very significant, sustainable competitive advantage*.

\* \* \*

Amazon management expressed a strong commitment to year-over-year unit cost productivity gains and laid out a goal of double-digit productivity gains over each of the next few years.

The Morgan Stanley report also included the following forecast for Amazon:

Amazon – Annual Income Statement
($ Thousands, except EPS)

| | | | Annual Data | | |
|---|---|---|---|---|---|
| | 1998 | 1999 | 2000E | 2001E | 2002E |
| Total Revenue | $609,912 | $1,639,839 | $2,751,765 | $4,120,027 | $6,180,040 |
| | | \* \* \* | | | |
| Net Income-Operating | (74,186) | (389,839) | (436,489) | (155,368) | 32,758 |
| | | \* \* \* | | | |
| Growth Rate Total Revenue (Yr/Yr) | 313% | 169% | 68% | 50% | 50% |
| | | \* \* \* | | | |
| Customer Accounts at Period End | 6 2 | 16 9 | 28.0 | 37 3 | 46 6 |

226.   On 9/20/00, First Boston issued a report on Amazon by Heath, after discussions with Bezos and Jenson, which was based on and repeated information provided by them at the Investor Conference.  Bezos or Jenson reviewed this report before it was issued and agreed with Heath it should be issued.  The report stated:

\*      Amazon hosted its annual investor day`.... *[T]he company put on a solid display of its long term strategy, recent successes, and managerial depth*.

227.   On 9/20/00, Salomon Smith Barney issued a report on Amazon based on the presentations at Amazon's 9/19-20/00 Investor Conference, stating:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1       *     Amazon analyst meeting was all about operating efficiency and scalability. *We feel confident that the cost structure is being leveraged and that top line growth*

2     *opportunities are abundant.*

3                       *   *   *

4       *     Management believes their business will yield double digit operating*

5     *margins long term.*

6     228    On 9/20/00, W.R. Hambrecht & Co. issued a report on Amazon which was based on

7 and repeated information provided at Amazon's 9/19-20/00 Investor Conference, stating:

8       *     Management indicated that it is confident in its growth outlook for the next 18 months.*

9                       *   *   *

10       *     Electronics business is gaining traction, as it represents the second largest category for Amazon.*  Management believes that its electronics category represents

11 a significant opportunity for the Company, *as it expects 100% of customers will purchase electronics merchandise over the next 12 months.*  *Amazon has a*

12 *customer base of 23 million ...*

13     229.   10/24/00, Amazon reported its 3rdQ 00 earnings in a release which stated:

14          Amazon.com, Inc. today announced net sales for the third quarter of 2000 were $638 million, an increase of 79% over net sales of $356 million for the third

15 quarter of 1999..

16          Pro forma operation loss for the third quarter of 2000 was $68 million, or 11% of sales, compared to a pro forma operating loss of $79 million, or 22% of sales,

17 in the third quarter of 1999.  Third-quarter pro forma net loss was $0.25 per share, an improvement over the pro forma net loss of $0.26 per share in the third quarter of

18 1999.

19                     *   *   *

20     *"[W]e are driving toward profitability, and we surpassed our key internal operational and financial objectives," said Warren Jenson, Amazon.com chief*

21 *financial officer*

22     230.   On 10/25/00, subsequent to the release of its 3rdQ 00 results, Amazon held a

23 conference call to discuss Amazon's business.  During the call – and in follow-up conversations with

24 analysts – Bezos and Jenson stated:

25     •     The biggest takeaway from this quarter is that new product categories work for Amazon.  The idea that people wouldn't buy electronics online or tools or kitchen

26 appliances never made any sense.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1    •    Amazon had 25.3 million customers

2    •    Amazon's consumer electronics business was succeeding.

3    •    Amazon was forecasting 01 and 02 revenues of $4.1 billion and $6.1 billion,
         respectively.

4

5    231.    On 10/25/00, Bezos appeared on CNBC:

     BEZOS:         .. [W]e are in a very strong cash position ... as of end of the quarter....
6                   *[W]e are in a very strong position* ....

7    232.    On 10/25/00, Morgan Stanley issued a report on Amazon by Meeker, after discussions

8    with Bezos and Jenson, which was based on and repeated information provided by them.  Bezos or

9    Jenson reviewed this report before it was issued and agreed with Meeker it should be issued.  The

10   report stated:

11          The key non-financial metrics in CQ3 were strong for Amazon.  The company
            ... *reached 25.3MM customers at the end of September*...
12
            Among the key incremental points from the quarter:  1) sales per active
13   customer reached a record high of $130 (vs  $125 in CQ2 and $121 in CQ1) .. .

14                               *   *   *

15          For C2001 and C2002, we are maintaining current estimates – C2001 revenue
     of $4,120MM ....  C2002 revenue of $6,180MM up 50% Y/Y ....
16

17   The Morgan Stanley report reported the following forecast on Amazon:

                        Amazon.com – Annual Income Statement
18                           ($ Thousands, Except EPS)

19                                          Annual Data
                          1998        1999       2000E        2001E        2002E
20   Total Revenue       $609,912   $1,639,839  $2,789,623   $4,120,027   $6,180,040
                                        *   *   *
21   Net Income – Operating  (74,186)  (389,851)  (414,482)   (155,368)    32,758
                                        *   *   *
22   Growth Rate
     Total Revenue (yr-yr)  313%        169%        70%         48%          50%
23                                       *   *   *
     Customer Accounts at
24   Period-End(MM)         6.2         16.9        28.5        37 8         47.1

25   233.    On 10/25/00, First Boston issued a report on Amazon by Kiggen after discussions

26   with Bezos and Jenson, which was based on and repeated information provided by them.  Bezos or

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 154 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1  Jenson reviewed this report before it was issued and agreed with Kiggen it should be issued. The

2  report stated:

3         Strong customer metrics: 2.8 million new customers (versus our model of 2.2
       million), revenue per customer of $130 (up from $125 in Q2) and customer
4      acquisition cost of $15 (vs $17 in Q2).

5         Amazon finished Q3'00 with roughly $900 million in cash and marketable
       securities.
6
                                    *   *   *
7

8         Amazon also disclosed that it has received informal inquiries from the SEC
       regarding its accounting treatment of ACN. Amazon is cooperating fully and is
       confident in its current accounting practices. More importantly, with or without
9      ACN's contribution, our conclusions about the economics of the Amazon model from
       this quarter are unchanged. In 2001, ACN revenue is expected to be trending toward
10     70% cash.

11     234.    Each of the statements made between 6/26/00-10/25/00 was false or misleading when

12  issued. The true but concealed facts were:

13  **Customer Metrics**

14         (a)    Amazon was falsifying its key customer metrics in order to artificially inflate

15  its reported number of customers/customer accounts to make Amazon's customer base appear much

16  larger than it actually was, and its business and business model look more successful than they

17  actually were, and to create the impression that Amazon had a much larger number or base of

18  customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue

19  growth;

20         (b)    Amazon was artificially inflating its stated total number of customers/customer

21  accounts by including persons who had not purchased from Amazon in over 12 months, which

22  Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very

23  likely that such a person, *i.e* , a non-purchaser in the prior 12 months, would not again purchase from

24  Amazon;

25         (c)    Amazon was artificially inflating its stated number of total customers/

26  customer accounts by counting customers based on e-mail addresses, *not* customer names, even

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1 though Amazon knew from analysis of its customer data that a material number of persons who had

2 purchased from Amazon *had more than one e-mail address and thus were being double, triple, or*

3 *even quadruple counted*.  This occurred in part because some customers intentionally signed up as

4 new users to take advantage of promotions for new customers;

5         (d)    In order to artificially inflate its total number of customer accounts, Amazon

6 was intentionally not purging its customer base or list of what it knew were dormant, outdated,

7 inactive and duplicative accounts of persons who had ceased doing business with Amazon;

8         (e)    In truth, during the 2ndQ and 3rdQ 00, Amazon was suffering serious

9 customer "churn" and was losing nearly as many customers as it was gaining.  The truth about

10 Amazon's customer metrics during the 2ndQ and 3rdQ 00 is shown below:

11

|  | 6/30/00 | 9/30/00 |
|---|---|---|
| Total Customers reported | 22.5M | 25.3M |
| New Customers reported | 2 5M | 2.8M |
| Actual Customers | 17.0M | 18.2M |
| Lost/Former Customers | 5.5M | 7.1M |
| Percentage of Lost/Former Customers | 24% | 28% |
| Additions to Lost/Former Customers (lost in quarter) | 1.4M | 1.6M |
| Actual Net New Customers | 1.1M | 1.2M |

16 Thus, contrary to the success of its business model and strong revenue growth prospects conveyed

17 by the number of new customers and total customers which defendants emphasized each quarter,

18 Amazon's net customer growth was anemic.  The percentage of lost/former customers was growing

19 precipitously during the Class Period;

20 **Operating Problems**

21         (f)    The statements that Amazon's business model "worked," was "cash" and

22 "capital" efficient and would permit Amazon to be "profitable," and that Amazon's pricing practices

23 were "sustainable" were all false   In fact, Amazon's business model did not and could not work, as

24 its costs were too high, its liquidity and working capital too low, its revenue growth too slow and its

25 customer attachment and retention rates too low to permit Amazon to succeed financially or ever

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1   reach actual profitability, given the massive debt that Amazon was accumulating to implement its

2   "Get Big Fast" expansion and diversification strategy;

3           (g)    The statements that Amazon had evolved into a business with mutually

4   enforcing divisions or stores and that ***each product or service it added helped it amortize its***

5   ***investments, reduce its unit costs and thus drive Amazon toward profitability were false***, as many

6   of the additional products and services Amazon was adding to offer for sale were so unsuccessful

7   that they exacerbated Amazon's financial problems, generated excessive inventories and adversely

8   impacted Amazon's cash flow, liquidity and financial condition;

9           (h)    Amazon's consumer electronics business was not nearly as successful as

10   claimed and would never reach profitability due to a number of factors, including that several

11   prestigious and well-known manufacturers of very important and desirable consumer electronic

12   products, such as Sony, Panasonic, Kenmore, Pioneer, Toshiba and others, refused to sell their

13   products directly to Amazon at wholesale prices because they did not want to disrupt their traditional

14   product distribution networks.  As a result, Amazon was faced with a "Hobson's Choice" – it was

15   forced to forego carrying the desirable consumer products of these prestigious manufacturers, which

16   were indispensable to providing a broad enough selection for Amazon's consumer electronics store

17   to attract sufficient customers or purchasers to succeed, ***or*** it was forced to purchase these desirable

18   and indispensable products through middlemen and other distributors at marked-up prices, as

19   opposed to directly from the manufacturer, which added costs in an ultra-competitive business line

20   that virtually assured Amazon would lose money on the sale of such products, in either case, dooming

21   Amazon's consumer electronics store to failure;

22   **Financial Statements and Condition**

23           (i)    Amazon's financial condition and financial statements for the 2ndQ and 3rdQ

24   00 were falsified as detailed at ¶¶262-297;

25           (j)    To falsify Amazon's financial condition and make it appear that Amazon had

26   larger cash balances and better liquidity than it actually had, Amazon engaged in the deceptive

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934   - 157 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1  practice of holding millions of dollars of accounts payable for **months longer than was**
2  **commercially reasonable** which, *inter alia*, was resulting in the creation of artificial disputes with
3  vendors to try to justify non-payment of invoices that were legitimately due and payable or Amazon
4  using its purchasing power to force vendor acquiescence in these payables stretchouts by threatening
5  to cease doing business with vendors if they did not acquiesce in the long-delayed payments;

6        (k)  Amazon was falsifying its financial condition and making its liquidity and
7  working capital appear better than they actually were by engaging in a phony product return scheme,
8  in which near the end of each quarterly reporting period employees at Amazon's huge distribution
9  centers were instructed to identify hundreds of thousands of items for return to vendors and segregate
10  those items for return, **but not actually ship them back to the vendor, because, in many instances,**
11  **Amazon's contractual arrangements with those vendors did not permit Amazon to return non-**
12  **defective, unsold merchandise**; yet Amazon accounted for these segregated but non-returnable items
13  as if they had actually been returned to vendors, thus artificially inflating Amazon's accounts
14  receivable and understating its inventories, boosting Amazon's apparent liquidity and working
15  capital;

16        (l)  Amazon's calculation of pro forma results was extremely misleading in that
17  it excluded non-cash expenses, but did not exclude non-cash income, including some $20.1 million
18  in the 2ndQ 00 and $21 million in the 3rdQ 00 in non-cash revenue attributable to ACN partners
19  This distortion of pro forma results was even more egregious since the actual value of the non-cash
20  revenue (as reflected by the value of the stock Amazon held) was only a fraction of the amount
21  recorded as revenue;

22        (m)  The statements made that Amazon was approaching "profitability" or would
23  become "profitable" were false, as Amazon **had not and would never achieve true profitability**, and
24  whatever "profits" or "profitability" Amazon was hoping to achieve could be reported only by
25  accounting legerdemain in which such items as amortization expense, as well as employee stock
26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 158 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1  option expense and losses from equity investments, were excluded as expenses in calculating

2  Amazon's results and thus not actually accounted for; and

3          (n)    The forecasts of annual revenue growth of 50% in 01-02 and 01-02 revenues

4  of $4.1 billion and $6.1 billion for Amazon were false as the defendants actually knew that revenue

5  growth of this amount could not and would not be achieved by Amazon in part because of the

6  problems, deficiencies and adverse conditions pleaded above.

7       235.    On 11/15/00, Morgan Stanley issued a report on Amazon, by Meeker, after

8  discussions with Bezos and Jenson that was based on and repeated information provided by them.

9  Bezos or Jenson reviewed this report before it was issued and agreed with Meeker it should be

10  issued. The report stated:

11      *    ***AMZN Reported A Fine Quarter ... Metrics Were Great. 25MM Customers***

12  The report forecast:

13  | FY Ending Dec. 31: | 2001(E) | 2002(E) |
| --- | --- | --- |
| **KEY FINANCIALS** | | |
| Revenue ($MM) | 4,120 | 6,180 |
| Operating | | |
| Income ($MM) | (56) | 132 |
| EPS | (0.42) | 0.08 |
| | | |
| **KEY METRICS** | | |
| Customer | | |
|   Accounts (MM) | 37.3 | 47.1 |

19                   *  *  *

20      Key non-financial metrics in CQ3 were strong .... [R]eaching 25.3MM

21  cumulative customers at the end of September.

                 *  *  *

22  [W]e are maintaining current estimates – C2001 revenue of $4,120MM (up 48%

23  Y/Y) .. and C2002 revenue of $6,180MM (up 50% Y/Y) ....

24                   *  *  *

25  Total customers at quarter-end reached 25.3MM ... and represented an increase of

  93% Y/Y. The repeat purchase level from existing customers was 77% (vs. 78% in

26  CQ2, 76% in CQ1 and 72% in CQ3:99).

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

* * *

Highlight: .... *We continue to believe that the success of Amazon's business model on a long term horizon is greatly dependent on increased share of wallet, and the company is demonstrating that it is achieving solid traction in this metric.*

236.    On 11/17/00, Bezos appeared on CNBC:

CNBC:        [B]ack in April a program called "The Summit" in Silicon Valley produced by NBC News, you said to a woman who asked, what exactly she owned when she owned Amazon stock. You did say what you own is what we like to think of as an incubator for e-commerce companies

BEZOS:        *That is not true*.

CNBC:        *You did describe your company that way, sir*

BEZOS:        *That's actually not what I said*.

CNBC:        *You didn't say this?  It is in quotes*.

BEZOS:        *I didn't say that*.

CNBC:        *It is on the tape*.

BEZOS:        ... I don't know that it is worth arguing over.... *[Amazon's] electronic store is something that we have started and has been very, very successful along with our tools store and our kitchen store.... They are doing great.*  It is the new product categories that a year ago, people didn't necessarily believe that we could do.  *Now, we are getting real traction there.*

237.    On 12/18/00, *Fortune* ran an article on Amazon that stated:

Today you can't get Bezos to stop talking about making money.  Literally. During one recent hourlong interview, the word "profit" or some variation thereof came up 25 times, as in, "*We are very much driving toward profitability*."  Indeed, *Bezos insists Amazon is this close to making money.*  He's even set a deadline. "We have, for the first time, set an internal goal with the date for when the company as a whole is going to be profitable," he proudly declares.  In an internal e-mail sent out to 7,000 Amazon.com employees, which he showed FORTUNE, Bezos laid it out. "We're putting a stake in the ground: "*We're going to become profitable*," he wrote "*That's right:  We're aiming to have sales of $5 billion, produce over $1 billion in gross profits, and achieve solid operating profitability by ...*"  Bezos blotted out the date ...

238.    Each of the statements made during 11/15/00-12/18/00 was false or misleading when issued.  The true but concealed facts were:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

**Customer Metrics**

(a) Amazon was falsifying its key customer metrics in order to artificially inflate its reported number of customers/customer accounts to make Amazon's customer base appear much larger than it actually was, and its business and business model look more successful than they actually were, and to create the impression that Amazon had a much larger number or base of customers to "monetize," helping to justify the forecasts of Amazon's very strong future revenue growth;

(b) Amazon was artificially inflating its stated total number of customers/customer accounts by including persons who had not purchased from Amazon in over 12 months, which Amazon knew, from its prior and ongoing analysis of its customers' behavior, meant that it was very likely that such a person, *i.e.*, a non-purchaser in the prior 12 months, would not again purchase from Amazon;

(c) Amazon was artificially inflating its stated number of total customers/customer accounts by counting customers based on e-mail addresses, *not* customer names, even though Amazon knew from analysis of its customer data that a material number of persons who had purchased from Amazon *had more than one e-mail address and thus were being double, triple, or even quadruple counted*. This occurred in part because some customers intentionally signed up as new users to take advantage of promotions for new customers;

**Operating Problems**

(d) The statements that Amazon's business model "worked," was "cash" and "capital" efficient and would permit Amazon to be "profitable," and that Amazon's pricing practices were "sustainable" were all false. In fact, Amazon's business model did not and could not work, as its costs were *too high, its liquidity and working capital too low, its revenue growth too slow and its* customer attachment and retention rates too low to permit Amazon to succeed financially or ever reach actual profitability, given the massive debt that Amazon was accumulating to implement its "Get Big Fast" expansion and diversification strategy,

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

1          (e)     The statements that Amazon had evolved into a business with mutually

2  enforcing divisions or stores and that *each product or service it added helped it amortize its*

3  *investments, reduce its unit costs and thus drive Amazon toward profitability were false*, as many

4  of the additional products and services Amazon was adding to offer for sale were so unsuccessful

5  that they exacerbated Amazon's financial problems, generated excessive inventories and adversely

6  impacted Amazon's cash flow, liquidity and financial condition; and

7  **False Profitability Statements**

8          (f)     The statements made that Amazon was approaching "profitability" or would

9  become "profitable" were false, as Amazon *had not and would never achieve true profitability*, and

10  whatever "profits" or "profitability" Amazon was hoping to achieve could be reported only by

11  accounting legerdemain in which such items as amortization expense, as well as employee stock

12  option expense and losses from equity investments, were excluded as expenses in calculating

13  Amazon's results and thus not actually accounted for.

14     239.    On 1/30/01, Amazon reported its 4thQ 00 results: "[N]et sales of ... 2000 were $972

15  million, an increase of 44 percent over net sales of $676 million in the fourth quarter of 1999."

16  However, Amazon also announced that it would be closing its McDonough, Georgia distribution

17  center, and its customer service center in Seattle and laying off 15% of its employees or

18  approximately 1,300 persons, and would incur a restructuring charge of over $150 million in the first

19  half of the year. *Amazon also told analysts it was cutting back on its revenue growth forecast from*

20  *50% to 20%-30% per year.*

21     240.    On 1/30/01, Bezos appeared on CNBC:

22  CNBC:         You made a lot of news in this announcement.... [F]inally, that you
               will achieve operating profitability by the end of the year ...
23
   BEZOS:        Let me say first that you know, for five years now, we have declined
24                to answer the question:  *"when is Amazon.com going to be*
                  *profitable? And Steve Frank, you probably more than anybody*
25                *have asked me that question.* So I think it's very appropriate that you
                  be the very first person to interview me now that we've made that
26                statement. *So you're hearing it for the very first time right now.*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax 619/231-7423

1                                              *   *   *

2    CNBC:           Give us a ballpark.  What kind of gross margins are you ultimately,
                     over the long-term, looking for and what kind of operating margins
3                    are you looking for?

4    BEZOS:          You know, long-term and operating margins, you know, we think this
                     can be around, as high as *around ten percent, maybe even a little*
5                    *higher, maybe a little lower....  [O]ur international business is*
                     *fantastically well.*
6
     241.    On 1/30/01, Bezos was interviewed on Fox News Network:
7
     BEZOS:          *I think you – you are certainly one of the people, at least once or*
8                    *twice or 10 times in the past, you've asked me when is Amazon.com*
                     *going to be profitable....  And we've always declined to answer that,*
9                    *because we didn't think we had enough visibility and confidence to*
                     *do so, and finally at this point, we're making the prediction that it*
10                   *should happen in the fourth quarter of this year.  That's our*
                     *expectation ....*
11
     242.    On 1/31/01, Morgan Stanley issued a report on Amazon by Meeker, after discussions
12
with Bezos and Jenson that was based on and repeated information provided by them.  Bezos or
13
Jenson reviewed this report before it was issued and agreed with Meeker it should be issued   The
14
report stated:
15
                     The key customer growth metric in CQ4 was strong....  [R]eaching 29.4MM
16                   cumulative customers.

17                                             *   *   *

18                   The good news from the quarter: 1) Trailing-Twelve-Month sales per active
                     customer increased by $4 to a record high of $134 (vs. $130 in CQ3 and $125 in
19                   CQ2) – a sign of increased share of wallet ....

20                                             *   *   *

21                   For C2001 and C2002, we are lowering our estimates – For C2001, revenue
                     from $4.1B to $3.4B (up 25% Y/Y) ....  For C2002, revenue from $6.2B to $4.3 (up
22                   25% Y/Y) ....  Note that we continue to expect operating breakeven/profit in CQ4.01,
                     when the profit leverage should kick-in. *In fact, the company officially committed*
23                   *to CQ4 breakeven for the first time.*

24   243.    On 1/31/01, First Boston issued a report on Amazon by Kiggen, after discussions with

25   Bezos and Jenson that was based on and repeated information provided by them   Bezos or Jenson

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1  reviewed this report before it was issued and agreed with Kiggen it should be issued   The report

2  stated:

3      Amazon announced that it expects to achieve cash operating profitability in Q4 of this
        year, in-line with our previous model.

4                                          *   *   *

5      Amazon announced that it expects to achieve operating profitability in Q4 of
        this year; we originally had been modeling this for late 2002.

6                                          *   *   *

7
8      Number of Customers Increased by 4.1M.  Amazon's active customer base,
        comprised of customers who have purchased in the past 12 months, is approaching
        20 million, a 40% y/y increase.  Twelve-month revenue per active customer reached
9       $134 in Q4'00, up from $130 in Q3'00.  Applying Q4'00 gross margin of 23%
        suggests a gross profit dollar contribution of over $30 per active customer per year,
10     well above the $13 cost of customer acquisition during the quarter.  Additionally,
        Amazon added 4.1 million new customers during the fourth quarter which was helped
11     significantly by its relationship with Toysrus.com, and above our estimate of 3 million
        and 3.8 million added in Q4 1999.  The company added a total of 12.3 million
12     customers in the year 2000 for a total of over 29 million.

13                                         *   *   *

14     Lowering 2001 Estimates.  As per management guidance, we are adjusting our
        model ... we are reducing our 2001 revenue estimate from $3.7 billion to $3.5 billion
15     ... [and] *profitability is in sight.*

16     244.    In mid-to-late 1/01, Bezos learned that Lehman Brothers analyst Suria was preparing

17  yet another negative report on Amazon's business which would assert that Amazon would face a

18  credit squeeze due to its deteriorating working capital position.  Given Amazon's stock price decline

19  when Suria's first negative report was issued, the prospect of another negative Suria report was a very

20  negative development.  Amazon tried to prevent the publication of this negative report, including

21  having defendant Doerr contact top executives at Lehman Brothers to threaten them to try to get them

22  to halt the report.  Knowing that Doerr's efforts had failed and this negative report was going to be

23  published and that when Suria had published his first negative report, Amazon's stock had been

24  driven much lower, on 2/2/01 and 2/5/01 Bezos sold 800,000 shares of his Amazon stock for $11.6

25  million.

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

1    245.    On 2/4/01, Bezos was interviewed in *The Seattle Times*:

2    TIMES:    ***Amazon.com has announced it plans to reach operating profitability
         by the end of this year. Why make the announcement now?***

3

4    BEZOS:    ... *[B]ecause we finally can.* .

5    TIMES    . What happens if the economy continues to slow?

6    BEZOS:    ***We've already taken that into consideration.***

7    246.    On 2/6/01, Lehman Brothers convertible debt analyst Suria published his negative

     report, indicating that Amazon's working capital had declined dramatically and asserting that Amazon

8    would likely face a "creditor's squeeze" later in 01. On 2/7/01, *Reuters* reported·

9         Amazon.com Inc. on Tuesday slammed a new report from one of its harshest
10    critics, a Lehman Bros. analyst who warned that the Internet retailer faces a "creditor
      squeeze" in the second half of 2001 .... ***"Obviously you can't take this seriously,"***
11    said Bill Curry, a spokesman for Seattle-based Amazon.com .... ***"It's a silly report
      ...."***

12    247.    On 3/18/01, Bezos appeared on "ABC News This Week," and was interviewed by

13    Sam Donaldson·

14    DONALDSON:    ... You've never made money. ***You say you'll make money
15                      at the end, the last quarter of this year?***

16    BEZOS    :    ***That's right***.

17    DONALDSON:    ***Still sticking to that?***

18    BEZOS:    Yeah.... We're doing a better job on our operating metrics and
19             financials than ever, so that's what gives us the visibility and
             the confidence to predict ... ***that we'll be profitable by the end
             of this year***.

20    248.    On 3/26/01, Bezos was interviewed on Fox News' "Your World with Neil Cavuto".

21    BEZOS.    ... ***What we do know is that we are well on our way to building a
22             darn good company ... and it's something, you know, we're going to
             get better and better and better at every year. And we're going to do
23             that profitably***.

24                      *   *   *

25    CAVUTO·    Even allowing for all the market hiccups, ***for the slowing economy,
26                the whole nine yards?***

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax 619/231-7423

1    BEZOS:        ***Sure, we were appropriately conservative when we made that***
                   ***prediction. And ...*** I think we were – we weren't overly conservative,
2                  we weren't under conservative.... ***But we really think we're going to***
                   ***achieve it ....***
3
     249    On 3/26/01, Bezos appeared on CNBC and stated as to Amazon's 01 results:
4
5    BEZOS:        ... ***[W]e are predicting 20 percent to 30 percent growth year over***
                   ***year and . ...***
6    CNBC:         But, $3-1/2 billion is an aggressive number or one that you should
                   easily make?
7
8    BEZOS:        It's – I would say we – ***it was an appropriately conservative number.***
                   ***So   you know, not overly conservative, but appropriately***
                   ***conservative.***
9
     250.   On 4/11/01, *Dow Jones Business News* reported:
10
     Bezos Shrugs Off Doubts About Amazon's Prospects
11
12           Jeff Bezos, chief executive of Amazon.com Inc., remains outwardly optimistic
     – and sometimes seems defiant – about his company's prospects, even as controversy
13   continues to swirl around the company.

14                                           *    *    *

15           Some analysts have recently questioned how Amazon will be able to achieve
     the better-than-forecast first-quarter pro-forma loss it announced Monday, despite the
16   company's acknowledgment that growth in its books, music and video segment was
     "slight" in the latest quarter.  These analysts also wonder how Amazon can report
17   better bottom line results when it says consumer electronics – notorious in retailing
     for having low profit margins – was a key growth "driver" in the first quarter.

18           When asked about such questions, Mr. Bezos said, ***"We love [the electronics***
     ***business] from a financial point of view."***  Then he referred to his oft-used response
19   of how Amazon would rather receive the dollar gross margin contribution from a
     $300 digital camera than a book, even if the camera has a lower gross margin in
20   percentage terms. Mr Bezos said the actual cash contribution to Amazon's margins
     will be greater for the camera, even though it costs the same to pack and ship as a
21   book.

22           The executive also reiterated past statements that Amazon can turn its
     electronics inventory much faster than brick-and-mortar retailers.
23
     251.   On 4/24/01, subsequent to the release of its 1stQ 01 results, Amazon held a
24
     conference call to discuss Amazon's business.  During the call – and in follow-up conversations with
25
     analysts – Bezos and Jenson stated:
26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

- This was yet another quarter of solid progress. *Amazon was very pleased with the performance of its business*.

- *Amazon was driving to profitability*.

- For 01, Amazon expected net sales to increase between 20% and 30% over sales in 00.

252.    On 4/25/01, Morgan Stanley issued a report on Amazon by Meeker, after discussions with Bezos and Jenson that was based on and repeated information provided by them. Bezos or Jenson reviewed this report before it was issued and agreed with Meeker it should be issued. The report stated:

*On the Road to Profitability* ...

*   *   *

FINANCIAL OUTLOOK

Maintaining revenue estimates, but improving C2001E EPS estimates – We are maintaining our C2001E revenue estimate, but lowering our operating loss and EPS estimates, based on the company's CQ1 performance and guidance. For C2001E, we are looking for revenue of $3.4B (up 24% Y/Y), an operating loss of $129MM vs. our previous $180MM loss estimate, and operating EPS of ($0.68) vs. our previous estimate of ($0.83). We are maintaining our C2002E revenue, operating income, and EPS estimates. We are looking for revenue of $4.3B (up 25% Y/Y), operating income of $22MM, and operating EPS of a loss of ($0.09).

*   *   *

Company guidance remains intact – Amazon.com reiterated its C2001E guidance of 20-30% Y/Y sales growth ....

CQ1:01 NON-FINANCIAL DETAILS:

... Total customers at quarter-end reached 32.5MM vs. 29 4 in CQ4 and 20.0MM in CQ1:00, and represented an increase of 63% Y/Y. The repeat purchase level from existing customers was 78% (vs. 75% in CQ4 and 77% in CQ1:00)

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax: 619/231-7423

1    The Morgan Stanley report also included the following forecast for Amazon:

2    Amazon.com – Annual Income Statement

| | 1998 | 1999 | 2000 | 2001E | 2002E |
|---|---|---|---|---|---|
| Total Revenue | $609,912 | $1,639,839 | $2,761,983 | $3,411,858 | $4,281.541 |
| | | * | * | * | |
| Operating Income | (61,601) | (352,370) | (317,000) | (129,471) | 21,836 |
| | | * | * | * | |
| Net Income – Operating | (74,186) | (389,815) | (417,158) | (248,653) | (34,748) |
| | | * | * | * | |
| Growth Rate | | | | | |
| Total Revenue (yr-yr) | 313% | 169% | 68% | 24% | 25% |

7
8        253.    On 4/25/01, *The Wall Street Journal* reported:

9        Amazon Loss Narrows on 22% Sales Rise

10            Amazon.com Inc. narrowed its net loss for the first quarter on a 22% jump in
        sales, ***expressing confidence that it can meet Wall Street's forecasts for the rest of
        the year***

11                            *    *    *

12            Amazon ... ***officials said it is on track to achieve profitability on operations
        by the fourth quarter***

13            "***We nailed our profitability goals and significantly exceeded expectations,***"
14        said Warren Jenson, Amazon's chief financial officer.

15        254.    As Amazon's stock remained inflated in price due to the positive but false statements

16    in 5/01, Amazon insiders Britto, Bezos and Dalzell took advantage of this artificial inflation of

17    Amazon stock by selling off 20,000, 300,000 and 200,000 shares of their stock as high as $17.14

18    per share, pocketing $322,000, $5 0 million and $3.2 million in illegal insider trading proceeds.  In

19    total, between 5/1/01-5/4/01, these Individual Amazon Defendants unloaded 520,000 shares of their

20    Amazon stock for $8.6 million in illegal insider trading proceeds.

21        255.    On 6/5/01, Amazon executives Bezos and Jenson appeared at the Amazon

22    Investors/Analyst Conference in Seattle.  In a formal presentation and in break-out sessions, they told

23    the assembled analysts, money and portfolio managers, institutional investors, brokers and stock

24    traders that:

25        •    Amazon's business model was advantaged and working well with impressive
            partnerships.
26
        •    Amazon now had 32.5 million customers.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

1    •   Amazon's customer base of 32.5 million customers was a unique asset.

2    •   Amazon was forecasting 2ndQ 01 revenues of $650-$700 million.

3    •   Amazon was very bullish on its outlook for the balance of 01, as well as 02-03

4    •   Amazon was forecasting pro forma profitability for the 4thQ 01.

5    •   Amazon was now forecasting pro forma profitability for 02

6    •   Amazon was forecasting 01 and 02 revenues of $3.4 billion and $4.2 billion, respectively.

7

8    256.   On 6/6/01, Morgan Stanley issued a report on Amazon by Meeker, after discussions
with Bezos and Jenson, which was based on and repeated information provided by them at the

9    conference.  Bezos or Jenson reviewed this report before it was issued and agreed with Meeker it

10   should be issued.  The report stated:

11   BASICS OF MANAGEMENT PRESENTATIONS:

12   Jeff Bezos (Founder and Chief Executive Officer)

13
     •   Jeff outlined ... key themes for the Analyst day.... Amazon.com's economic
14   model is advantaged, with a very positive combination of high inventory turns and
     relatively high gross margins ... Amazon.com's platform has become a unique asset
15   with impressive partnerships, very positive customer experiences, and scale and reach
     ... Amazon.com's oldest international operations (Germany and the UK) should reach
16   break-even on a pro-forma operating income basis in CQ4:01

17                                    *   *   *

18   Warren Jenson (SVP and Chief Financial Officer)

19   •   Amazon.com believes that its past investments have built unique capabilities,
     capacity, and scale that have allowed it to deliver on its operating commitments. Over
20   the next 18 months, the company's focus will be on growth and accelerated process
     improvements.
21
     •   *Warren stated that he was bullish on the company's C2002 and C2003*
22   *growth prospects ....  Warren reiterated the company's guidance of pro-forma*
     *operating profitability in CQ4....  Warren stated that Amazon.com should leave*
23   *C2001 well positioned for pro-forma operating profitability in C2002.*  [Note that
     this is the first time that the company has given guidance for C2002.]  For the year,
24   we are modeling revenue of $4 3B, up 25% Y/Y, $1.1B in gross profit ...

25   The Morgan Stanley report included the following forecast for Amazon:

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 169 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

Amazon.com – Annual Income Statement
($ Thousands, Except EPS)

| | 1998 | 1999 | 2000 | 2001E | 2002E |
|---|---|---|---|---|---|
| Total Revenue | $609,912 | $1,639,839 | $2,761,983 | $3,411,858 | $4,281,541 |
| Operating Income | (61,601) | (352,370) | (317,000) | (129,471) | 21,836 |
| Net Income – Operating | (74,186) | (389,815) | (417,158) | (248,653) | (34,748) |
| Growth Rate Total Revenue (yr-yr) | 313% | 169% | 68% | 24% | 25% |
| Customer Accounts at Period-End (MM) | 6.2 | 16 9 | 29 4 | 39 7 | 49.0 |

257   On 6/5/01, *The Wall Street Journal* reported:

**Amazon Gives Upbeat Earnings Outlook**

Amazon.com Inc. remains "**well-positioned**" next year to show a profit, albeit one that excludes a raft of items, company executives said in an **upbeat presentation to financial analysts and investors**.

\* \* \*

"**The bottom line is we are bullish about our '02 and '03 growth prospects**," Mr Jenson said.

258.   On 7/16/01, Bezos was interviewed on Fox News Network:

[FOX.]   But we can talk about the path to profitability.  When are you guys going to start making money?

BEZOS:   **Well, we have set expectations for a pro forma operating profit this Q4.**

\* \* \*

[FOX:]   But should you be trading with all the rest of the retailers who are in big trouble now?

BEZOS:   Well, the business is quite different in many respects from a traditional physical retailer.  For one, you need a smaller capital investment in the online business for a given level of sales once you reach a certain scale.  So you don't have to build physical stores, which is very, very capital intensive.  That's one.

259.   Each of the statements made between 1/30/01-7/16/01 was false or misleading when issued.  The true but concealed facts were:

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

**Customer Metrics**

(a)　　　Amazon was artificially inflating its stated number of total customers/ customer accounts by counting customers based on e-mail addresses, *not* customer names, even though Amazon knew from analysis of its customer data that a material number of persons who had purchased from Amazon *had more than one e-mail address and thus were being double, triple, or even quadruple counted*. This occurred in part because some customers intentionally signed up as new users to take advantage of promotions for new customers,

(b)　　　In order to artificially inflate its total number of customer accounts, Amazon was intentionally not purging its customer base or list of what it knew were dormant, outdated, inactive and duplicative accounts of persons who had ceased doing business with Amazon;

**Operating Problems**

(c)　　　The statements that Amazon's business model "worked," was "cash" and "capital" efficient and would permit Amazon to be "profitable," and that Amazon's pricing practices were "sustainable" were all false. In fact, Amazon's business model did not and could not work, as its costs were too high, its liquidity and working capital too low, its revenue growth too slow and its customer attachment and retention rates too low to permit Amazon to succeed financially or ever reach actual profitability, given the massive debt that Amazon was accumulating to implement its "Get Big Fast" expansion and diversification strategy;

(d)　　　The statements that Amazon had evolved into a business with mutually enforcing divisions or stores and that *each product or service it added helped it amortize its investments, reduce its unit costs and thus drive Amazon toward profitability were false*, as many of the additional products and services Amazon was adding to offer for sale were so unsuccessful that they exacerbated Amazon's financial problems, generated excessive inventories and adversely impacted Amazon's cash flow, liquidity and financial condition;

(e)　　　Amazon's consumer electronics business was not nearly as successful as claimed and would never reach profitability due to a number of factors, including that several

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax 619/231-7423

1  prestigious and well-known manufacturers of very important and desirable consumer electronic

2  products, such as Sony, Panasonic, Kenmore, Pioneer, Toshiba and others, refused to sell their

3  products directly to Amazon at wholesale prices because they did not want to disrupt their traditional

4  product distribution networks   As a result, Amazon was faced with a "Hobson's Choice" – it was

5  forced to forego carrying the desirable consumer products of these prestigious manufacturers, which

6  were indispensable to providing a broad enough selection for Amazon's consumer electronics store

7  to attract sufficient customers or purchasers to succeed, *or* it was forced to purchase these desirable

8  and indispensable products through middlemen and other distributors at marked-up prices, as

9  opposed to directly from the manufacturer, which added costs in an ultra-competitive business line

10  that virtually assured Amazon would lose money on the sale of such products, in either case, dooming

11  Amazon's consumer electronics store to failure;

12  **Financial Statements and Condition**

13         (f)      Amazon's financial condition and financial statements for the 4thQ 00 were

14  falsified as detailed at ¶¶262-267 and 289-297;

15         (g)      To falsify Amazon's financial condition and make it appear that Amazon had

16  larger cash balances and better liquidity than it actually had, Amazon engaged in the deceptive

17  practice of holding millions of dollars of accounts payable for *months longer than was*

18  *commercially reasonable* which, *inter alia*, was resulting in the creation of artificial disputes with

19  vendors to try to justify non-payment of invoices that were legitimately due and payable or Amazon

20  using its purchasing power to force vendor acquiescence in these payables stretchouts by threatening

21  to cease doing business with vendors if they did not acquiesce in the long-delayed payments;

22         (h)      Amazon was falsifying its financial condition and making its liquidity and

23  working capital appear better than they actually were by engaging in a phony product return scheme,

24  in which near the end of each quarterly reporting period employees at Amazon's huge distribution

25  centers were instructed to identify hundreds of thousands of items for return to vendors and segregate

26  those items for return, *but not actually ship them back to the vendor, because, in many instances,*

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

1    *Amazon's contractual arrangement with those vendors did not permit Amazon to return non-*

2    *defective, unsold merchandise*; yet Amazon accounted for these segregated but non-returnable items

3    as if they had actually been returned to vendors, thus artificially inflating Amazon's accounts

4    receivable and understating its inventories, boosting Amazon's apparent liquidity and working

5    capital;

6              (i)       The statements made that Amazon was approaching "profitability" or would

7    become "profitable" were false, as Amazon *had not and would never achieve true profitability*, and

8    whatever "profits" or "profitability" Amazon was hoping to achieve could be reported only by

9    accounting legerdemain in which such items as amortization expense, as well as employee stock

10   option expense and losses from equity investments, were excluded as expenses in calculating

11   Amazon's results and thus not actually accounted for;

12             (j)       The forecasts that Amazon would achieve "pro forma" profitability by the

13   4thQ 01 and for 02 were false as defendants actually knew Amazon could not and would not reach

14   pro forma profitability at that time, in part due to Amazon's inability to generate sufficient revenues

15   to report even pro forma profitability by that time; and

16             (k)       The forecasts of annual revenue growth of 20%-30% in 01-02 and 01-02

17   revenues of $3.4 billion and $4.2 billion for Amazon were false as the defendants actually knew that

18   revenue growth of this amount could not and would not be achieved by Amazon in part because of

19   the problems, deficiencies and adverse conditions pleaded above

20        260.    On 7/19/01, Piper Jaffray issued a report on Amazon by Rashtchy, after discussions

21   with Bezos and Jenson that was based on and repeated information provided by them.  Bezos or

22   Jenson reviewed this report before it was issued and assured Rashtchy it was accurate.  The report

23   forecast 2ndQ 01 revenues of $700 million with 01 and 02 revenues of $3.4 billion and $4.1 billion,

24   respectively.  The report also stated:

25        •       Q2 Revenues Likely To Exceed $700 Million.  We expect Q201 revenue to
             exceed $700 million, beating our $685 million estimate by at least 2%, the Street
26           consensus estimate of $677.8 million, and exceeding Company guidance of $650
             million to $700 million.

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934       - 173 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax. 619/231-7423

261.   While Amazon stock declined substantially during 00-01, as analyst criticism of Amazon escalated and Amazon made partial disclosures, due to defendants' continuing concealments and misrepresentations Amazon's stock continued to trade at artificially inflated prices. Then, on 7/23/01, Amazon reported much worse-than-anticipated 2ndQ 01 results, showing lower than anticipated revenues, larger than anticipated operating losses and anemic customer growth *Amazon also sharply cut its forecast of revenue growth for 01-02 to as low as 10%*. One analyst stated: "*In the space of a quarter, they are saying growth for the full year will be only a little more than half of what they thought it was going to be three months ago.*'" And, while Bezos and Jenson insisted that Amazon would still achieve pro forma operating profitability in the 4thQ 01, they are just about the only two persons left who claim to believe that fictitious illusion. As a result of the revelations of 7/23/01 – which largely debunked the hoax that Amazon had created a viable business with a workable business model that would generate sufficient revenue growth to ultimately obtain profitability – Amazon stock collapsed from $17-1/8 to $11-29/32 – *a huge 25% decline in one day. This was one of the largest one-day percentage declines in Amazon stock in its history as a public company and the size of that decline, combined with the amount of stock volume on that day, demonstrates that the securities markets were caught off guard and unaware of the extremely negative information finally revealed by Amazon on 7/23/01*. Amazon's stock has continued to fall as analysts have digested the reality that this Company is doomed and will likely never achieve even pro forma profitablity, let alone achieve profitability – *reaching a low of $5-43/64 on 9/27/01*.

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 174 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

## AMAZON'S MISLEADING FINANCIAL
## REPORTING DURING THE CLASS PERIOD

262.    In order to inflate the price of Amazon's stock, defendants caused the Company to issue misleading results during the Class Period wherein Amazon manipulated its liabilities and profitability during the Class Period by processing product returns to its vendors which it had not shipped back to vendors in order to reduce its reported accounts payable and inflate gross profit Amazon also grossly overstated the value of the services it provided to, and the value of consideration received from, customers in its Amazon Commerce Network, which significantly increased the revenue Amazon recognized from these agreements, and, during the first half of 00, by failing to properly report the value of investments.

263.    Amazon reported the following quarterly financial data during the Class Period:

| | 9/30/98 | 12/31/98 | 3/31/99 | 6/30/99 | 9/30/99 | |
|---|---|---|---|---|---|---|
| Revenues | $154M | $253M | $294M | $314M | $356M | |
| Gross Profit | $ 35M | $ 53M | $ 65M | $ 68M | $ 70M | |
| Pro Forma Net Loss | $ 21M | $ 18M | $ 31M | $ 67M | $ 79M | |
| Accounts Payable | $ 60M | $113M | $133M | $166M | $237M | |

| | 12/31/99 | 3/31/00 | 6/30/00 | 9/30/00 | 12/31/00 | 3/31/01 |
|---|---|---|---|---|---|---|
| Revenues | $676M | $574M | $578M | $638M | $972M | $700M |
| Gross Profit | $ 88M | $128M | $136M | $167M | $224M | $183M |
| Pro Forma Net Loss | $175M | $ 99M | $ 89M | $ 68M | $ 90M | $ 76M |
| Accounts Payable | $463M | $256M | $286M | $305M | $485M | $257M |

264.    All of the above results were reported in press releases issued by Amazon. Amazon included its interim results in Forms 10-Q which were filed with the SEC. The 12/31/98, 12/31/99 and 12/31/00 results were incorporated in Amazon's annual 98, 99 and 00 financial statements filed in Forms 10-K with the SEC. With regard to the financial information included in the Forms 10-Q, Amazon represented that "in the opinion of management," its financial statements were a "fair presentation" of the Company's results and financial position.

265.    These representations were false and misleading when made, as Amazon's financial statements reported during the Class Period did not present fairly Amazon's results and the results did not contain adequate disclosures to be presented in conformity with GAAP and SEC rules. As

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 175 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1  *Barron's* has noted, "most everything this company seems to present to the investment community

2  and to the public is anything but plain, direct and resembling economic reality."

3      266.    GAAP are those principles recognized by the accounting profession as the

4  conventions, rules and procedures necessary to define accepted accounting practice at a particular

5  time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

6  SEC which are not prepared in compliance with GAAP are presumed to be misleading and

7  inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial

8  statements must also comply with GAAP, with the exception that interim financial statements need

9  not include disclosure which would be duplicative of disclosures accompanying annual financial

10 statements. 17 C.F.R. §210.10-01(a).

11     267.    Pursuant to GAAP, financial reporting should be reliable in that it represents what it

12 purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59). Moreover, GAAP requires that

13 information be complete, which means that nothing is left out of the information that may be

14 necessary to insure that it validly represents underlying events and conditions (FASB Statement of

15 Concepts No. 2, ¶79).

16 **Amazon's Misleading Reporting of ACN Agreements**

17     268.    The Individual Amazon Defendants caused Amazon to issue materially misleading

18 financial results by manipulating its reported gross profits in that Amazon recognized revenue from

19 Amazon's ACN agreements wherein the revenue was not realizable and by intentionally

20 misclassifying write-downs of the equity securities received from non-monetary exchanges as

21 "investment losses" and not as offsets against reported gross profits. GAAP requires at its very

22 essence that transactions must be reported in accordance with their substance, not their form.

23     269.    Pursuant to GAAP, as described by FASB Statement of Concepts No 5, ¶¶83-84,

24 revenue is not recognizable unless and until it is realizable, or when related assets received or held

25 are convertible into known amounts of cash or claims to cash.

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

270.    Amazon used a practice of exchanging non-saleable advertising space for equity investments and agreements with start-up Internet companies to inflate its revenues, gross profit and earnings. As a result, Amazon reported misleading financial statements in that it included revenue well in excess of the amount it would realize in cash and that did not reflect a fair presentation of its results.

271.    In late 99, Amazon entered into multi-year agreements with several companies to feature the companies (or the companies' products and services) on Amazon's Web site. Much of the consideration for these agreements was to be paid in stock of these start-up companies    Amazon recorded the stock received as investments and a corresponding amount as unearned revenue (liability).    Then, during the 4thQ 99 and each quarter of 00, Amazon recognized revenue by amortizing its unearned revenue account over the terms of the respective agreements. Because these types of revenues had virtually no direct costs associated with them, nearly the entire amount of revenue recognized under these agreements increased Amazon's reported gross profit.    Amazon recognized the following amounts of revenue solely based on the value it had ascribed to stock received (non-monetary exchanges) from these agreements during the Class Period:

| 4thQ 99 | 1stQ 00 | 2ndQ 00 | 3rdQ 00 | 4thQ 00 |
|---------|---------|---------|---------|---------|
| $5.8M | $17.1M | $20.1M | $21 0M | $20.8M |

272.    Amazon's reported gross profit, as well as its revenue growth, were critical financial elements closely followed by investors and analysts during the Class Period.

273.    Amazon's reported gross profit from non-monetary exchanges as a percent of total gross profit reported during the Class Period is set forth as follows:

| 4thQ 99 | 1stQ 00 | 2ndQ 00 | 3rdQ 00 | 4thQ 00 |
|---------|---------|---------|---------|---------|
| 7% | 13.3% | 14.8% | 12.6% | 9.3% |

274.    Beginning in 99, Amazon entered into agreements wherein it received equity securities from customers in exchange for advertising and promotional services to be provided in the future Amazon ascribed a value of $54 million to these 99 agreements and recorded this amount as deferred revenue, recognizing $5.8 million in revenue from these transactions in 99. During the 1stQ 00,

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934         - 177 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1    Amazon entered into agreements with Greenlight.com, drugstore.com, Audible, Inc  and living.com.

2    As a result, Amazon's unearned revenue account (an account on which investors and analysts focused

3    since it purportedly represented future revenue) increased from less than $55 million to more than

4    $134 million.  Amazon based the recorded value of the agreements on what it determined to be the

5    fair value of the consideration received from the companies it made agreements with, rather than the

6    value of the services it was providing.  In fact, due to the volatile and uncertain value of the equity

7    securities Amazon received, or would receive, from these and other entities, it was not a reliable

8    measure of the value of the transactions.  Note the following factors which defendants knew or

9    should have known concerning the valuation of equity securities received in these ACN transactions:

10   •    Drugstore.com common stock had traded near $70 per share in 99.  By early 2/00, it
         traded around $30, but dropped to $20 by late 2/00.  By the time Amazon reported
11       its 1stQ 00 results, drugstore.com stock had dropped below $10 per share  By 10/00,
         it traded at less than $4 per share.

12
     •    Greenlight.com is a private company with no readily determinable stock price
13       Greenlight.com did not have management experienced in car sales and did not have
         a nationwide market at the time of the ACN transaction with Amazon.
14

15   •    Audible, Inc. common stock, which traded around $15 in early 2/00, dropped to
         below $5 per share by the time Amazon reported its 1stQ 00 results in 4/00.

16   •    Ashford.com, which traded as high as $25 per share in late 99, traded around $10 in
         early 2/00 and dropped to below $5 per share when Amazon reported its 1stQ 00
17       results in 4/00.

18       275.    By the time Amazon reported its 1stQ 00 results in 4/00, Amazon's investments in

19   companies associated with the ACN agreements had dropped precipitously to a third of the value

20   when the agreements were entered into.  Nevertheless, Amazon reported revenue as if it had received

21   valuable (realizable) consideration for the reported revenue, failing to inform investors of the

22   minimal cash it would receive for that revenue.  Investors were forced to wait for subsequent SEC

23   filings to learn of the uncertain consideration for the revenue recognized.

24

25

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 178 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

**Amazon's Improper Accounting for Investments**

276.   During the first half of 00, Amazon improperly reported the value of investments it held despite knowing that these investments were impaired and that the impairment was other than temporary

277.   GAAP, as set forth in SFAS No. 115, ¶16 states:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary.... If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss).

(Footnote omitted.)

278.   As to investments accounted for under the equity method, GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 18, requires:

> b.   *The equity method*.  An investor initially records an investment in the stock of an investee at cost, and adjusts the carrying amount of the investment to recognize the investor's share of the earnings or losses of the investee after the date of acquisition   The amount of the adjustment is included in the determination of net income by the investor, and such amount reflects adjustments similar to those made in preparing consolidated statements including adjustments to eliminate intercompany gains and losses, and to amortize, if appropriate, any difference between investor cost and underlying equity in net assets of the investee at the date of investment.  The investment of an investor is also adjusted to reflect the investor's share of changes in the investee's capital.  Dividends received from an investee reduce the carrying amount of the investment.  *A series of operating losses of an investee or other factors may indicate that a decrease in value of the investment has occurred which is other than temporary and which should be recognized even though the decrease in value is in excess of what would otherwise be recognized by application of the equity method.*

279.   Furthermore, Amazon falsely represented in its financial statements:

> We regularly review all of our investments in public and private companies for other-than-temporary declines in fair value.  When we determine that the decline in fair value of an investment below our accounting basis is other-than-temporary, we reduce the carrying value of the securities we hold and record a loss in the amount of any such decline.

280.   In late 99 and early 00, Amazon invested in several Internet companies, including Basis Technology, drugstore.com, Eziba.com, HomeGrocer.com, Pets.com, living.com,

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

1  weddingchannel.com, Della.com, Gear.com, Wineshopper.com, Sotheby's and Ashford.com. As a
2  result, Amazon's "Investments in Equity-Method Investees" and "Other Equity Investments"
3  increased to $371 million at 12/31/99 and $584 million at 3/31/00. By the time Amazon reported its
4  1stQ 00 results, the value of essentially all of these investments had declined to a fraction of the value
5  at the date of acquisition. These companies were experiencing ongoing and accelerating operating
6  losses. In fact, Amazon's share of the losses from equity method investments in the 1stQ 00 alone
7  exceeded $88 million. Nevertheless, Amazon failed to record any impairment loss related to these
8  investments despite indications that the loss in value was other than temporary.

9      281.   In the 2ndQ 00, these investments continued to generate huge losses. Amazon's share
10  of the losses in the 2ndQ 00 was $110 million. The market value of these investments had dropped
11  even further. Nevertheless, Amazon failed to record an impairment loss. For example, Ashford com
12  for the quarter ended 12/31/99 had revenue of $20.1 million, resulting in a loss of $19 million, for
13  the quarter ended 3/31/00 revenue decreased to $11.8 million, resulting in a loss of $41 million, and
14  at 6/30/99, revenue was $13.1 million with a resulting loss of $39 million. During that same period,
15  Ashford.com's cash balance had decreased from $93.5 million at 9/30/99 to $38 1 million at 6/30/00,
16  and its quoted market price had gone from $9 22 at 9/30/99 to $2.875 at 6/30/00, a decease of 69%
17  in value. Yet, with these staggering losses, Amazon at 6/30/00 failed to record an impairment of its
18  investment in Ashford.com.

19      282.   In the 3rdQ 00, "Investment in Equity-Method Investees" and "Other Equity
20  Investments" totaled $164 million. This was partially due to Amazon reclassifying $96 million of
21  these investments as "Marketable Securities." The investee companies continued to generate huge
22  losses and the fair market value of the investments declined even more. However, Amazon recorded
23  only $34 million in impairment losses in its investments in Audible, Inc. and NextCard, Inc., plus an
24  additional $14 million for the bankruptcy of an investee company – living.com.

25      283.   Then, in the 4thQ 00, Amazon recorded a loss of $155 million to record certain
26  investments at fair value. This amount represented more than half the total value of these investments

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 180 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

1 on Amazon's books just six months earlier and was in addition to the equity method losses Amazon

2 had already recorded. The total impairment losses recorded in 00 and related to other-than-temporary

3 declines in equity investments in Audible, Inc., NextCard, Inc., WebVan Group, Inc., Ashford com,

4 Inc., Greg Manning Auctions, Inc. and Sotheby's Holdings, Inc. were $189 million.

5   284. Amazon's failure to record the other-than-temporary impairment of its investments

6 caused its assets to be materially overstated during 00.

7 **Amazon's Improper Classification**
 **of ACN Investment Losses**

8

9   285. Defendants' practice of using non-monetary exchanges of advertising spaces for equity

 securities was nothing more than speculation by Amazon that the resulting security would be

10 realizable in the future. However, until then, defendants utilized an accounting scheme designed

11 solely to inflate Amazon's revenue and gross profit to mislead investors that the business was

12 growing faster than it was and that its reported gross profit was materially higher than it actually was

13 The securities received by Amazon were, for the most part, not freely tradeable, and the companies

14 were incurring significant operating losses. The recording of these equity securities at inflated values

15 did not meet the basic requirements under GAAP of an asset. Moreover, more egregious than

16 defendants' practice of recording inflated revenue and gross profit on these non-monetary exchanges,

17 was defendants' practice of recording the write-downs of these equity securities (defendants

18 ultimately could not maintain their inflated values) as investment losses, reported below the revenue

19 and gross profit line in the income statement. Accordingly, when Amazon had to record losses

20 associated with the equity transactions associated with its ACN investments, these losses were

21 recorded below the gross profit line in Amazon's financial statements and identified as non-recurring

22 charges in violation of GAAP. This was done for the sole purpose of misleading investors that these

23 losses were not the result of normal operations, which they clearly were, since the investments were

24 recorded as a result of purported revenue transactions.

25   286. Amazon subsequently recorded significant losses from its investments in its ACN

26 partners as disclosed in its SEC report on Form 10-Q for 3/31/01.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone. 619/231-1058 • Fax 619/231-7423

During the third and fourth quarters of 2000, and the first quarter of 2001, we determined that the declines in value of several of our investments in our strategic partners were other-than-temporary, and we recognized losses totaling $225 million (consisting of $34 million, $155 million, and $36 million in the third and fourth quarter of 2000 and first quarter of 2001, respectively) to record these investments at their then current fair value.

287.    Amazon's presentation and disclosure of its losses in investments originating from non-monetary exchange transactions with its ACN partners violated the very core of GAAP. FASB Statement of Concepts No. 6 states the following regarding the classification of losses and expenses:

**Revenues, Expenses, Gains and Losses**

... Revenues and gains are similar, and expenses and losses are similar, but some differences are significant in conveying information about an enterprise's performance. *Revenues and expenses result from an entity's ongoing major or central operations and activities – that is, from activities such as producing or delivering goods, rendering services, lending, insuring, investing, and financing. In contrast, gains and losses result from incidental or peripheral transactions of an enterprise with other entities and from other events and circumstances affecting it.* Some gains and losses may be considered "operating" gains and losses and may be closely related to revenues and expenses. Revenues and expenses are commonly displayed as gross inflows or outflows of net assets, while gains and losses are usually displayed as net inflows or outflows.

\*   \*   \*

Since a primary purpose of distinguishing gains and losses from revenues and expenses is to make displays of information about an enterprise's sources of comprehensive income as useful as possible, fine distinctions between revenues and gains and between expenses and losses are principally matters of display or reporting (paragraphs 64, 219-220, and 228).

288.    Amazon intentionally reported the losses on its investments as non-operating and non-recurring. However, these losses should have been offset against the revenue recognized on the ACN arrangements, as their substance was a revenue-related transaction. Accordingly, Amazon materially overstated its revenues, gross profit and operating income during the Class Period by misstating its reported revenues, gross profit and operating losses by at least $75 million.

**Amazon's Manipulation of Accounts Payable and Inventory**

289.    During the Class Period, concerns about Amazon's future prospects increasingly focused on the Company's liquidity and whether it would have enough cash to operate until it reached

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax 619/231-7423

1   profitability. Due to this focus, defendants knew that not only cash would be important to investors,

2   but also the level of outstanding payables, since any financial analysis of Amazon's ability to continue

3   operating would involve amounts currently due to vendors  Thus, the ratio of days in payables was

4   an important measure of Amazon's health and prospects.  In order to minimize payables and make

5   the Company's liquidity appear stronger and overstate gross profit, defendants engaged in a vendor

6   return scheme to reduce outstanding payables.

7       290.    At the end of each quarter during the Class Period, there was an enormous amount

8   of pressure from Amazon's corporate offices to the distribution centers to get vendor returns

9   processed in order to meet the numbers.  Processing these returns, in actuality, meant entering them

10  into the accounting system as though the product had been returned to the vendor, even though a

11  material amount of return goods would remain at the distribution center for some time before actual

12  shipment to the vendor.  In fact, trucks scheduled to pick up the returns would not arrive until weeks

13  after quarter end, if at all.  Processing consisted of organizing and packing the products and scanning

14  the barcodes into Amazon's computer system to report them as returned to the vendor.  Much of these

15  returns were books which Amazon had over-purchased from publishing vendors, but also included

16  toys, music, and electronics merchandise.  The volume of these unreturned (but accounted for as

17  returned) merchandise was enormous.  Each distribution center had as many as 25 employees

18  working to package the products for returns, with the goal of shipping back 100,000 units per week

19  per distribution center.  Even though shipping companies had trucks available to take the returned

20  product back to vendors, Amazon corporate would instruct these companies (including USA Trucks

21  and Morgan Southern) to wait until two weeks (or more) after the quarter to pick up the returned

22  product and take it to vendors.  Thus, while payables would be reduced, product would remain in

23  inventory, causing cost of sales to be understated and gross profit overstated.

24      291.    Amazon management knew the above accounting manipulation was occurring, but

25  did not correct it  By 8/99, Vice President of Finance Brannon and CFO Covey were told that some

26  $36 million that Amazon had recorded as credits from book vendors for returns was improper

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 183 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax: 619/231-7423

1  because the vendors were rejecting the goods that Amazon was returning.  However, Brannon and

2  Covey did not stop these practices.  In late 99, Amazon's outside accountants also informed Amazon

3  management of a problem with Amazon's inventory in that it was overstated by $36 million due to

4  these return activities, whereby Amazon failed to reduce the carrying value of its inventory by

5  product segregated and recorded as product returned.  Amazon promised to correct this problem, but

6  had not by mid-00, leading to additional improperly recorded credits.  Amazon corporate knew that

7  the returns were improperly recorded because the distribution centers would send spreadsheets to the

8  corporate returns department showing the details and status of returned product.  The misstatement

9  was possible because, as Bezos, Covey and Jenson knew, the Company had failed to implement a

10  computer database infrastructure capable of tracking its vendor return activities.   Thus, it was

11  impossible to track which returned items were rejected by vendors.  One of the reasons for Amazon's

12  poor internal control systems was Amazon's information systems staff's focus on front-end Web site,

13  rather than MIS systems to run the Company.  Amazon held a series of four large meetings with the

14  operating accounting department and Bezos, Covey and (later) Jenson, between 8/99 and 12/99 to

15  discuss this very issue.

16      292.   Despite these meetings, the problems with Amazon not properly accounting for

17  rejected returns and the resulting understatement of accounts payable and overstatement of inventory

18  was still ongoing well into 00.

19      293.   The reason vendors rejected returns, and the reason Amazon resorted to processing

20  returns which it did not ship, was because Amazon had not returned books and other products within

21  the specified time set forth in the invoices and contracts.  It was also due to Amazon's practice of

22  returning product to the wrong distributor.  Amazon purchased from book vendors such as Random

23  House, a publishing company that had multiple divisions within its company  For example, Random

24  House had various divisions such as Random House School, Random House Adult Trade, Random

25  House Children's.  If Amazon returned a book to the wrong division, the vendor would send it back

26  to Amazon rather than route the returned book to the correct division or department.  The inability

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax  619/231-7423

1   to return electronics-related inventory was due to Amazon's practice of purchasing electronics

2   merchandise from unauthorized vendors.   These vendors would not accept returns and the

3   manufacturers (including Sony and JVC) would refuse to do so, due to Amazon's purchases from the

4   unauthorized dealers.

5          294.   Amazon was recording the returns, and improperly reducing payables for returns it

6   was not entitled to make at the time the returns were recorded.   GAAP, as described by FASB

7   Statement of Concepts No. 5, ¶¶83-84, states that income and gains should not be recognized until

8   the entity has done what it must do to be entitled to the income, a general requirement being that the

9   product has been shipped.

10         295    As a result of Amazon's practice of recording returns it had not yet made (and was not

11   yet entitled to make), Amazon's accounts payable and cost of sales were materially understated and

12   investors were given a false impression of the Company's liquidity and profitability.

13         296.   Due to these accounting improprieties, the Company presented its financial results and

14   statements in a manner which violated GAAP, including the following fundamental accounting

15   principles:

16              (a)    The principle that interim financial reporting should be based upon the same

17   accounting principles and practices used to prepare annual financial statements was violated (APB

18   No. 28, ¶10);

19              (b)    The principle that financial reporting should provide information that is useful

20   to present and potential investors and creditors and other users in making rational investment, credit

21   and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

22              (c)    The principle that financial reporting should provide information about the

23   economic resources of an enterprise, the claims to those resources, and effects of transactions, events

24   and circumstances that change resources and claims to those resources was violated (FASB Statement

25   of Concepts No 1, ¶40);

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1          (d)     The principle that financial reporting should provide information about how

2    management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

3    for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

4    securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability

5    to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50),

6          (e)     The principle that financial reporting should provide information about an

7    enterprise's financial performance during a period was violated.  Investors and creditors often use

8    information about the past to help in assessing the prospects of an enterprise.  Thus, although

9    investment and credit decisions reflect investors' expectations about future enterprise performance,

10   those expectations are commonly based at least partly on evaluations of past enterprise performance

11   (FASB Statement of Concepts No. 1, ¶42); and

12         (f)     The principle that conservatism be used as a prudent reaction to uncertainty

13   to try to ensure that uncertainties and risks inherent in business situations are adequately considered

14   was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

15   represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

16       297.    Further, the undisclosed adverse information concealed by defendants during the

17   Class Period is the type of information which, because of SEC regulations, regulations of the national

18   stock exchanges and customary business practice, is expected by investors and securities analysts to

19   be disclosed and is known by corporate officials and their legal and financial advisors to be the type

20   of information which is expected to be and must be disclosed.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax  619/231-7423

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

## THE INDIVIDUAL AMAZON DEFENDANTS'
## ILLEGAL INSIDER TRADING

298.    While Amazon's top insiders were issuing false statements about Amazon to inflate its stock price, the Individual Amazon Defendants sold 6.5 million shares of Amazon stock for $250 million to personally profit from the artificial inflation in Amazon's stock price which their fraudulent scheme caused.  Notwithstanding their access to confidential information as a result of their status as officers and insiders of the Company, and their corresponding duty to disclose adverse material facts before trading in Amazon stock, the Individual Amazon Defendants sold significant amounts of Amazon shares at artificially inflated prices in order to profit from the fraud, and did so while in possession of material non-public information.  These defendants' insider selling during the Class Period is detailed below·

| Defendant | Stock Holdings at 7/23/01 | Class Period Sales | Total Holdings(1) | Proceeds | % of Holdings Sold(2) | % of Holdings Sold(3) |
|---|---|---|---|---|---|---|
| Alberg | 1,171,690 | 1,300,000 | 2,471,690 | $ 56,208,522 | 52.60% | 52.60% |
| Bezos | 115,889,346 | 2,548,650 | 118,437,996 | $ 59,852,774 | 2.15% | 2.15% |
| Brannon | 0 | 12,000 | 12,000 | $ 864,725 | 100.00% | 17.24% |
| Britto | 47,536 | 47,000 | 94,536 | $ 2,126,625 | 49.72% | 49 72% |
| Cook | 69,698 | 143,000 | 212,698 | $ 10,536,677 | 67 23% | 15 33% |
| Covey | 1,583,200 | 323,000 | 1,906,200 | $ 16,613,338 | 16.94% | 10 45% |
| Dalzell | 0 | 650,000 | 650,000 | $ 26,667,062 | 100.00% | 71.04% |
| Engstrom | 360,000 | 156,000 | 516,000 | $ 9,078,082 | 30.23% | 9.77% |
| Risher | 408,000 | 630,000 | 1,038,000 | $ 32,025,772 | 60.69% | 21.69% |
| Shriram | 146,688 | 312,000 | 458,688 | $ 12,394,580 | 68.02% | 47.16% |
| Spiegel | 100,000 | 170,000 | 270,000 | $ 6,653,671 | 62 96% | 9.94% |
| Stonesifer | 85,640 | 137,770 | 223,410 | $ 10,313,847 | 61 67% | 20.46% |
| Wright | 7,500 | 150,000 | 157,500 | $ 7,526,744 | 95 24% | 19.80% |
| **TOTALS:** | | **6,579,420** | | **$250,862,418** | | |

(1)   Total holdings include common stock held and options exercised
(2)   Includes common stock and options exercised
(3)   % sold totals derived from total holdings that include common stock and vested options

299.    The details of the Individual Amazon Defendants' sales are shown below:

| Defendant | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Alberg | 11/02/98 | 60,000 | $21.63 | $ 1,297,800 |
| | 11/02/98 | 60,000 | $21.68 | 1,300,900 |
| | 11/02/98 | 120,000 | $20.82 | 2,498,400 |

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone· 619/231-1058 • Fax· 619/231-7423

| | | | | |
|---|---|---|---|---|
| | | 11/10/98 | 60,000 | $22.57 | 1,354,300 |
| | | 11/13/98 | 18,000 | $21.67 | 390,180 |
| | | 11/17/98 | 102,000 | $21.83 | 2,227,340 |
| | | 11/17/98 | 120,000 | $24.26 | 2,912,000 |
| | | 11/18/98 | 120,000 | $27.34 | 3,281,400 |
| | | 02/11/99 | 20,000 | $53.58 | 1,071,700 |
| | | 05/03/99 | 4,000 | $79.97 | 319,880 |
| | | 05/04/99 | 20,000 | $79.97 | 1,599,400 |
| | | 05/19/99 | 4,000 | $67.69 | 270,750 |
| | | 05/19/99 | 12,000 | $67.90 | 814,878 |
| | | 11/01/99 | 150,000 | $68.17 | 10,225,005 |
| | | 11/11/99 | 50,000 | $72.11 | 3,605,300 |
| | | 11/16/99 | 100,000 | $78.50 | 7,850,000 |
| | | 11/29/99 | 100,000 | $92.65 | 9,265,000 |
| | | 11/30/99 | 50,000 | $88.00 | 4,400,000 |
| | | 02/21/01 | 30,000 | $12.25 | 367,500 |
| | | 02/22/01 | 30,000 | $11.82 | 354,639 |
| | | 02/23/01 | 15,000 | $11.56 | 173,438 |
| | | 02/26/01 | 30,000 | $11.94 | 358,125 |
| | | 02/27/01 | 10,000 | $11.75 | 117,500 |
| | | 02/28/01 | 15,000 | $10.21 | $   153,087 |
| | **Total:** | | **1,300,000** | **N/A** | **$56,208,522** |
| | Bezos | 11/02/98 | 60,000 | $21.34 | $ 1,280,800 |
| | | 11/02/98 | 120,000 | $21.46 | 2,576,200 |
| | | 11/02/98 | 120,000 | $21.53 | 2,584,400 |
| | | 11/02/98 | 120,000 | $21.63 | 2,595,600 |
| | | 11/02/98 | 180,000 | $21 52 | 3,874,800 |
| | | 11/02/98 | 180,000 | $21.65 | 3,897,600 |
| | | 11/02/98 | 300,000 | $21.15 | 6,346,500 |
| | | 05/12/00 | 368,650 | $54.24 | 19,996,682 |
| | | 02/02/01 | 375,000 | $14.70 | 5,511,263 |
| | | 02/05/01 | 425,000 | $14.56 | 6,187,830 |
| | | 05/01/01 | 100,000 | $16.30 | 1,630,200 |
| | | 05/02/01 | 100,000 | $17.14 | 1,714,250 |
| | | 05/03/01 | 50,000 | $16.62 | 831,200 |
| | | 05/04/01 | 50,000 | $16.51 | $   825,450 |
| | **Total:** | | **2,548,650** | **N/A** | **$59,852,774** |
| | Brannon | 11/09/99 | 12,000 | $72.06 | $   864,725 |
| | **Total:** | | **12,000** | **N/A** | **$   864,725** |
| | Britto | 11/15/99 | 5,000 | $73.93 | $      369,625 |
| | | 11/16/99 | 8,000 | $76.61 | 612,875 |
| | | 05/01/00 | 10,000 | $58.69 | 586,875 |
| | | 05/16/00 | 4,000 | $58.81 | 235,250 |
| | | 05/01/01 | 20,000 | $16.10 | $   322,000 |
| | **Total:** | | **47,000** | **N/A** | **$ 2,126,625** |
| | Cook | 02/08/99 | 23,000 | $53.75 | $ 1,236,365 |
| | | 11/22/99 | 120,000 | $77.50 | $ 9,300,312 |
| | **Total:** | | **143,000** | **N/A** | **$10,536,677** |

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

| | | | | |
|---|---|---|---|---|
| Covey | 11/09/98 | 90,000 | $20.68 | $ 1,861,650 |
| | 11/23/98 | 36,000 | $34.86 | 1,255,020 |
| | 11/25/98 | 24,000 | $35.04 | 841,000 |
| | 02/11/99 | 23,000 | $53.52 | 1,231,075 |
| | 05/04/99 | 100,000 | $77.04 | 7,704,125 |
| | 05/11/99 | 50,000 | $74.41 | $ 3,720,468 |
| Total: | | 323,000 | N/A | $16,613,338 |
| | | | | |
| Dalzell | 11/03/98 | 60,000 | $21.52 | $ 1,291,200 |
| | 11/25/98 | 90,000 | $35.07 | 3,156,750 |
| | 11/02/99 | 50,000 | $66.00 | 3,300,000 |
| | 11/09/99 | 20,000 | $71.22 | 1,424,376 |
| | 11/10/99 | 80,000 | $71.77 | 5,741,248 |
| | 11/16/99 | 25,000 | $78.75 | 1,968,750 |
| | 02/24/00 | 20,000 | $67.82 | 1,356,300 |
| | 02/25/00 | 30,000 | $65.92 | 1,977,501 |
| | 05/12/00 | 10,000 | $53.75 | 537,500 |
| | 05/15/00 | 15,000 | $55.33 | 830,000 |
| | 05/16/00 | 25,000 | $57.10 | 1,427,500 |
| | 02/08/01 | 25,000 | $15.04 | 375,938 |
| | 05/01/01 | 200,000 | $16.40 | $ 3,280,000 |
| Total: | | 650,000 | N/A | $26,667,062 |
| | | | | |
| Engstrom | 11/24/98 | 1,200 | $37.08 | $    44,500 |
| | 11/24/98 | 19,200 | $37.25 | 715,200 |
| | 02/25/99 | 135,600 | $61.34 | $ 8,318,382 |
| Total: | | 156,000 | N/A | $ 9,078,082 |
| | | | | |
| Risher | 11/10/98 | 78,000 | $22.62 | $ 1,764,750 |
| | 11/17/98 | 51,000 | $24.82 | 1,265,990 |
| | 11/18/98 | 21,000 | $25.31 | 531,563 |
| | 11/24/98 | 60,000 | $35.17 | 2,110,200 |
| | 05/06/99 | 147,400 | $70.31 | 10,364,578 |
| | 05/07/99 | 52,600 | $70.00 | 3,682,000 |
| | 08/10/99 | 48,000 | $41.85 | 2,008,814 |
| | 08/10/99 | 72,000 | $41.85 | 3,013,222 |
| | 11/09/99 | 50,000 | $75.19 | 3,759,655 |
| | 02/23/00 | 50,000 | $70.50 | $ 3,525,000 |
| Total: | | 630,000 | N/A | $32,025,772 |
| | | | | |
| Shriram | 11/02/98 | 150,000 | $21.34 | $ 3,201,325 |
| | 11/23/98 | 30,000 | $38.32 | 1,149,750 |
| | 02/19/99 | 12,000 | $49.15 | 589,875 |
| | 02/22/99 | 10,000 | $52.81 | 528,090 |
| | 05/18/99 | 12,000 | $67.75 | 813,000 |
| | 05/19/99 | 38,000 | $68.56 | 2,605,280 |
| | 05/26/99 | 18,000 | $57.75 | 1,039,500 |
| | 05/27/99 | 8,000 | $58.38 | 467,040 |
| | 05/28/99 | 10,000 | $59 00 | 590,000 |
| | 05/28/99 | 24,000 | $58.78 | $ 1,410,720 |
| Total: | | 312,000 | N/A | $12,394,580 |

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934      - 189 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

| | | | | |
|---|---|---|---|---|
| Spiegel | 11/03/98 | 45,000 | $21.79 | $ 980,625 |
| | 11/23/98 | 45,000 | $33.00 | 1,485,000 |
| | 02/12/99 | 42,000 | $53.33 | 2,240,070 |
| | 02/19/99 | 14,400 | $49.89 | 718,416 |
| | 02/22/99 | 23,600 | $52.10 | $1,229,560 |
| **Total:** | | **170,000** | **N/A** | **$6,653,671** |
| | | | | |
| Stonesifer | 05/14/99 | 3,370 | $65.03 | $ 291,151 |
| | 05/14/99 | 4,200 | $65.03 | 273,126 |
| | 05/14/99 | 4,200 | $65.03 | 273,126 |
| | 11/18/99 | 126,000 | $75.78 | $9,548,444 |
| **Total:** | | **137,770** | **N/A** | **$10,313,847** |
| | | | | |
| Wright | 07/29/99 | 200 | $50.03 | $ 10,006 |
| | 07/29/99 | 400 | $50.22 | 20,088 |
| | 07/29/99 | 600 | $50.09 | 30,056 |
| | 07/29/99 | 1,000 | $50.15 | 50,156 |
| | 07/29/99 | 1,000 | $50.62 | 50,625 |
| | 07/29/99 | 2,000 | $50.31 | 100,625 |
| | 07/29/99 | 5,000 | $50.50 | 252,500 |
| | 07/29/99 | 5,600 | $50.19 | 281,050 |
| | 07/29/99 | 7,400 | $50.25 | 371,850 |
| | 07/29/99 | 19,800 | $50.12 | 992,475 |
| | 07/29/99 | 34,000 | $50.37 | 1,712,750 |
| | 07/29/99 | 73,000 | $50.06 | $3,654,563 |
| **Total:** | | **150,000** | **N/A** | **$7,526,744** |
| **GRAND TOTAL:** | | **6,579,420** | **N/A** | **$250,862,418** |

300.    The Individual Amazon Defendants' selling grouped by time period is shown below

| Defendant | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Alberg | 11/02/98 | 60,000 | $21.63 | $ 1,297,800 |
| | 11/02/98 | 60,000 | $21.68 | $ 1,300,900 |
| | 11/02/98 | 120,000 | $20.82 | $ 2,498,400 |
| Bezos | 11/02/98 | 60,000 | $21.34 | $ 1,280,800 |
| | 11/02/98 | 120,000 | $21.46 | $ 2,576,200 |
| | 11/02/98 | 120,000 | $21.53 | $ 2,584,400 |
| | 11/02/98 | 120,000 | $21.63 | $ 2,595,600 |
| | 11/02/98 | 180,000 | $21.52 | $ 3,874,800 |
| | 11/02/98 | 180,000 | $21.65 | $ 3,897,600 |
| | 11/02/98 | 300,000 | $21.15 | $ 6,346,500 |
| Shriram | 11/02/98 | 150,000 | $21.34 | $ 3,201,325 |
| Dalzell | 11/03/98 | 60,000 | $21.52 | $ 1,291,200 |
| Spiegel | 11/03/98 | 45,000 | $21.79 | $ 980,625 |
| Covey | 11/09/98 | 90,000 | $20.68 | $ 1,861,650 |
| Alberg | 11/10/98 | 60,000 | $22.57 | $ 1,354,300 |
| Risher | 11/10/98 | 78,000 | $22.62 | $ 1,764,750 |
| Alberg | 11/13/98 | 18,000 | $21.67 | $ 390,180 |
| | 11/17/98 | 102,000 | $21.83 | $ 2,227,340 |
| | 11/17/98 | 120,000 | $24.26 | $ 2,912,000 |

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

| | | | | |
|---|---|---|---|---|
| Risher | 11/17/98 | 51,000 | $24.82 | $ 1,265,990 |
| Alberg | 11/18/98 | 120,000 | $27.34 | $ 3,281,400 |
| Risher | 11/18/98 | 21,000 | $25.31 | $   531,563 |
| Covey | 11/23/98 | 36,000 | $34.86 | $ 1,255,020 |
| Shriram | 11/23/98 | 30,000 | $38.32 | $ 1,149,750 |
| Spiegel | 11/23/98 | 45,000 | $33.00 | $ 1,485,000 |
| Engstrom | 11/24/98 | 1,200 | $37.08 | $     44,500 |
| | 11/24/98 | 19,200 | $37 25 | $   715,200 |
| Risher | 11/24/98 | 60,000 | $35 17 | $ 2,110,200 |
| Covey | 11/25/98 | 24,000 | $35.04 | $   841,000 |
| Dalzell | 11/25/98 | 90,000 | $35.07 | $ 3,156,750 |
| **11/98 Total:** | | **2,540,400** | **N/A** | **$60,072,743** |
| | | | | |
| Cook | 02/08/99 | 23,000 | $53 75 | $ 1,236,365 |
| Alberg | 02/11/99 | 20,000 | $53 58 | $ 1,071,700 |
| Covey | 02/11/99 | 23,000 | $53.52 | $ 1,231,075 |
| Spiegel | 02/12/99 | 42,000 | $53.33 | $ 2,240,070 |
| Shriram | 02/19/99 | 12,000 | $49 15 | $   589,875 |
| Spiegel | 02/19/99 | 14,400 | $49.89 | $   718,416 |
| Shriram | 02/22/99 | 10,000 | $52.81 | $   528,090 |
| Spiegel | 02/22/99 | 23,600 | $52.10 | $ 1,229,560 |
| Engstrom | 02/25/99 | 135,600 | $61.34 | $ 8,318,382 |
| **2/99 Total:** | | **303,600** | **N/A** | **$17,163,533** |
| | | | | |
| Alberg | 05/03/99 | 4,000 | $79.97 | $   319,880 |
| | 05/04/99 | 20,000 | $79.97 | $ 1,599,400 |
| Covey | 05/04/99 | 100,000 | $77.04 | $ 7,704,125 |
| Risher | 05/06/99 | 147,400 | $70.31 | $10,364,578 |
| | 05/07/99 | 52,600 | $70.00 | $ 3,682,000 |
| Covey | 05/11/99 | 50,000 | $74.41 | $ 3,720,468 |
| Stonesifer | 05/14/99 | 3,370 | $65.03 | $   219,151 |
| | 05/14/99 | 4,200 | $65.03 | $   273,126 |
| | 05/14/99 | 4,200 | $65.03 | $   273,126 |
| Shriram | 05/18/99 | 12,000 | $67.75 | 813,000 |
| Alberg | 05/19/99 | 4,000 | $67.69 | 270,750 |
| | 05/19/99 | 12,000 | $67.90 | 814,878 |
| Shriram | 05/19/99 | 38,000 | $68.56 | 2,605,280 |
| | 05/26/99 | 18,000 | $57.75 | 1,039,500 |
| | 05/27/99 | 8,000 | $58.38 | 467,040 |
| | 05/28/99 | 10,000 | $59.00 | 590,000 |
| | 05/28/99 | 24,000 | $58.78 | $ 1,410,720 |
| **5/99 Total:** | | **511,770** | **N/A** | **$36,167,022** |
| | | | | |
| Wright | 07/29/99 | 200 | $50.03 | $     10,006 |
| | 07/29/99 | 400 | $50.22 | $     20,088 |
| | 07/29/99 | 600 | $50.09 | $     30,056 |
| | 07/29/99 | 1,000 | $50.15 | $     50,156 |
| | 07/29/99 | 1,000 | $50.62 | $     50,625 |
| | 07/29/99 | 2,000 | $50.31 | $   100,625 |
| | 07/29/99 | 5,000 | $50.50 | $   252,500 |
| | 07/29/99 | 5,600 | $50.19 | $   281,050 |
| | 07/29/99 | 7,400 | $50.25 | $   371,850 |

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 191 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone 619/231-1058 • Fax 619/231-7423

|  |  |  |  |  |
|---|---|---|---|---|
|  | 07/29/99 | 19,800 | $50.12 | $   992,475 |
|  | 07/29/99 | 34,000 | $50.37 | $1,712,750 |
|  | 07/29/99 | 73,000 | $50.06 | $3,654,563 |
| Risher | 08/10/99 | 48,000 | $41.85 | $2,008,814 |
|  | 08/10/99 | 72,000 | $41.85 | $3,013,222 |
| **7/99 & 8/99 Totals:** |  | **270,000** | **N/A** | **$12,548,780** |
|  |  |  |  |  |
| Alberg | 11/01/99 | 150,000 | $68.17 | $10,225,005 |
| Dalzell | 11/02/99 | 50,000 | $66.00 | $3,300,000 |
| Brannon | 11/09/99 | 12,000 | $72.06 | $   864,725 |
| Dalzell | 11/09/99 | 20,000 | $71.22 | $1,424,376 |
| Risher | 11/09/99 | 50,000 | $75.19 | $3,759,655 |
| Dalzell | 11/10/99 | 80,000 | $71.77 | $5,741,248 |
| Alberg | 11/11/99 | 50,000 | $72.11 | $3,605,300 |
| Britto | 11/15/99 | 5,000 | $73.93 | $   369,625 |
| Alberg | 11/16/99 | 100,000 | $78.50 | $7,850,000 |
| Britto | 11/16/99 | 8,000 | $76.61 | $   612,875 |
| Dalzell | 11/16/99 | 25,000 | $78.75 | $1,968,750 |
| Stonesifer | 11/18/99 | 126,000 | $75.78 | $9,548,444 |
| Cook | 11/22/99 | 120,000 | $77.50 | $9,300,312 |
| Alberg | 11/29/99 | 100,000 | $92.65 | $9,265,000 |
|  | 11/30/99 | 50,000 | $88.00 | $4,400,000 |
| **11/99 Total:** |  | **946,000** | **N/A** | **$72,235,315** |
|  |  |  |  |  |
| Risher | 02/23/00 | 50,000 | $70.50 | $3,525,000 |
| Dalzell | 02/24/00 | 20,000 | $67.82 | $1,356,300 |
|  | 02/25/00 | 30,000 | $65.92 | $1,977,501 |
| **2/00 Total:** |  | **100,000** | **N/A** | **$6,858,801** |
|  |  |  |  |  |
| Britto | 05/01/00 | 10,000 | $58.69 | $   586,875 |
| Bezos | 05/12/00 | 368,650 | $54.24 | $19,996,682 |
| Dalzell | 05/12/00 | 10,000 | $53.75 | $   537,500 |
|  | 05/15/00 | 15,000 | $55.33 | $   830,000 |
| Britto | 05/16/00 | 4,000 | $58.81 | $   235,250 |
| Dalzell | 05/16/00 | 25,000 | $57.10 | $ 1,427,500 |
| **5/00 Total:** |  | **432,650** | **N/A** | **$23,613,806** |
|  |  |  |  |  |
| Bezos | 02/02/01 | 375,000 | $14.70 | $ 5,511,263 |
|  | 02/05/01 | 425,000 | $14.56 | $ 6,187,830 |
| Dalzell | 02/08/01 | 25,000 | $15.04 | $   375,938 |
| Alberg | 02/21/01 | 30,000 | $12 25 | $   367,500 |
|  | 02/22/01 | 30,000 | $11.82 | $   354,639 |
|  | 02/23/01 | 15,000 | $11.56 | $   173,438 |
|  | 02/26/01 | 30,000 | $11.94 | $   358,125 |
|  | 02/27/01 | 10,000 | $11.75 | $   117,500 |
|  | 02/28/01 | 15,000 | $10.21 | $   153,087 |
| **2/01 Total:** |  | **955,000** | **N/A** | **$13,599,319** |
|  |  |  |  |  |
| Bezos | 05/01/01 | 100,000 | $16.30 | $ 1,630,200 |
| Britto | 05/01/01 | 20,000 | $16.10 | $   322,000 |
| Dalzell | 05/01/01 | 200,000 | $16.40 | $ 3,280,000 |
| Bezos | 05/02/01 | 100,000 | $17.14 | $ 1,714,250 |

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

| | 05/03/01 | 50,000 | $16.62 | $ 831,200 |
| | 05/04/01 | 50,000 | $16.51 | $ 825,450 |
| 5/01 Total: | | 520,000 | N/A | $ 8,603,100 |
| **GRAND TOTAL:** | | **6,579,420** | **N/A** | **$250,862,418** |

301. These sales were unusual in timing. The sales in 5/99, 5/00 and 2/01 each preceded the publication of very negative analysts' reports or articles about Amazon which these defendants knew were on the way and expected would cause Amazon's stock to fall sharply. The sales in 11/99 occurred as Amazon's stock was soaring to its all-time high of $113 and took place as the Individual Amazon Defendants were learning that Amazon's 4thQ 99 results would not be as strong as forecast. None of these defendants acquired any stock during the Class Period by option exercise or otherwise and continued to own that stock. They sold stock they already owned or acquired because they knew the stock was artificially inflated and would decline sharply in price when the true facts, which they were concealing, became public. Wright and Covey left Amazon because of their knowledge of the illegal conduct and in an effort to distance themselves from the debacle they knew was coming, and sold their Amazon stock to pocket millions because they knew that when the truth came out, Amazon stock would collapse to much lower levels. By selling off the large amounts of Amazon stock when they did, the Individual Amazon Defendants not only personally profited from the artificial inflation in the price of Amazon stock that their false and misleading statements and manipulations had created, but they also avoided losing millions when the stock declined.

302. These stock sales occurred during the time period when Amazon was supposedly enjoying a period of business success, was successfully implementing its "Get Big Fast" strategy, and was poised to achieve strong revenue growth, not only in the next quarter or two, but during the next few years, and reach profitability  As a result, if these exceptionally favorable present conditions and future prospects actually existed, Amazon stock should have been poised for a major advance over the next few years as was being predicted by several prominent investment firms that followed Amazon and whose analysts were relying upon the information provided them by the Individual

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1    Amazon Defendants   Nevertheless, the Individual Amazon Defendants unloaded their shares at the

2    beginning or during the early stages of this supposed exceptionally favorable period.

3          303     Defendants' sales were significant, whether comparing their sales to their actual

4    stockholdings or their holdings including vested options, although the comparison to option holdings

5    is less meaningful than the comparison to actual stockholdings.  While certain of the Individual

6    Amazon Defendants also held options to purchase Amazon stock during the Class Period, which they

7    did not exercise to acquire stock and then sell it, they actually took this action to help further and

8    perpetuate their fraudulent scheme.  First, none of these defendants wanted to acquire any additional

9    Amazon stock during this period and continue to hold it because they knew the stock was artificially

10   inflated and would collapse when the true facts became known.  Thus, none of them exercised any

11   of their vested stock options for the purpose of acquiring and continuing to hold Amazon stock.  In

12   addition, none of these Individual Amazon Defendants was willing to exercise more vested stock

13   options to acquire Amazon stock and immediately sell that stock for several reasons.  First of all, each

14   of the Individual Amazon Defendants realized that their stock sales would become known to the

15   public, either through public reporting of their Form 144s or through the Form 4s they had to file

16   with the SEC to disclose their sales. This public reporting and disclosure acted as a significant market

17   restraint on the amount of stock the Individual Amazon Defendants could actually sell.  Many

18   sophisticated investors and several insider-selling or short-selling newsletter services closely track

19   insider selling by corporate executives and then quickly publicize that information as a sign that

20   something is likely seriously wrong at a corporation that has not yet been disclosed – negative

21   publicity which can result in analyst inquiries and often a decline in the stock price.  Therefore, while

22   the Individual Amazon Defendants wanted to unload significant amounts of the stock they actually

23   owned or could acquire by stock option exercise, they realized that they had to exercise some restraint

24   and *not exercise all their vested stock options and sell the stock acquired thereby because of the*

25   *negative consequences outlined above*.  Thus, the Individual Amazon Defendants sold only as much

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934     - 194 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

1 of their Amazon stock and exercisable and vested stock options as they thought they could without
2 generating trouble and negative publicity.

3     304.   Defendant Bezos did not and could not sell more of his personal stockholdings in
4 Amazon for several reasons. As the high-profile CEO of a high-profile public company, Bezos knew
5 that any sales of his Amazon stock – which he was required to report to the SEC – would be closely
6 monitored by the SEC, sophisticated professionals in the investment community and various insider-
7 selling or short-selling newsletter services that closely track insider selling by corporate executives
8 Bezos knew that any sales he made of his Amazon stock would be quickly publicized, as in fact
9 happened on each of the occasions when he sold his stock during the Class Period.

10     305.   The public reporting and disclosure of Bezos' stock sales acted as a significant market
11 deterrent on the amount of stock he could actually sell during the Class Period. As Bezos knew, sales
12 of his Amazon stock would not only receive widespread publicity, but would be characterized and
13 interpreted as a signal that something was seriously wrong at Amazon that had not yet been disclosed.
14 This negative publicity would cause a crisis of confidence in the Company, and result in analyst
15 inquiries and the likely decline of Amazon's stock price.

16     306.   Bezos also knew that large sales of his Amazon stock could result in an SEC inquiry
17 or investigation of his insider trading, which in turn would fuel yet additional concern in the
18 investment community about the Company and a perception that he and other Company executives
19 were concealing material adverse information about the state of the Company's business and financial
20 condition. Thus, Bezos refrained from selling more of his Amazon stock during the Class Period in
21 an effort to obscure his insider trading from the SEC and prevent any inquiry or investigation.

22     307   For all of these reasons, while Bezos wanted to unload significant amounts of the
23 Amazon stock he owned in view of the undisclosed material adverse information he then knew about
24 the Company's business and financial condition, he realized that he had to limit the amount of his
25 sales because of the negative consequences that would result therefrom. Thus, Bezos sold only as

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone. 619/231-1058 • Fax. 619/231-7423

1  much of his Amazon stock as he thought he could without generating the negative publicity and

2  consequences outlined above.

3      308.   Galli and Jenson did not sell any stock during the Class Period. This was because they

4  owned no stock outright which they could sell and the stock options they held were virtually all

5  ***unvested*** and by the time any options vested, the few that were vested (Galli, 100,000 shares and

6  Jenson, 100,000 shares) were at exercise prices (Galli $53.9375 and Jenson $63.25) in excess of

7  Amazon's market prices. Although Jenson's options were repriced to $13.38 per share in 2/01, the

8  newly repriced options did not begin to vest until 8/01, and Jenson therefore did not have the

9  opportunity to exercise the options and sell the stock he would acquire thereby until after the Class

10  Period ended.

11      309.   The Individual Amazon Defendants also had an additional economic motive for

12  behaving in this way, *i.e.*, not exercising all of their vested stock options and selling off the stock.

13  First, their vested options would remain exercisable for several years and thus even a sharp decline

14  in Amazon stock in the near term would not eliminate the value of these options  These Individual

15  Amazon Defendants had the option of holding onto these options in hopes that the stock would later

16  recover and they could then exercise these options and sell the stock. Moreover, in some cases the

17  options were priced at a level such that the profit in exercising and selling was very small, so that the

18  upside of holding the options and selling years later was more attractive. Also, these defendants

19  knew that after Amazon's stock price declined sharply, they likely could get Amazon's Board of

20  Directors to re-price the options downward with much lower exercise prices and longer exercise

21  lives, thus immediately restoring the value in those unexercised vested stock options. Executives do

22  not face the same risk of loss in stock options as they do with common stock – because they did not

23  pay for the options, and because a company can always lower the exercise price of the options if the

24  price of the stock falls:

25          Directors simply lower the options' exercise prices to the stock's current price level.
        Presto! The options can soon be back in the money again. It doesn't matter if the

26          stock ever returns to the levels where the options were originally issued.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone 619/231-1058 • Fax: 619/231-7423

1  E.S. Browning & Laura Jereski, *In the Money: Firms With Sagging Stocks Set New 'Repricings' of*

2  *Executive Options*, Wall St. J., 6/11/97, at C1; *see* Adam Levy, *The New Math of CEO Pay*,

3  Bloomberg, 7/99, at 24:

4       CEOs, already richly compensated, now get stock options that reward them
   even when they don't deliver for their shareholders. The practice is called repricing

5

                  \*   \*   \*

6

7       Options – grants that let executives buy stock at a certain price during a set
   period of time – were supposed to tie CEO pay to company performance. If the stock
   went up, the options were worth a bundle. Now, companies are repricing options to

8       give executives a shot at cashing in even though their stocks have sunk. In short,
   options have become an entitlement rather than an incentive.

9

10      310.    In calculating the percentage of stock sold by each Individual Amazon Defendant

11  during the Class Period herein, unexercised options are ***not*** included in one of the alternative

12  calculations.  This calculation includes ***only*** stock actually owned by the Individual Amazon

13  Defendants because unexercised options at Amazon did not represent the same investment risk as

14  stock.  For example, the unexercised options could, at the discretion of the Amazon Board, be

15  repriced at the lower exercise price.  In fact, in 1/01, Amazon announced that its executives would

16  be given the right to exchange outstanding stock options with exercise prices greater than $23 per

17  share for new options with a lower exercise price, and that the new options would begin to vest in

18  stages beginning on 8/14/01.  Under the formula for the repricing of the options, the new exercise

19  price of the options would be set at the lowest closing price of the stock between 1/1/01 and 2/14/01

20  (the official grant date), or at 85% of the 2/14/01 price if that price was higher.  As a result of the

21  repricing of their options pursuant to this formula, Amazon executives, such as defendant Jenson –

22  whose options previously had a weighted average exercise price of $56.43 per share – were enabled

23  to exchange their options for new ones with an exercise price of only $13.38 per share.

24      311.    Thus, when the market price of Amazon stock went down, the unexercised options

25  held by the Individual Amazon Defendants were repriced to ***lower*** fair market value.  Options once

26  exercised and held as shares cannot be "repriced." Thus, the real risk to each Individual Amazon

Defendant was in options actually exercised and held as stock.

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax· 619/231-7423

312.   Ownership of stock options is considerably different from ownership in stock.   A stock option is a right to purchase a security for a pre-determined price (the exercise price) on or before a specified expiration date.   It is common for publicly traded companies to compensate their management, in part, by granting them stock options which vest over time   No money changes hands at the time these options are granted   Since stock options are a "free ride," there is no fundamental economic incentive to exercise options before they expire unless a holder expects to see poor stock performance.

313.   Also, stock options have no capital at risk.   The exercise price is not paid until the option is exercised. Thus, an option has substantial upside potential without the downside risk. Further, stock options issued by a company are not freely tradeable. Because of this, they have to be held to maturity to realize their full economic value. Because of these significant differences, one cannot and should not lump an insider's stock ownership together with an insider's options to determine whether the insider sold a suspicious amount of his stock in the company.   In fact, none of the insider-trading services that collect and disseminate information about securities by corporate insiders include vested stock options in their calculation of the insider's "total holdings" of stock

314.   Exercisable stock options do not carry the same economic risk as actual stock ownership.   If a stock's price declines, the owner of the stock suffers a real economic loss of the money paid for the stock. The holder of a vested stock option does not lose any invested money; at worst, the option holder suffers a reduced expectancy of profit in the future.   Thus, vested options are not the equivalent of common stock owned because stock actually owned is owned – no further action or expenditure is required.   The owner's invested cash is actually at risk to any market price decline   The holder of a vested stock option has no invested cash and no money at risk until that person actually purchases the stock, i.e., pays the exercise price. To actually own the stock, the option holder must put capital at risk.   Thus, the failure of the Individual Amazon Defendants in this case to exercise any more of their vested options, i e., their failure to purchase more Amazon stock, is consistent with plaintiffs' theory of their case – these defendants were getting out of their Amazon

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax: 619/231-7423

1    stock, not buying more   Exercising more options would be investing in Amazon, while these

2    defendants were divesting themselves of their Amazon stock.

3                              **STATUTORY SAFE HARBOR**

4           315.    The statutory safe harbor provided for forward-looking statements ("FLS") does not

5    apply to the false FLS pleaded.  The safe harbor does not apply to Amazon's financial statements or

6    results.  The safe harbor does not apply to FLS made by the underwriters or the securities analysts.

7    The statements made by defendants during 10/99-2/00, in ¶¶150, 152, 155-156, 159, 161, 164-165,

8    167, 171-173, 178, 182 and 190-192, were all made in connection with, in contemplation of and as

9    part of defendants' plan to enable Amazon to make its offering of the 6.875% convertible notes in

10   2/00 and thus none of those forward-looking statements made during that time period is entitled to

11   any protection under the statutory Safe Harbor.  Amazon's cautionary statements issued were not

12   meaningful because the Individual Amazon Defendants each actually knew of the adverse condition

13   of Amazon's business and the problem that insufficient cash flow was causing.  The defendants are

14   liable for the false FLS pleaded because, at the time each FLS was made, the speaker actually knew

15   the FLS was false and the FLS was authorized and/or approved by an executive officer of Amazon

16   who knew that the FLS was false.

17

18

19

20

21

22

23

24

25

26

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 199 -

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax. 619/231-7423

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

**FIRST CLAIM FOR RELIEF**

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

316.    Plaintiffs incorporate ¶¶1-315 by reference.

317.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

318.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading, or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Amazon's publicly traded securities during the Class Period.

319.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Amazon publicly traded securities, including debt instruments.  Plaintiffs and the Class would not have purchased Amazon's publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

320    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Amazon publicly traded securities during the Class Period.

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934          - 200 -

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the 1934 Act Against
### Amazon, Bezos, Doerr and Kleiner Perkins

321. Plaintiffs incorporate ¶¶1-320 by reference.

322. Bezos, Doerr and Kleiner Perkins acted as controlling persons of Amazon within the meaning of §20(a) of the 1934 Act. Kleiner Perkins controlled Amazon, as it was a controlling shareholder in the Company and controlled Doerr, as Doerr was a partner in Kleiner Perkins. By reason of Bezos' position as Chief Executive Officer and Chairman of Amazon and his stock ownership in Amazon, by reason of Doerr's positions as a director of Amazon and a partner in Kleiner Perkins, and by reason of Kleiner Perkins' interest in and control over Amazon, these defendants had the power and authority to cause Amazon to engage in the wrongful conduct complained of herein. Amazon controlled each of the Individual Amazon Defendants and all of its employees. By reason of such conduct, Bezos, Doerr, Kleiner Perkins and Amazon are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

323. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Amazon's publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, directors and officers of Amazon and their families and affiliates.

324. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Amazon had more than 357 million shares of stock outstanding, as well as other publicly traded securities, owned by thousands of persons.

325. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone: 619/231-1058 • Fax  619/231-7423

1          (b)    Whether defendants omitted and/or misrepresented material facts;

2          (c)    Whether defendants' statements omitted material facts necessary to make the

3    statements made, in light of the circumstances under which they were made, not misleading; and

4          (d)    Whether defendants knew or deliberately disregarded that their statements

5    were false and misleading.

6    **PRAYER**

7        WHEREFORE, plaintiffs pray for judgment as follows. declaring this action to be a proper

8    class action; awarding damages, including interest; and such equitable/injunctive or other relief as

9    the Court may deem proper.

10   **JURY DEMAND**

11       Plaintiffs demand a trial by jury.

12   DATED: October 5, 2001           HAGENS BERMAN LLP

13                           STEVE W. BERMAN, WSBA #12356
                        KARL P. BARTH, WSBA #22780

14                           1301 Fifth Avenue, Suite 2900
                        Seattle, WA 98101

15                           Telephone: 206/623-7292
                        206/623-0594 (fax)

16                           Liaison Counsel

17                           MILBERG WEISS BERSHAD

18                            HYNES & LERACH LLP
                        WILLIAM S LERACH, admitted *pro hac vice*

19                           LORI G. FELDMAN, WSBA #29096

20

21                           WILLIAM S. LERACH

22

23

24                           LORI G. FELDMAN

25                           1001 Fourth Avenue, Suite 2550
                        Seattle, WA 98154

26                           Telephone: 206/839-0730

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058 • Fax. 619/231-7423

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
JAN M. ADLER
ALEXANDRA S. BERNAY
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

CAULEY, GELLER, BOWMAN
  & COATES, LLP
PAUL J. GELLER
One Boca Place, Suite 421A
2255 Glades Road
Boca Raton, FL 33431
Telephone: 561/750-3000

WEISS & YOURMAN
JOSEPH H. WEISS
551 Fifth Avenue, Suite 1600
New York, NY 10176
Telephone: 212/682-3025

WECHSLER HARWOOD HALEBIAN
  & FEFFER LLP
ROBERT I. HARWOOD
FREDERICK W. GERKENS III
THOMAS J. HARRISON
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: 212/935-7400

Executive Committee Members

N:\CASES\Amazon2\Amazon2Cons.cpt

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934        - 203 -

1

## DECLARATION OF SERVICE BY MAIL

2

3      I, the undersigned, declare:

4      1       That declarant is and was, at all times herein mentioned, a citizen of the United States

5  and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in

6  the within action; that declarant's business address is 600 West Broadway, Suite 1800, San Diego,

7  California 92101

8      2.      That on October 5, 2001, declarant served the CONSOLIDATED COMPLAINT FOR

9  VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 by depositing a true copy thereof

10  in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully

11  prepaid and addressed to the parties listed on the attached Service List.

12      3       That there is a regular communication by mail between the place of mailing and the

13  places so addressed.

14      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day

15  of October, 2001, at San Diego, California.

16

17                                          CORINNE N. SWEAT

18

19

20

21

22

23

24

25

26

Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone  619/231-1058 • Fax  619/231-7423

AMAZON.COM II (LEAD/EXECUTIVE LIST)
Service List - 09/28/01
Page    1

COUNSEL FOR PLAINTIFF(S)

Paul J. Geller
CAULEY, GELLER, BOWMAN &
  COATES, LLP
2255 Glades Road, Suite 421A
Boca Raton, FL  33431
  561/750-3000
  561/750-3364 (fax)

William S. Lerach
Jan M. Adler
Alexandra S. Bernay
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
600 West Broadway, Suite 1800
San Diego, CA  92101-5050
  619/231-1058
  619/231-7423 (fax)

Joseph H. Weiss
WEISS & YOURMAN
551 Fifth Avenue, Suite 1600
New York, NY  10176
  212/682-3025
  212/682-3010 (fax)

Lori G. Feldman
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
1001 Fourth Avenue, Suite 2550
Seattle, WA  98154
  206/839-0730
  206/839-0728 (fax)

Robert I. Harwood
Frederick W. Gerkens III
Thomas J. Harrison III
WECHSLER HARWOOD HALEBIAN &
  FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY  10022
  212/935-7400
  212/753-3630 (fax)

Steve W. Berman
Karl P. Barth
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
  206/623-7292
  206/623-0594 (fax)

COUNSEL FOR DEFENDANTS

Barry M. Kaplan (Personal Service)*
Douglas W. Greene
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
  206/583-8888
  206/583-8500 (fax)

Jonathan C. Dickey (Via FedEx)**
Shelley K. Mack
GIBSON, DUNN & CRUTCHER LLP
1530 Page Mill Road
Palo Alto, CA  94304
  650/849-5300
  650/849-5333 (fax)

Meryl L. Young (Via FedEx)**
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza, Suites 1400-1800
Irvine, CA  92614-8557
  949/451-3800
  949/451-4220 (fax)

* Denotes service via hand-delivery.
** Denotes service via Fed Ex.